### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

ROBERT STACY YARBROUGH, #264973

                Petitioner,

v.                         CIVIL ACTION NO. 2:05cv368

GENE M. JOHNSON, Director of the
Virginia Department of Corrections,

                Respondent.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

    This matter was initiated by petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The matter was referred to the undersigned United States Magistrate Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Rule 72 of the Local Civil Rules of the United States District Court for the Eastern District of Virginia.

## I.  STATEMENT OF THE CASE

### A.  Background

    Petitioner, Robert Stacy Yarbrough ("Yarbrough"), was charged with the capital murder and robbery of Cyril Hugh Hamby ("Hamby") on May 8, 1997.  On June 26, 1998, Yarbrough was convicted by a jury in the Circuit Court for the County of Mecklenburg ("Circuit Court"), Virginia, on both charges, and sentenced to death for the capital murder charge, based on a jury finding of vileness, and to life in prison for the robbery charge.  This was confirmed by the

Circuit Court in its January 19, 1999 sentencing order.  Yarbrough was represented at trial and throughout his appeals by Buddy A. Ward, Esq.

On January 29, 1999, Yarbrough noted his appeal.  On April 1, 1999, Yarbrough filed his appellate brief with the Supreme Court of Virginia ("first direct appeal").[1]  On September 17, 1999, the Supreme Court of Virginia affirmed both convictions and the life sentence for robbery, but vacated the capital-murder death sentence, based on the trial court's refusal to instruct the jury that Yarbrough could be sentenced to life without parole, and remanded the case for resentencing.  Yarbrough v. Commonwealth, 258 Va. 347, 374-75 (1999) ("Yarbrough I").

---

[1]This brief alleged the following errors:
I.   The trial court erred in granting the Commonwealth Attorney's motion to appoint an Assistant Commonwealth Attorney from another jurisdiction to assist in the prosecution of the case.
II.   The trial court erred in denying Appellant's requested instruction that "a sentence to life in prison means life without parole."
III.   The trial court erred by instructing the jury that "they were not to concern themselves with what would happen afterward when the jury asked if Appellant would be allowed parole or released after serving a certain number of years on a life sentence."
IV.   The trial court erred in denying Appellant's motion to strike the capital-murder aspect of the murder indictment.
V.   The evidence was insufficient as a matter of law to support a finding of guilty of capital murder.
VI.   The trial court erred in denying Appellant's motion to declare the Virginia death penalty unconstitutional.
VII.   The trial court erred in refusing to vacate the jury recommendation in that the sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factors, and was disproportionate to the penalty imposed in other cases.

2

From May 30, 2000 to June 1, 2000, the Circuit Court held a second sentencing hearing before a new jury. On June 1, 2000, this jury also sentenced Yarbrough to death, based on the aggravating condition of vileness. The trial court entered the sentencing order on December 8, 2000.[2]

On January 4, 2001, Yarbrough noted his appeal. On March 12, 2001, Yarbrough filed his appellate brief with the Supreme Court of Virginia ("second direct appeal").[3] On September 14, 2001, that court affirmed the sentence based on the jury's finding of "vileness" of the offense. Yarbrough v. Commonwealth, 262 Va. 388, 398-99 (2001) ("Yarbrough II"). Yarbrough petitioned for a rehearing, which the Supreme Court of Virginia denied on November 2, 2001.

---

[2]On November 30, 2000, Yarbrough filed a Motion for Mistrial asserting that the court's curative instruction could not overcome the prejudice of the prosecutor's comment that the jury should consider the possibility that the parole-eligibility rule for life sentences could change at any time, making it possible at some future time for Yarbrough to be paroled. The delay in filing this motion was later raised as grounds for Yarbrough's direct appeal. The court denied this motion in the December 8, 2000, sentencing order.

[3]This brief alleged the following errors:
I.   The trial court erred in allowing the Commonwealth's peremptory strike of venireman, Melvin Woodson, over Appellant's Batson motion.
II.   The trial court erred by denying Appellant's motion for mistrial based on improper remarks by the prosecutor during closing argument.
III.   The trial court erred in refusing to vacate the jury recommendation in that the sentence was imposed under the influence of passion, prejudice or other arbitrary factors, and was disproportionate to the penalty imposed in similar cases.

Yarbrough then petitioned the United States Supreme Court for certiorari.  On May 13, 2002, the United States Supreme Court denied that petition.  <u>Yarbrough v. Virginia</u>, 535 U.S. 1060 (2002).

On July 12, 2002, Yarbrough filed a petition for a writ of habeas corpus in the Supreme Court of Virginia ("first state habeas").[4]  Throughout the state habeas process, Yarbrough was

---

[4]This petition ("Yarbrough's Initial State Petition") contained the following claims:
I.  Yarbrough was convicted by a jury that was misled about the appropriate burden of proof, because the trial court's instructions and prosecutor's explanation of "reasonable doubt" were defective.
II.  Yarbrough's trial counsel rendered ineffective assistance by failing to:  object to the Court's instruction and to the prosecutor's explanation of "reasonable doubt"; investigate and present evidence of Yarbrough's innocence; challenge the forensic evidence; challenge the testimony of Dominic Rainey ("Rainey") ; investigate and present relevant mitigating evidence; and preserve and/or raise meritorious arguments on direct appeal.
III.  The death penalty in Virginia is unconstitutional.
On July 9, 2002, in anticipation of his initial state habeas petition that was filed on July 12, 2002, Yarbrough filed a motion for leave to amend that petition.  On July 16, 2002, the court granted that motion.
On July 26, 2002, Yarbrough filed an amended petition ("Yarbrough's Amended State Petition") with a motion to exceed the state's 50-page limitation.  This petition restated the claims of the initial petition, plus added the following claim:  Yarbrough was sentenced to death by a jury that was selected in a racially discriminatory fashion.  On July 29, 2002, Respondent filed Warden's Opposition to Motion for Leave to Exceed Page Limits.  On August 23, 2002, the court denied Yarbrough's motion to exceed the page limitation, and Yarbrough was directed to file a petition of no more than fifty (50) pages within thirty (30) days.
On September 23, 2002, Yarbrough filed his conforming 50-page petition ("Yarbrough's 50-Page State Petition").  This petition presented essentially the same claims as the amended petition, but reorganized the presentation of the various ineffective assistance of counsel claims.  The claims presented in this petition were:
I.  Yarbrough was sentenced to death by a jury that was selected in a racially discriminatory fashion.

represented by P. Scott De Bruin, Esq., and Jennifer L. Givens, Esq. On October 15, 2002, Yarbrough filed a Motion for Discovery, including "all documents and things" in the custody of the "Custodian of Records, Virginia Division of Forensic Science."[5] On

---

II.   Yarbrough was convicted by a jury that was misled about the burden of proof, because (A) the trial court's instructions and (B) the prosecutor's explanation of "reasonable doubt" were defective.

III.   Yarbrough's trial counsel rendered ineffective assistance (A) by failing to protect Yarbrough under <u>Batson v. Kentucky</u> at trial and on appeal; (B) by failing to object to the Court's instruction and to the prosecutor's explanation of "reasonable doubt"; (C) by failing to challenge the Commonwealth's evidence during the guilt phase of Yarbrough's trial (including (1) forensic evidence, (2) credibility of Commonwealth witnesses, and (3) other challengeable evidence); (D) by failing to investigate and present relevant mitigating evidence; and (E) by failing to preserve and/or raise meritorious arguments at trial and on direct appeal.

IV.   The death penalty in Virginia is unconstitutional.

On April 23, 2003, Yarbrough filed Petitioner's Motion for Leave to Amend his Petition for Writ of Habeas Corpus and Accompanying Amendment. In this motion, Yarbrough sought to add a claim that his trial counsel was ineffective for failing to object to improper verdict forms. This claim asserted that the verdict form failed to provide the jury the option of sentencing Yarbrough to life imprisonment even if they found the aggravating factor proved beyond a reasonable doubt. On May 1, 2003, Respondent filed his Response in Opposition to Motion for Leave to Amend Petition for a Writ of Habeas Corpus, arguing that Yarbrough's motion was not timely and could not succeed on the merits. On May 8, 2003, Yarbrough filed Petitioner's Reply in Support of his Motion for Leave to Amend his Petition for Writ of Habeas Corpus. The court denied this Motion for Leave to Amend in its May 29, 2003 opinion. <u>See infra</u>, note 6.

[5]On October 28, 2002, Respondent filed a Response in Opposition to Motion for Discovery, arguing that the request was a "fishing expedition" not related to any of Yarbrough's claims and that discovery should be limited to the discovery motion litigated previously at trial. On November 1, 2002, Yarbrough filed a Motion to Strike Warden's Response in Opposition to Yarbrough's Motion for Discovery, because Respondent's Motion was not timely filed. On

5

October 23, 2002, Respondent filed a Motion to Dismiss. On November 12, 2002, Yarbrough filed Petitioner's Opposition to Respondent's Motion to Dismiss. On December 11, 2002, the Supreme Court of Virginia summarily denied Yarbrough's motion for discovery. On May 29, 2003, the Supreme Court of Virginia dismissed the habeas petition. <u>Yarbrough v. Warden</u>, No. 021660 (Va. May 29, 2003) ("<u>Yarbrough III</u>").[6]

On June 4, 2003, Yarbrough filed Petitioner's Notice of Intention to Apply for Rehearing. On June 30, 2003, Yarbrough filed his Petition for Rehearing, arguing that his case should be

---

November 6, 2002, Respondent filed a Motion for Extension of Time regarding the previously filed motion opposing discovery. The Court did not explicitly rule on the Motion for Extension of Time, but did deny Yarbrough's original Motion for Discovery in its May 29, 2003 opinion. See infra, note 6.

[6]The court's opinion addressed the claims in Yarbough's 50-page petition. The court also denied Yarbrough's motion to amend his petition, and consequently, did not consider the additional claim (that counsel was ineffective for failure to object to the verdict form), included in that motion. Additionally, the court denied Yarbrough's motion for discovery and for an evidentiary hearing.
Claims I, II(A), and II(B) were procedurally defaulted because they were not raised at trial or on direct appeal. The court held that claims III(A)(1), III(A)(2), III(A)(3), III(B), III(C)(1), III(C)(2), III(C)(3), and III(D) did not satisfy either the "performance" or "prejudice" prongs of <u>Strickland</u>. The court held that the portions of claim III(E) alleging that counsel was ineffective for failing to brief the denial of a motion in limine on appeal and for failing to timely file a motion for mistrial did not satisfy the "prejudice" prong of <u>Strickland</u>; the court did not address the "performance" prong for this claim. The court held that the portions of claim III(E) alleging that counsel was ineffective for failing to raise claims I, II, and IV on direct appeal did not satisfy either the "performance" or "prejudice" prongs of <u>Strickland</u>. Claim IV was denied on the merits.

reviewed in light of a United States Supreme Court case decided on June 26, 2003.[7]  On January 7, 2004, the Supreme Court of Virginia granted Yarbrough's request for rehearing and directed the Circuit Court to conduct an evidentiary hearing.  Yarbrough v. Warden, No. 021660 (Va. Jan. 7, 2004).[8]

On March 16, 2004, the Circuit Court completed the evidentiary hearing,[9] and on May 6, 2004, it submitted its findings to the Supreme Court of Virginia that counsel's performance was deficient, but did not result in prejudice.  Yarbrough v. Warden, No. 021660 (Va. Cir Ct. May 6, 2004) ("Yarbrough IV").  On March 3, 2005, the Supreme Court of Virginia issued its opinion,[10] affirming the

---

[7]Wiggins v. Smith, 539 U.S. 510 (2003) (reversing and remanding a habeas corpus decision based on the claim that counsel was ineffective for failing to present mitigating evidence during capital sentencing).

[8]On September 12, 2003, the Supreme Court of Virginia had denied Yarbrough's request for a rehearing.  It appears there was no intervening request for reconsideration between the Supreme Court of Virginia's denial of Yarbrough's rehearing request on September 12, 2003, and the subsequent grant of an evidentiary hearing on January 7, 2004.  Both rulings referenced Yarbrough's May 29, 2003, rehearing petition.

[9]On January 23, 2004, Yarbrough filed with the Circuit Court a Motion to Recuse, requesting that the judge, who had presided over his previous trials, recuse himself from the evidentiary hearing because of a comment he made to the state habeas counsel that he did not believe that trial counsel could have done anything else that would have changed the outcome of the case.  Following the filing of Respondent's brief on January 30, 2004, and oral argument on the motion, the Circuit Court denied the motion on February 5, 2004.

[10]Both Yarbrough and Respondent filed Proposed Findings of Fact and Conclusions of Law with the Circuit Court on June 9, 2004.

Circuit Court's finding that there was no prejudice, declining to rule on the deficient performance issue, and dismissing Yarbrough's petition for rehearing. <u>Yarbrough v. Warden</u>, 269 Va. 184, 198 n.2, 201-02 (2005) ("<u>Yarbrough V</u>").

On March 8, 2005, Yarbrough filed Petitioner's Notice of Intention to Apply for Rehearing with the Supreme Court of Virginia. On April 4, 2005, Yarbrough filed his Petition for Rehearing, which was denied on April 29, 2005. On May 13, 2005, the Circuit Court scheduled Yarbrough's execution for June 24, 2005.

On June 16, 2005, Yarbrough filed a Notice of Intent to File Petition for a Writ of Habeas Corpus by a Person on [sic] State Custody Under a Death Sentence; Motion for Appointment of Counsel; and Motion for Immediate Stay of Execution Pending Final Disposition of Habeas Petition by the Federal Court, accompanied by

---

Yarbrough's brief alleged errors of fact and law underlying the Circuit Court's <u>Strickland</u> analysis, plus errors in the standard of review used and the court's failure to recuse itself. Respondent's brief alleged errors of fact and law underlying the <u>Strickland</u> performance prong analysis. On June 21, 2004, Respondent filed Warden's Response to Petitioner's Objections to Circuit Court's Findings of Fact and Recommended Conclusions of Law.

On November 5, 2004, the Supreme Court of Virginia scheduled the case for oral argument in January, 2005. Because Yarbrough had not filed a response to Respondent's Proposed Findings of Facts and Conclusions of Law, the Circuit Court order also directed Yarbrough to file 10 copies of his response to this document with the Circuit Court by November 19, 2004. On November 19, 2004, Yarbrough filed Yarbrough's Response to the Warden's Objections to Findings of Fact and Recommended Conclusions of Law.

a Motion for Leave to Proceed in Forma Pauperis.[11]  On September 15, 2005, while in the custody of the Virginia Department of Corrections at the Sussex I State Prison, Yarbrough filed a federal petition ("Yarbrough's Federal Petition")[12] for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On June 20, 2005, the undersigned magistrate judge entered an Order directing Respondent to file a response within forty-five (45) days of receipt of the federal habeas petition, and advising Yarbrough of his right to file a reply to that answer within twenty-one (21) days of its receipt.  On October 25, 2005, Respondent filed his Rule 5 Answer and Motion to Dismiss accompanied by a supporting memorandum ("Respondent's Memorandum").

On November 10, 2005, Yarbrough filed a Motion for Extension of Time to File Reply [to Respondent's Motion to Dismiss],

---

[11]Also on June 16, 2005, Respondent filed Warden's Response to Motion for Stay of Execution and to Motion for Appointment of Counsel, requesting that this Court impose a 50-page limit for Yarbrough's petition and require it be filed within thirty (30) days of entry of the stay of execution.  On June 17, 2005, Yarbrough filed a Reply to Warden's Response to Motion for Stay of Execution and to Motion for Appointment of Counsel, requesting until October 14, 2005, to file his habeas petition and requesting the Court deny Respondent's page-limit motion.  Also, on June 17, 2005, this Court entered an Order granting the motions for appointment of counsel, stay of execution, and leave to proceed in forma pauperis; denying Respondent's motion for a page limitation; and requiring Yarbrough to file his petition within ninety (90) days of the order.  Yarbrough's counsel for the instant petition are F. Nash Bilisoly, Esq., Trey R. Kelleter, Esq., and Jennifer L. Givens, Esq.

[12]Yarbrough included in this petition a request for an evidentiary hearing, which this Court has denied, infra.

accompanied by a supporting brief.[13]  On November 17, 2005, the undersigned magistrate judge entered an Order granting the Motion for Extension of Time, extending the deadline to December 6, 2005. On December 6, 2005, Yarbrough filed his Memorandum in Opposition to Rule 5 Answer and Motion to Dismiss ("Yarbrough's Opposition Memorandum").[14]

## B. Grounds Alleged

Yarbrough now asserts in this Court that he is entitled to relief under 28 U.S.C. § 2254 for the reasons substantially as follows:

I.   Trial counsel was ineffective for failing to investigate and present relevant mitigating evidence at Yarbrough's sentencing hearing. (State Habeas Claim III(D).)

II.  Yarbrough's jury was selected in violation of Batson v. Kentucky:

A. Yarbrough was denied his rights under Batson v. Kentucky when Melvin Woodson ("Woodson") was excluded from the resentencing jury because of his race. (Second Direct Appeal Claim I.)

B(1) Yarbrough was denied his rights under Batson v. Kentucky when the prosecutor struck Virginia Bugg ("Bugg") from the resentencing jury as a pretext for racial discrimination. (State Habeas Claim I.)

---

[13]On November 15, 2005, Respondent filed a Response to Petitioner's Motion for Extension of Time.

[14]This was accompanied by a Motion for Funds for Forensic Testing and Expert Assistance and a supporting memorandum.  On December 15, 2005, Respondent filed Respondent's Objection to Yarbrough's Motion for Funds for Forensic Testing and Expert Assistance.  This motion has been denied, infra.

B(2) Trial counsel was ineffective for failing to protect Yarbrough's rights under <u>Batson v. Kentucky</u> at the resentencing hearing and on direct appeal. (State Habeas Claim III(A).)

III. Yarbrough was sentenced by a jury that was misled on the burden of proof, and his trial counsel was ineffective for failing to object to the trial court's instruction and the prosecutor's improper explanation of "reasonable doubt." (State Habeas Claims II and III(B).)

IV. Trial counsel was ineffective for failing to obtain a forensic expert to help challenge the forensic evidence presented at trial. (State Habeas Claim III(C)(1).)

V. Trial counsel was ineffective for failing to impeach Rainey.[15] (State Habeas Claim III(C)(2).)

VI. The death penalty in Virginia is unconstitutional. (State Habeas Claim IV.)

Yarbrough's 50-Page State Petition, filed in the Supreme Court of Virginia on September 23, 2002, asserted essentially the same claims for relief as alleged in the instant petition.  That court ultimately determined that the ineffective assistance of counsel claims failed to meet the <u>Strickland</u> standard; the Virginia death penalty was found to be constitutional; and the remaining claims were procedurally barred from review.  <u>Yarbrough III</u>; <u>Yarbrough V</u>.

## II. <u>PETITIONER'S MOTION FOR AN EVIDENTIARY HEARING AND MOTION FOR FUNDS FOR FORENSIC TESTING AND EXPERT ASSISTANCE</u>

As a preliminary matter, the Court considers Yarbrough's

---

[15]In his court filings, Yarbrough has referred to Rainey as his "co-defendant."  The Court notes, however, that Rainey and Yarbrough were tried and convicted separately.

request for an evidentiary hearing.  The Court has determined that an evidentiary hearing is not required, as purely legal issues are presented and the record before the Court adequately resolves the legal issues raised.  See Rule 8 of the Rules Governing Section 2254 Cases.  Accordingly, the Court DENIES Yarbrough's motion for an evidentiary hearing.

The Court next considers Yarbrough's motion for funds for forensic testing and expert assistance.  This court may order the defense counsel to procure the expert and "shall order the payment of fees and expenses" for that expert, up to $7,500 (without circuit court approval) only if the court finds appointment of a defense expert is "reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f) and (g)(2).[16]  Yarbrough has requested this full amount in his motion.  See Motion for Funds for Forensic Testing and Expert Assistance, at 3.

This Court has determined that "expert assistance is not reasonably necessary" if the claim could not "be reviewed on the merits, or if [the prisoner] would not be able to win on the merits regardless of the expert's finding . . . ." Weeks v. Angelone, 4 F. Supp. 2d 497, 519 (E.D. Va. 1998).  The Fourth Circuit has also determined an expert is not necessary if the court determines an

---

[16]The Court notes that this statute is cited in the prisoner's motion as 28 U.S.C. §§ 848 (q)(9) and (10), and in Respondent's brief as 21 U.S.C. § 848(q).  In March 9, 2006, this wording was deleted from 21 U.S.C. § 848(q)(9) and (10)(B), but it was reenacted verbatim as 18 U.S.C. § 3599(f) and (g)(2).

evidentiary hearing is not needed, <u>Lawson v. Dixon</u>, 3 F.3d 743, 753 (4th Cir. 1993).  The Court finds in this case that appointment of a defense expert is not "reasonably necessary" because the case can be adjudicated on the merits from the record alone.  Accordingly, the Court DENIES Yarbrough's motion for funds for forensic testing and expert assistance.

### III.  <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

The Court is mindful of the extensive procedural history in this matter.  The case was tried before a jury in the first instance, and, Yarbrough was convicted of both robbery, for which he received a sentence of life imprisonment, and capital murder, for which he was sentenced to death based on the jury's finding of vileness.  On direct appeal, both convictions and the life sentence were affirmed, but, due to trial court error, Yarbrough was granted a resentencing hearing on the capital murder sentence.  At the resentencing hearing, held before a newly-empaneled jury, Yarbrough was again sentenced to death based on the aggravating condition of vileness.  On a second direct appeal, the jury's vileness finding was affirmed, after which Yarbrough's petition for rehearing was denied by the state court as was his petition for certiorari to the United States Supreme Court.  Yarbrough then began the state habeas process, in which the Supreme Court of Virginia denied his motion for discovery and dismissed his state habeas petition.  This led to the instant petition in which Yarbrough asks this Court, in

addition to granting his petition for writ of habeas corpus, to grant him an evidentiary hearing and to authorize funding for forensic testing and expert assistance.

## A. Exhaustion and Procedural Default

In order for this Court to address the merits of this habeas petition, all of Yarbrough's claims must be exhausted. See 28 U.S.C. § 2264(a); 28 U.S.C. § 2254(b). The exhaustion requirement is satisfied when "allegations advanced in federal court . . . [are] the same as those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), aff'd 996 F.2d 1560 (4th Cir. 1993). Exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. See O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999) (citing Brown v. Allen, 344 U.S. 443, 447 (1953)); see also Skipper v. French, 130 F.3d 603, 610 n.4 (4th Cir. 1997). In order for a claim to be considered exhausted, it must be "fairly presented to the state courts," which means "that both the operative facts and the controlling legal principles must be presented to the state court." Matthews v. Evatt, 105 F.3d 907, 910-11 (4th Cir. 1997) (internal quotations omitted). Claims that were not fairly presented to the state court, but would now be barred if presented to the state court, are to be treated as procedurally defaulted. Clagett v. Angelone, 209 F.3d 370, 378 (4th Cir. 2000).

Yarbrough's state habeas petition filed with the Supreme Court

14

of Virginia contained essentially the same claims raised in the present petition with the exception of claim II(A),[17] which was presented to the Supreme Court of Virginia on direct appeal. Consequently, all of Yarbrough's claims were exhausted.

Respondent asserts, however, that some of Yarbrough's claims are barred from review in this Court because they were barred from review under state procedural rules.  Respondent's Memorandum, at 10.  Any claims procedurally barred in state court pursuant to an adequate and independent state procedural rule are procedurally defaulted in federal court, and, consequently, are ordinarily barred from federal habeas review.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  The Supreme Court of Virginia held Yarbrough's claims, numbered II(B)(1) and III(A)[18] in the instant petition (State Habeas claims I, II(A), and II(B)), to be barred from state habeas review because they could have been raised at trial or on direct appeal, but were not.  Yarbrough III, at *2-3.  In making

---

[17]This claim is:  Yarbrough was denied his rights under Batson v. Kentucky when Melvin Woodson was excluded from the sentencing jury because of his race.

[18]The Court notes that in Yarbrough's Federal Petition, Yarbrough combined his "reasonable doubt" claims with the related ineffectiveness of counsel claim as claim III.  Because the claim raises both issues of procedural and substantive law, this Court will treat the claims as divided into the following subclaims:
III(A) Yarbrough was sentenced by a jury that was misled on the burden of proof by the court's instruction regarding, and the prosecutor's explanation of "reasonable doubt."
III(B) Yarbrough's trial counsel was ineffective for failing to object to the trial court's instruction and the prosecutor's explanation of "reasonable doubt."

this ruling, the court relied on <u>Slayton v. Parrigan</u>, 215 Va. 27, 29 (1974), which the courts consistently have held constitutes such an independent-and-adequate state-law ground so as to support procedural default in federal court. <u>Smith v. Murray</u>, 477 U.S. 527, 533 (1986); <u>Wright v. Angelone</u>, 151 F.3d 151, 159-60 (4th Cir. 1998). Thus, this Court FINDS that Yarbrough's claims II(B)(1) and III(A) in the instant petition are procedurally defaulted from federal review.

Further, the Court has determined that a portion of claim IV of Yarbrough's Federal Petition is procedurally defaulted from federal review. In support of claim IV, Yarbrough has included additional legal support and facts that were not included in his state habeas petition. Because these "controlling legal principles" and "operative facts" were, therefore, not properly presented to the Supreme Court of Virginia, <u>Matthews</u>, 105 F.3d at 910-11, they are procedurally defaulted and cannot be reviewed by this Court.

Specifically, the <u>controlling legal principles</u> that Yarbrough added to claim IV in the instant petition, <u>supra</u>, are references to the ABA Guidelines for the Appointment of Counsel in Death Penalty Cases (1989), <u>see</u> Respondent's Memorandum, at 40 n. 8, as well as the case law, including <u>Strickland</u>, cited by Yarbrough, which purportedly requires use of the guidelines as "the primary standard for determining reasonable diligence in capital cases."

16

Yarbrough's Federal Petition, at 116-17 (referencing <u>Strickland v.</u>
<u>Washington</u>, 466 U.S. 668, 688 (1984); <u>Wiggins v. Smith</u>, 539 U.S.
510, 524 (2003); <u>Rompilla v. Beard</u>, 545 U.S. 374, 125 S. Ct. 2456,
2462 (2005)).  <u>Strickland</u> and <u>Wiggins</u> describe the ABA Guidelines
as "'guides for determining what is reasonable,'" <u>Wiggins</u>, 539 U.S.
at 524 (quoting <u>Strickland</u>, 466 at 688), but neither case mandated
their use.  In <u>Strickland</u>, the Court further emphasized that it was
not mandating the use of these guidelines in every case:

> [B]ut they are only guides. No particular set
> of detailed rules for counsel's conduct can
> satisfactorily take account of the variety of
> circumstances faced by defense counsel or the
> range of legitimate decisions regarding how
> best to represent a criminal defendant. Any
> such set of rules would interfere with the
> constitutionally protected independence of
> counsel and restrict the wide latitude counsel
> must have in making tactical decisions.

<u>Strickland</u>, 466 U.S. at 688-89.  Further, the portion of <u>Rompilla</u>
cited by Yarbrough does not reference the ABA guidelines; it
instead restates the "reasonableness" standard for federal review
of habeas cases decided by state courts.  <u>Rompilla</u>, 125 S. Ct. at
2462.

Further, the <u>operative facts</u> that the Court finds Yarbrough
did not properly present to the Supreme Court of Virginia include
assertions that: the Commonwealth's forensic expert only tested ten
(10) of twenty-three (23) loci in identifying DNA samples;[19] the

---

[19]The Court notes that the record reflects that by the time of
Yarbrough's trial, twenty-three (23) loci were able to be tested,

forensic expert used statistics that were flawed because they were based on a comparison with DNA collected solely from felons in Virginia; and the governor ordered a review of all DNA testing related to capital cases because of concerns about protocols. Yarbrough's Federal Petition, at 119-20. Because these factual assertions were not presented to the Supreme Court of Virginia, however, they are procedurally defaulted for federal review. Further, insofar as the governor's review of DNA testing occurred after Yarbrough's trial, the resulting report would not be material to this Court's review even if it were not procedurally barred because <u>Strickland</u> requires a review from counsel's perspective <u>at the time of trial, and without the benefit of hindsight</u>. <u>Strickland</u>, 466 U.S. at 690-91.

Respondent also asserts that Yarbrough is procedurally barred from challenging part of the Supreme Court of Virginia's decision for claim II(A). Respondent's Memorandum, at 32. Specifically, Respondent asserts that Yarbrough cannot question in this proceeding the justification offered by the prosecutor for striking Woodson, namely, that Woodson was a teacher, because Yarbrough did not present this portion of the claim on direct appeal. <u>Id.</u>

---

as compared to the ten (10) loci that the expert's laboratory was capable of testing at the time testing was done. <u>See infra</u>, Section III.B.1. Genetic loci are locations or areas on the strand of DNA. Transcript I, Day III, at 14. Each loci has a number of possible types, which can be used to distinguish between individuals. <u>Id.</u>

Because the Supreme Court of Virginia relied on this justification in rendering the appellate decision (claim I of the second direct appeal, see supra note 3), and, therefore, must have reviewed the relevant portion of the trial transcript, this Court finds that the issue was properly presented to the state court during the direct appeal. Thus, no portion of Yarbrough's claim II(A) is procedurally defaulted in this Court.

Based on the foregoing, this Court FINDS that claim II(B)(1), claim III(A), and the aforementioned controlling legal principles and new operative facts that Yarbrough added to claim IV in the instant petition are procedurally defaulted in this Court.

## B. Limited Exceptions to Procedural Default

Although some of Yarbrough's claims are procedurally defaulted, he may still obtain review of these claims if he can establish either: (1) cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or (2) that failure to consider the claim will result in a fundamental miscarriage of justice because he is actually innocent of the crime for which he is convicted. Clagett, 209 F.3d at 379 (citing Coleman, 501 U.S. at 750); Weeks, 176 at 269.

### 1. Cause and Prejudice

Cause refers to "some objective factor external to the defense" that impeded compliance with the state's procedural rule. Strickler v. Greene, 527 U.S. 263, 283 n.24 (1999) (quoting Murray

v. Carrier, 477 U.S. 478, 488 (1986)).

> Objective factors that may constitute "cause" include: (1) "interference by officials that makes compliance with the State's procedural rule impracticable"; (2) "a showing that the factual or legal basis for a claim was not reasonably available to counsel"; (3) novelty of the claim; and (4) constitutionally ineffective assistance of counsel.

Wright, 151 F.3d at 160 n.5 (quoting McCleskey v. Zant, 499 U.S. 467, 493-94 (1991)). Yarbrough claims he meets the criteria for an exception to procedural default for claims II(B)(1) and III(A) because his federal habeas petition contains claims of ineffective assistance of counsel that correspond to these claims. Yarbrough's Federal Petition, at 13. The Court finds that claims II(B)(2) and III(B) allege ineffective assistance of counsel in relation to claims II(B)(1) and III(A), respectively. However, because the Court also finds, infra, that the Supreme Court of Virginia's ruling that these claims did not satisfy either prong of Strickland was reasonable,[20] Yarbrough has not made the requisite showing of cause regarding these claims for this Court to make an exception to the procedural bar. Because Yarbrough has not made a sufficient showing for cause, this Court will defer addressing Yarbrough's

---

[20]As highlighted by Respondent, Respondent's Memorandum, at 12 n.1, Yarbrough's claim that his assertions of ineffective assistance of counsel under this cause provision are subject to de novo review is unfounded. See Orbe v. True, 233 F. Supp. 2d 749, 759-60 (E.D. Va. 2002). Instead, this Court's deference to the Supreme Court of Virginia's findings is the proper standard of review. Id.

claims of prejudice for these claims until it reaches the merits of his corresponding ineffective assistance of counsel claims, <u>infra</u>.

Yarbrough also has not asserted there was any cause outside of his control that prevented him from including in his state habeas petition the additional controlling law and facts included in his federal habeas petition for claim IV.  During cross-examination of the Commonwealth's DNA expert, defense counsel elicited testimony that at the time of trial, twenty-three (23) loci could be tested, as compared to the ten (10) loci the expert's laboratory was capable of testing at the time testing was done.  Transcript of Record, Day III, at 44, <u>Commonwealth v. Yarbrough</u> (1998) (No. CR 97-325) ("Transcript I").  Defense counsel also obtained testimony from the expert that the statistical probabilities were based on comparison with a DNA database consisting solely of felons convicted in Virginia.  <u>Id.</u> at 58-59.  So, this information was available to Yarbrough when he prepared his state habeas petition. Further, because this Court can review the majority of claim IV on the merits, Yarbrough has failed to make a showing of prejudice for the procedurally barred portion of that claim.

## 2. <u>Miscarriage of Justice</u>

"In a capital case, to show 'actual innocence' of the death penalty, a petitioner must show by clear and convincing evidence that but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." <u>Weeks</u>,

176 F.3d at 270 n.11.   Yarbrough has not met this standard in regard to claim II(B)(1).   This claims deals solely with jury selection and an alleged violation of Batson, but the courts have recognized that such a claim "does not have a fundamental impact on the accuracy--as opposed to the integrity--of the criminal process." Sawyer v. Smith, 497 U.S. 227, 248 (1990) (Marshall, J., dissenting) (citing Allen v Hardy, 478 U.S. 255, 259 (1986)).   In Allen, the United States Supreme Court held that the rule of Batson, which was a "new constitutional rule of criminal procedure" that "chang[ed] the standard for proving [the] unconstitutional abuse of peremptory challenges," would not be retroactively applied and therefore would not be available to federal habeas petitioners whose convictions became final before Batson was decided.   Allen, 478 U.S. at 257-59.   In so doing, the Court reasoned that the "[r]etroactive effect [of a new rule] is 'appropriate [only] where a new constitutional principle is designed to enhance the accuracy of criminal trials.'" Id. at 259 (citing Solem v. Stumes, 465 U.S. 638, 643 (1984)).   Accordingly, because the rule of Batson "may [only] have some bearing on the truthfinding function of a criminal trial," it did not have "such a fundamental impact on the integrity of factfinding as to compel [the] retroactive application [of Batson]." Id.   See also, Johnson v. California, 545 U.S. 162, 125 S. Ct. 2410, 2419 (2005) (Thomas, J., dissenting) (the three-step "burden-shifting approach [of Batson] is a 'prophylactic framework'

22

that polices racially discriminatory jury selection rather than an 'independent constitutional command'") (quoting <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 555 (1987)); <u>Teague v. Lane</u>, 489 U.S. 288, 315 (1989) (rule requiring that petit juries be composed of a fair cross section of the community is not a "bedrock procedural element" to be retroactively applied "[b]ecause the absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction"); <u>Reyes v. Greiner</u>, 340 F. Supp. 2d 245, 266 (E.D.N.Y. 2004) ("As it has evolved, <u>Batson</u> does not implicate the right of a defendant to the equal protection of the laws; its focus is on the equal protection of the excluded juror.") (citing <u>Edmonson v. Leesville Concrete Co.</u>, 500 U.S. 614, 618 (1991) (Kennedy, J.) (recognizing "the changed premise of <u>Batson</u> that the Equal Protection right violated by the unlawful exercise of a peremptory challenge was not that of the defendant, but rather that of the excluded juror."); <u>Morales v. Greiner</u>, 273 F. Supp. 2d 236, 252-53 (E.D.N.Y. 2003) (violations of <u>Batson</u> do not undermine a defendant's right to a fair trial, and because the rule of <u>Batson</u> is intended to protect the rights of an excluded juror, "[b]y the time a case reaches its appellate stage, it is too late to rectify [any] injury to the challenged jurors.").

Considering the foregoing, the Court finds that Yarbrough has

not provided evidence that the jurors who were seated on the resentencing panel, and who did find him eligible for the death sentence, could not have reasonably done so.  See, Morales, 273 F. Supp. 2d at 253 (an unasserted Batson claim "does not implicate any rights of the petitioner," and the "issue bears no relation to the defendant's guilt or innocence and as such cannot undermine confidence in the verdict; nor does it raise any concern over the adversarial testing of the government's case.")  The Court further finds that even assuming there had been a Batson violation, there is nothing "'fundamentally unfair' about enforcing procedural default rules in cases devoid of any substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination."   Smith v. Murray, 477 U.S. 527, 538-39 (1986) (citations omitted) (approving use of the "cause and prejudice test" in a capital case and rejecting the suggestion that the procedural default inquiry is to be "appl[ied] differently depending on the nature of the penalty a State imposes for the violation of its criminal laws.").

Further, with regard to claim III(A), Yarbrough's resentencing jury was instructed on the burden of proof using a Model Jury instruction that has previously been upheld as constitutional.  See infra, Section III.C.4.  Prior to reading the instructions, the court instructed the jury that it was advising them on the law.  Transcript of Record, Day III, at 97, Commonwealth v. Yarbrough

(2000) (No. CR 97-325) ("Transcript II").  In so doing, the court distinguished between the court's "instructions [on the law]" and the "argument[s] of counsel." Id. at 100.  Additionally, the Commonwealth Attorney preceded his discussion of reasonable doubt by stating, "The Court's instructions are written statements of the law . . . ." Id. at 102.  Yarbrough has not shown by clear and convincing evidence that a reasonable juror would have misunderstood these instructions and found him guilty absent proof beyond a reasonable doubt.  Consequently, the Court finds both claims II(B)(1) and III(A) to be procedurally barred.

In support of his claim IV, Yarbrough has stated that without the aid of an expert, he cannot obtain the new evidence he needs to support his claim of actual innocence, and as a result, he could not demonstrate to the Supreme Court of Virginia the requisite prejudice required by Strickland; therefore, he needed the expert appointed to fully develop his case.  Yarbrough's Opposition Memorandum, at 18.  In conjunction with this argument, he stated that the state court's denial of his discovery request, submitted in conjunction with his state habeas petition, prevented him from obtaining and presenting such evidence in support of his state habeas petition. Id.

Yarbrough had filed a discovery request in conjunction with his state habeas petition, but he never made a motion to specifically request appointment of a forensic expert as he did in

conjunction with the instant federal habeas petition.  Compare

Petitioner's Motion for Discovery, No. 021660 (Va. Oct. 11, 2002)

with Petitioner's Motion for Funds for Forensic Testing and Expert

Assistance, No. 2:05cv368 (E.D. Va. Dec. 6, 2005).  Further,

Yarbrough filed three versions of his state habeas petition, and

each included a general request for discovery, "expert assistance

as necessary," and an evidentiary hearing.  Yarbrough's Initial

State Petition, at 10-11; Yarbrough's Amended State Petition, at

10-11; Yarbrough's 50-Page State Petition, at 6-7.  Yarbrough first

indicated to the state court his specific need for a forensic

expert in his opposition to Respondent's motion to dismiss.

Petitioner's Opposition to Respondent's Motion to Dismiss at 9, No.

021660 (Va. Nov. 12, 2002) ("Yarbrough is unable to proffer any

further evidence of prejudice on this claim without the ability to

review the evidence in police custody . . . and access to an

independent forensic expert to conduct the testing that should have

been conducted at the time of his trial.")  Yarbrough asserts now

that because the Supreme Court of Virginia did not allow him time

to complete discovery and to determine if an expert was necessary,

its decision to dismiss his case was premature and prevented him

from properly demonstrating prejudice.  Yarbrough's Federal

Petition, at 123-24.  Unlike his federal habeas petition, in which

Yarbrough specifically indicated he needed expert assistance to

show prejudice, id. at 123-24, in his various state habeas

petitions, he indicated prejudice from a "laymen's [sic] view" with no direct reference to the need for a forensic expert. Yarbrough's Federal Petition, at 18; Yarbrough's Initial State Petition, at 22-25; Yarbrough's Amended State Petition, at 30-37; Yarbrough's 50-Page State Petition, at 21-25. Because this claim can be evaluated on the merits using the existing record, see infra, there is no need for this Court to evaluate the Supreme Court of Virginia's decision to deny Yarbrough's discovery motion in conjunction with the court's dismissal of his petition.

Yarbrough asserts that he needs appointment of a forensic expert to find potential new evidence, thus the only new evidence he actually has presented for consideration of the actual innocence exception is the result of the American Society of Crime Laboratory Directors ("ASCLD") review of the Virginia Division of Forensic Science's DNA testing for death row cases. Yarbrough's Federal Petition, at 121. Yarbrough's case was included in this review, but the review found "no 'technical procedural error or deviation from accepted protocol,'" and "no 'interpretive conclusion that [was] consider[ed] inappropriate.'" Respondent's Memorandum, at 46 (quoting the ASCLD's report at 8-9). As a result, Yarbrough has not provided any new evidence that would support a finding that a reasonable juror would more likely than not have not convicted him in light of the ASCLD Report. This means that the controlling legal principles and new operative facts Yarbrough added to claim

IV in the instant petition are procedurally defaulted in this Court.

Based on the foregoing, the Court FINDS that claims II(B)(1) and III(A), and the aforementioned portions of claim IV raised in the instant petition are procedurally barred before this Court, and, because Yarbrough has not established either cause and prejudice or a miscarriage of justice based on his asserted actual innocence, the Court recommends that these claims be DENIED.

## C. **Merits**

The Court will now address the merits of Yarbrough's remaining claims that are not procedurally barred.  These are claims I, II(A), II(B)(2), III(B), IV (excluding the portions of this claim addressed, _supra_, as procedurally barred), V, and VI.  Because many of the claims assert ineffective assistance of counsel, those claims, I, II(B)(2), III(B), portions of IV, and V, will be addressed first, followed by claims II(A) and VI.

A federal court may not grant relief on a habeas claim previously adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).  In drafting this statute, Congress "plainly sought to ensure a level of 'deference to the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way."  <u>Williams v. Taylor</u>, 529 U.S. 362, 386 (2000).  <u>See also</u> <u>Bell v. Jarvis</u>, 236 F.3d 149, 157 (4th Cir. 2000) (recognizing that, for claims adjudicated on the merits by the state court, the federal court "is limited by the deferential standard of review set forth in § 2254(d), as interpreted by the Supreme Court in <u>Williams</u>[].")  Consequently, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated."  <u>Williams</u>, 529 U.S. at 387.  Moreover, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be [objectively] unreasonable."  <u>Id.</u> at 411.  In deference to the state court's decision, this Court may not grant relief unless it determines that decision on the merits was "legally or factually unreasonable."  <u>See</u> <u>Bell</u>, 236 F.3d at 163 (quoting <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1178 (10th Cir. 1999)).

### 1. <u>Ineffective Assistance of Counsel Standard</u>

Claims  I,  II(B)(2),  III(B),  IV,  and  V  all  assert

ineffectiveness of counsel. The controlling standard for ineffective assistance of counsel claims is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). As such, to grant Yarbrough relief on his ineffective assistance of counsel claims, this Court must find that the state court's dismissal of such claims involved an unreasonable application of <u>Strickland</u>. Under <u>Strickland</u>, the state court was required to subject Yarbrough's claim to a two-prong test in which the petitioner must prove both ineffective assistance (incompetence) and prejudice. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381 (1986). To grant relief, the state court had to find: (1) Yarbrough's lawyer's performance fell below the range of competence demanded of lawyers in criminal cases, <u>Strickland</u>, 466 U.S. at 690; and (2) there is a reasonable probability that, but for the deficient performance by counsel, the ultimate result would have been different, <u>id.</u> at 694.

When assessing counsel's performance under <u>Strickland</u>'s first prong, the Supreme Court has stressed that the constitutional guarantee of effective assistance of counsel seeks only to "ensure that criminal defendants receive a fair trial," and not to "improve the quality of legal representation." <u>Id.</u> at 689. The reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> In order to prevail, a petitioner "must overcome the presumption that, under the circumstances, the challenged action

30

'might be considered sound trial strategy.'" Id. (quoting Michel
v. Louisiana, 350 U.S. 91, 101 (1955)). Accordingly, the reviewing
court must grant a "heavy measure of deference to counsel's
judgments," and, in doing so, may only evaluate such performance
from counsel's perspective at the time of the alleged error and in
light of all the circumstances. Id. at 690-91; Kimmelman, 477 U.S.
at 381. Additionally, a reviewing court generally should assess
counsel's overall performance throughout the case, Kimmelman, 477
U.S. at 386, and avoid "Monday morning quarterbacking." Stamper v.
Muncie, 944 F.2d 170, 178 (4th Cir. 1991); see also Strickland, 466
U.S. at 689 ("A fair assessment of attorney performance requires
that every effort be made to eliminate the distorting effects of
hindsight . . . .").

The second prong of the Strickland analysis presents an
equally rigorous standard. To affirmatively prove prejudice, a
petitioner must do more than merely demonstrate that his attorney's
error had "some conceivable effect" on the outcome of the case.
Strickland, 466 U.S. at 693. Rather, the petitioner must
demonstrate "a reasonable probability[21] that, but for counsel's
unprofessional errors, the result of the proceeding would have been
different." Id. at 694. As with the first prong, the reviewing

---

[21]The Court notes that this standard is not so high as to
require that a petitioner "show that counsel's deficient conduct
more likely than not altered the outcome in the case." Strickland,
466 U.S. at 693-94. "A reasonable probability is a probability
sufficient to undermine confidence in the outcome." Id. at 694.

court must consider the "totality of the evidence" before it in conducting the prejudice inquiry.  <u>Id.</u> at 695.

Additionally, a reviewing court need not consider the two prongs of the <u>Strickland</u> analysis in sequential order.  <u>Strickland</u>, 466 U.S. at 697.  The court need not even address both prongs if the petitioner fails to make a sufficient showing on one.  <u>Id.</u> When evaluating an ineffective assistance of counsel claim, a court should first apply whichever prong more quickly disposes of the respective claim.  <u>See id.</u>

**2. Claim I: Whether Trial Counsel was Ineffective for Failing to Investigate and Present Relevant Mitigating Evidence at Yarbrough's Sentencing Hearing (State Habeas Claim III(D))**

In claim I, Yarbrough alleges that his trial counsel was constitutionally ineffective for failing to present sufficient mitigating evidence at his sentencing hearing.  Yarbrough's Federal Petition, at 29.  Defense counsel called two witnesses: a prison official who testified to Yarbrough's good behavior, and Yarbrough's mother, who confirmed Yarbrough lived with her.  <u>Id.</u> Yarbrough contends that there were a number of other witnesses who could have been called to provide testimony about Yarbrough's childhood.  <u>Id.</u>  Yarbrough further contends that defense counsel was on notice as to Yarbrough's background because of information provided to counsel by the psychologist appointed to assist the defense.  <u>Id.</u> at 50.

Initially, the Supreme Court of Virginia found neither prong

of Strickland was satisfied for this claim.  Yarbrough III, at *13-14.  As discussed supra, Yarbrough then petitioned for a rehearing, which the Supreme Court of Virginia granted,[22] which included directing the Circuit Court to conduct an evidentiary hearing. Yarbrough v. Warden, No. 02-1660 (Va. Jan. 7, 2004).  As also discussed, supra, the Circuit Court's ultimate findings submitted to the Supreme Court of Virginia was that the effectiveness prong of Strickland was satisfied (i.e., counsel's performance was deficient), but the prejudice prong was not (i.e., Yarbrough suffered no prejudice as a result of the deficient performance). Yarbrough IV, at *17, 20.  The Supreme Court of Virginia declined to evaluate the effectiveness prong; instead, the court dismissed this claim based solely on a finding that Yarbrough had not

---

[22]The justification for granting the petition for rehearing was based on the United States Supreme Court's intervening decision, in Wiggins v. Smith, 539 U.S. 510 (2003), supra, which addressed an ineffectiveness of counsel claim involving failure to present mitigating evidence relating to the defendant's childhood at sentencing.  The Supreme Court of Virginia's subsequent dismissal of Yarbrough's habeas rehearing petition relied substantially on that decision.  Yarbrough V.  Because this Court's review must focus on evaluating the Supreme Court of Virginia's decision in light of "established" federal law, the Supreme Court of Virginia's reliance on a federal decision rendered after Yarbrough's conviction might, in contrast, appear to be an application of a "new" law.  However, within the Wiggins opinion, the United States Supreme Court emphasized that it was not departing from established federal law, but was merely "apply[ing] the same 'clearly established' precedent of Strickland."  Wiggins, 539 U.S. at 522. Consequently, this Court remains limited to the deferential standard of review of evaluating whether the Supreme Court of Virginia reasonably applied the established federal law from Strickland.

satisfied the prejudice prong of <u>Strickland</u>.  <u>Yarbrough V</u>, at 198 n.2, 201-02.

Because the Supreme Court of Virginia dismissed the case based on Yarbrough's failure to satisfy the <u>Strickland</u> prejudice prong, this Court will first assess whether that court's analysis of the prejudice prong was legally and factually reasonable.  <u>See id.</u> at 201-02.  In determining prejudice, the Supreme Court of Virginia reasoned that it must "reweigh the evidence in aggravation against the totality of available mitigating evidence."  <u>Id.</u> at 200 (quoting <u>Wiggins</u>, 539 U.S. at 534).  The court then proceeded to discuss the evidence of aggravation and mitigation in Yarbrough's case, and that evidence was presented in contrast with the evidence presented in <u>Wiggins</u>.  <u>Id.</u> at 200-02.  In <u>Wiggins</u>, the United States Supreme Court found that the mitigating evidence consisted of a childhood in which the defendant "suffered torment, sexual molestation, . . . repeated rape," and periods of homelessness; diminished mental capacity; and no prior convictions; the Court did not specifically discuss or consider any aggravating factors, but pointed out the absence of a record of violent conduct.  <u>Wiggins</u>, 539 U.S. at 534, 537.  In considering Yarbrough's case, by comparison, the Supreme Court of Virginia found the following evidence of aggravation based on the nature of the crime: "Hamby was alive when all ten of the knife wounds were inflicted on him, . . . [Hamby] may have lived for 15 minutes as he bled to death[,]

34

. . . [and] Yarbrough continued to cut Hamby's neck . . . even after Hamby pleaded with Yarbrough to stop." Yarbrough V, at 200. The mitigation evidence, as determined by the Supreme Court of Virginia, included lack of a prior record, neglect as a child due to his mother's crack addiction and substandard living conditions, and Yarbrough's attempt to compensate for his mother's neglect by providing care to his half-sister.  Id. at 200-01.  The Supreme Court of Virginia ultimately determined that because Yarbrough did not suffer the same "extreme physical abuse" or diminished mental capacity as did the defendant in Wiggins, there was insufficient evidence to find that the second sentencing hearing would have been different had counsel investigated and presented mitigation evidence regarding Yarbrough's childhood.  Id. at 201-02.

As stated, supra, for this Court to grant the instant writ of habeas corpus, the state court's determination must have involved an unreasonable application of federal law or must have been based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d).  Yarbrough alleges that the state court's determination was an unreasonable application of federal law because the Supreme Court of Virginia "failed to weigh the mitigating evidence in this case independently and appropriately; instead, it merely compared it to that present in Wiggins and determined that it did not stack

35

up."[23]  Yarbrough's Federal Petition, at 76.  Yarbrough divides his mitigation evidence into two categories and asserts that the Supreme Court of Virginia ignored the second category, which consisted of Yarbrough's efforts to care for his sister.  Id. Because the state court's opinion specifically referenced Yarbrough's care for his sister, this assertion has no merit.  See Yarbrough V, at 200.  Thus, Yarbrough has failed to make a showing that the state court unreasonably applied established federal law.

Yarbrough also asserts that the state court made an unreasonable determination of the facts in light of the evidence presented.  Yarbrough's Federal Petition, at 66.  Yarbrough provides six reasons for this assertion.  Id. at 66-73.

---

[23]In making this claim, Yarbrough compares his case with Rompilla, to essentially assert that his case does "stack up" against Rompilla, and so should have the same result, namely, that counsel was constitutionally ineffective.  Yarbrough's Federal Petition, at 75, 78.  Yarbrough, consequently, appears to ask this Court to make the same comparison of mitigating and aggravating factors made by the Supreme Court of Virginia that Yarbrough has claimed was a misapplication of Wiggins.  See id. at 73-78. Although there may have been similarities between Yarbrough's background and that of the defendant in Rompilla, there is a key legal difference in the cases:  Rompilla dealt with counsel's duty to investigate evidence that the prosecution would be likely to use as aggravation evidence at sentencing, as opposed to mitigation evidence as in the instant case.  Rompilla, 125 S. Ct. at 2460. The Court specifically discussed the lack of assistance the defendant provided counsel regarding his family background, and determined there was no need to focus on whether more investigation was needed in this area, because counsel's failure to investigate the defendant's prior conviction was "dispositive." Id. at 2463. Ultimately, the Court finds that Yarbrough's lack of prior convictions for his defense counsel to have investigated is distinguishing; thus, the Court's result in Rompilla is not directly applicable to his case.

Yarbrough first takes issue with the state court's determination that the testimony of his cousin, Anthony Riley, and his half-sister, Dorian Jenkins, was not credible. <u>Id.</u> at 66-68. He then provides examples of testimony that he asserts was not considered by the state court in its opinion. <u>Id.</u> Because most of this testimony lends support to Yarbrough's assertions that he was neglected due to his mother's crack use, and that he provided care to his half-sister to compensate for that neglect, <u>id.</u>, both of which the state court found as substantiated by other testimony, <u>Yarbrough V</u>, at 200, Yarbrough's claim that the court's findings of fact on this point were unreasonable has no merit. Further, based on the age of the aforementioned witnesses, it was not unreasonable for the state court to seek corroboration of testimony regarding events that allegedly occurred when they were nine (9) and five (5) years old, respectively. <u>See</u> <u>Yarbrough IV</u>, at *15.[24]

Yarbrough's second issue is that the Supreme Court of Virginia erroneously found that the Circuit Court rejected the testimony of Anthony Riley and Dorian Jenkins when the Circuit Court merely expressed reservations regarding its reliability. Yarbrough's Federal Petition, at 68-69. As with Yarbrough's first issue, <u>see</u>

---

[24]This Court also notes that in the Circuit Court's recommendation to the Supreme Court of Virginia, the Circuit Court found that there was insufficient evidence to find the <u>Strickland</u> prejudice prong was satisfied, "even accepting at face value[,] for purposes of analysis[,] the questionable evidence of Anthony Riley and Dorian Jenkins." <u>Yarbrough IV</u>, at *19.

supra, because the facts discussed in the testimony to which
Yarbrough refers were found by the Supreme Court of Virginia to be
substantiated by other testimony, Yarbrough has not provided a
basis for his claim that the court's findings of fact were
unreasonable.  Further, even when the Circuit Court did take this
additional testimony into account, see supra, note 23, it found
that the Strickland prejudice prong was not satisfied.  See id. at
69.  Consequently, this claim has no merit.

Yarbrough's third issue is that the state court's
determination that his mother provided adequately for him at times
was unreasonable.  Yarbrough's Federal Petition at 69.  The Circuit
Court's findings of facts state that Yarbrough was age twelve (12)
when his mother admitted her crack addiction and then appeared, at
least to others, to have overcome it.  Yarbrough IV, at *13.
Further, Yarbrough "presented no evidence that [his mother]
regularly used or abused drugs after she admitted her drug problems
to her mother and [Yarbrough's father] and decided to get her life
straightened out."  Id.  Yarbrough's cousin and half-sister had
stopped living with him before this point, id. at 12, so their
testimony, which Yarbrough states was not fully considered by the
court, see supra, would have little or no bearing on this finding.
Consequently, this court finds it was not unreasonable for the
Supreme Court of Virginia to conclude that Yarbrough's mother was
able to provide adequately for him during the time in which the

38

evidence suggests she was not addicted to crack.  See Yarbrough V, at 200.

Yarbrough's fourth issue is that the Circuit Court's finding that Yarbrough's mother did not use drugs regularly after she admitted she was addicted to crack was unreasonable.  Yarbrough's Federal Petition at 69-70.  Yarbrough points to admissions in his mother's testimony that she "slipped and slid" and had "plenty" of relapses.  Id. at 70.  The Circuit Court and Supreme Court of Virginia both recognized the "slipped and slid" testimony in their findings of fact.  Yarbrough IV, at *13, Yarbrough V, at 194.  It does not appear that the state courts found that Yarbrough's mother never used drugs after he turned age twelve (12), just that the use did not lead to the same level of neglect that had occurred prior to that point.  See Yarbrough V, at 194; Yarbrough IV, at *13.  As Yarbrough states himself in support of this issue, by the time he turned twelve (12), his cousin and half-sister no longer lived with him, Yarbrough's Federal Petition, at 70.  Consequently, it was not unreasonable for the state courts to rely primarily on the testimony provided by Yarbrough's mother, a witness he called to testify, in making findings of fact for this period of Yarbrough's life.

Yarbrough's fifth issue involved the state court's finding that trial counsel had "'presented some recent personal background information.'"  Id. at 70-71 (quoting Yarbrough V, at 201).  In

39

what appears more a challenge to the court's application of federal law than to any findings of fact, Yarbrough argues that the prison official's testimony at his sentencing hearing did not qualify as mitigation evidence under Wiggins.  Id. In Wiggins, defense counsel was alleged to be ineffective because the mitigation evidence they chose to present related solely to the defendant's lack of direct responsibility for the crime, but provided no insight into his life history or background.  Wiggins, 539 U.S. at 514, 519.  As a result, references to mitigation evidence in Wiggins appear to have focused on this type of evidence, see, e.g., id. at 537, but the Court never intended to restrict the definition of mitigation evidence;[25]  further, the Court's conclusion in that case

_____

[25]In Skipper, the case Yarbrough relies on to contrast "[e]vidence of a defendant's conduct in prison," with the "life history or family background," in Wiggins, Yarbrough's Federal Petition, at 71, the United States Supreme Court stated:

> there is no question but that such inferences [that could be drawn from testimony about good behavior in prison] would be "mitigating" in the sense that they might serve "as a basis for a sentence less than death." Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." The Court has therefore held that evidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an "aggravating factor" for purposes of capital sentencing.  Likewise, evidence that the defendant would not pose a danger if spared

specifically focused on "the available mitigating evidence, taken as a whole." Id. at 538.  Similarly, in the portion of the Supreme Court of Virginia's opinion that Yarbrough points to for this issue, the court listed all of the aggravating and mitigating evidence (including that presented at the sentencing hearing and at the state habeas evidentiary hearing) it considered for its decision regarding the Strickland prejudice prong.  Yarbrough V, at 200-02.  The court summarized the prison counselor's testimony presented at the sentencing hearing as "show[ing] that Yarbrough had adjusted to prison life in that he had not received any adverse disciplinary reports during the time he had been incarcerated." Id. at 201 (emphasis added).  This Court finds that the state court reasonably summarized the sentencing testimony, recognized the absence of similar testimony in Wiggins, and weighed that testimony in making a determination of prejudice.  Further, this Court finds that the state court's categorization of the testimony as "personal background information" had no impact on its ultimate findings of fact and conclusions of law.

Yarbrough's sixth and last issue relates to the state court's

_____

(but incarcerated) must be considered potentially mitigating.
Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986) (citations omitted).  Nothing in Wiggins disturbs the Court's classification of prison official testimony regarding the defendant's good behavior as mitigating evidence.  Such evidence simply wasn't relevant to the defendant's claim that counsel failed to investigate his background to find mitigating evidence.  Wiggins, 539 U.S. at 514.

"fail[ure] to address or consider significant evidence presented . . . at the evidentiary hearing." Yarbrough's Federal Petition, at 71-73. Under this category, Yarbrough first asserts that the state court's finding that his mother and her boyfriend "tried to hide their drug use from the children" was erroneous, but he did not provide any testimony that disproves this finding. See id. at 72. The state court's finding that Yarbrough's mother "attempted to conceal [her] drug use," Yarbrough V, at 193 (emphasis added), is supported by her testimony that she was "'probably' . . . unsuccessful[]." See Yarbrough's Federal Petition at 72 (quoting Evidentiary Hearing Transcript, at 101-02) (emphasis omitted). Further, the additional testimony asserted by Yarbrough as not having been considered by the Circuit Court and Supreme Court of Virginia was substantially included in the Circuit Court's findings of fact, Yarbrough IV, at *8-10, and is not inconsistent with the Supreme Court of Virginia's finding of "neglect and privation." Yarbrough V, at 193-94. The Supreme Court of Virginia's conclusion rested mainly on its finding that Yarbrough had shown no evidence of "extreme abuse" or "diminished mental capacity."[26]   Id. at 201.

---

[26]Lovitt v. True, the case Respondent cited as "a virtually identical 'Wiggins'[sic] claim" to the instant case, Memorandum in Support of Motion to Dismiss, at 22, is generally distinguishable from the instant case because the proposed mitigation testimony in Lovitt was "classic double-edged evidence." 403 F.3d 171, 179 (4th Cir. 2005). The Fourth Circuit, however, notes with approval that the Supreme Court of Virginia cited the defendant's lack of diminished mental capacity in Lovitt as support for distinguishing that defendant's case from Wiggins (in which the defendant was

Yarbrough has not provided evidence to show that this finding was erroneous; his allegation that the state court's findings of fact were erroneous is based solely on a restatement of the same evidence the court did consider in finding that Yarbrough was neglected as a child. See, e.g., Yarbrough's Federal Petition, at 65-73. Consequently, this Court finds that the Supreme Court of Virginia's factual determinations were reasonable in light of the evidence presented at the state habeas evidentiary hearing. Because Yarbrough has not been able to meet either of the requisite tests (i.e., that the state court's application of federal law or its finding of facts was unreasonable) for the granting of a federal writ of habeas corpus, this Court FINDS that Yarbrough has failed to establish ineffective assistance of counsel as to claim I.[27]  As such, the Court recommends that claim I be DENIED.

### 3. **Claim II(B)(2): Whether Trial Counsel was Ineffective for Failing to Protect Yarbrough's Batson Rights at Trial and on Direct Appeal (State Habeas Claim III(A))**

In claim II(B)(2), Yarbrough alleges that his counsel was ineffective for failing to preserve Batson claims arising from Yarbrough's second sentencing hearing.  Yarbrough's Federal

---

found to have a diminished mental capacity). Id. at 182.

[27]Because Yarbrough has failed to show the Supreme Court of Virginia's analysis of the Strickland prejudice prong was unreasonable, this Court need not perform the analysis for the effectiveness prong.  As the Supreme Court of Virginia did in its review, Yarbrough V, at 198 n.2, this Court expresses  no opinion on the Circuit Court's finding that the effectiveness prong was satisfied.

Petition, at 93.  Although defense counsel challenged three (3) of the prosecution's peremptory challenges on Batson grounds, Yarbrough has limited this ineffectiveness claim to defense counsel's failure to preserve the challenge of Bugg.[28]  Id. at 93-101.

Under Batson v. Kentucky, a criminal defendant has the right to challenge certain types of discrimination[29] in the selection of the petit jury for his trial.  Batson, 476 U.S. 79, 96 (1986). Batson set out a three-part burden-shifting process for the court to use in evaluating such claims of discrimination.  Id. at 96-98. First, the defendant in a criminal case must make a prima facie case by establishing that "he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges [during jury selection] to remove from the venire members of the defendant's race."[30]  Id. at 96 (citation omitted).  "In deciding

_____

[28]Yarbrough's claim that the peremptory strike of juror Woodson violated Batson was preserved at trial and raised on appeal.  That claim has been raised as claim II(A) in the instant petition and is addressed infra.  Yarbrough does not, however, assert that counsel was ineffective regarding this Batson issue.
Further, the underlying Batson challenge to the striking of Bugg was raised in the instant petition as claim II(B)(1).  This Court finds, supra, that this claim was procedurally barred from review.

[29]Batson deals solely with racial discrimination, which is the issue raised herein, but it has been extended to allow defendants to also challenge peremptory strikes that appear to discriminate on the basis of gender.  J.E.B. v. Alabama, 511 U.S. 127 (1994).

[30]Under Batson, criminal defendants are restricted to raising challenges only when members of defendant's race were struck from

whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances," such as "a 'pattern' of strikes against black jurors" and "the prosecutor's questions and statements during voir dire examination." Id. at 96-97.  After the court finds the defendant has made the prima facie showing, the prosecutor then must provide "a neutral explanation for challenging [the] jurors." Id. at 97.  Finally, the trial court must "determine if the defendant has established purposeful discrimination." Id. at 98.  In reviewing cases involving Batson challenges, moreover, the reviewing court is charged with "giv[ing] those findings great deference." Id. at 98 n.21.

At Yarbrough's second sentencing hearing, defense counsel made the prima facie showing by calling the court's attention to the fact that the Commonwealth used 60% of its peremptory challenges to remove three (3) of the five (5) African-American jurors from the panel.  Yarbrough's Federal Petition, at 82.  In response to the Batson challenge, the prosecutor proffered that the race-neutral reason for removing Bugg, in particular, was that, based on information received from an employee in the Commonwealth Attorney's office, who knew Bugg, and because of Bugg's responses to some of the voir dire questions, the prosecutor had reason to

the jury.  Batson, 476 at 96.  This portion of Batson was subsequently expanded to allow defendants to challenge peremptory strikes based on race even if the defendant's race differs from that of the jurors removed by the peremptory strike.  Powers v. Ohio, 499 U.S. 400 (1991).

believe "she ha[d] a severe mental handicap." <u>Id.</u> at 83 (quoting
Transcript II, Day I, at 330).   Because the prosecutor proffered
sufficient evidence that would have supported a strike for cause,
the court decided and defense counsel conceded, that the prosecutor
had provided sufficient reasons for his peremptory challenge.  <u>See</u>
<u>id.</u>  Yarbrough claims in the instant petition that defense counsel
should    have    maintained    his    <u>Batson</u>    challenge    because    the
Commonwealth's delay in challenging Bugg until the peremptory stage
prevented    another    African-American    prospective    juror,    Ms.    Emma
Blakeney ("Blakeney"), from being seated on the panel.[31]  <u>Id.</u> at 82-
83.  Yarbrough asserts as further support for this claim that Bugg
was one (1) of only two (2) prospective jurors questioned about

_____

[31]Based on the record, the procedure used for selecting the
second sentencing jury was as follows.  The prosecutor and defense
counsel conducted <u>voir dire</u> of potential jurors in groups of three
(3).  Yarbrough's Federal Petition, at 79-80.  Both counsel had the
opportunity to request the court strike jurors for cause during
this <u>voir dire</u>.  <u>See id.</u> at 83.  Once counsel completed <u>voir dire</u>
of the group, the group was accepted for seating on the panel.  <u>Id.</u>
at 82.  The court's intent was to complete the panel with twenty-
four (24) prospective jurors.  <u>Id.</u> at 79.  This was to ensure there
would be twelve (12) jurors for sentencing, two (2) alternates, and
ten (10) additional prospective jurors to provide for the five (5)
peremptory challenges allowed to each party, if necessary.  <u>Id.</u>
Prior to <u>voir dire</u> of the last group of three (3), twenty-three
(23) prospective jurors had been seated in the panel.  <u>Id.</u> at 82.
So, when <u>voir dire</u> of the last group was completed, the court
selected the first juror of that group to be seated in the panel,
and dismissed the remaining two (2) members of that group.
Blakeney was the second juror in that group, so she was dismissed.
<u>Id.</u>  The court then allowed both counsel to complete their
peremptory challenges.  <u>Id.</u>  As pointed out by Yarbrough, if the
Commonwealth had successfully removed Bugg for cause prior to
completion of <u>voir dire</u>, Blakeney would have been seated in the
panel of twenty-four (24) prospective jurors.  <u>See id.</u> at 83.

having children,[32] implying that this selective questioning was targeted to find pretexts for removing African-American jurors. Id. at 80-81.

The Supreme Court of Virginia held, in reviewing Yarbrough's state habeas petition, that this claim did not satisfy either the performance or the prejudice prongs of Strickland. Yarbrough III, at *5.  In making that decision, the state court appeared to conflate the requirements for making the prima facie case (step 1 of Batson) with the requirements for determining if the race-neutral reason for the strike is a pretext for discrimination (step 3 of Batson).  Batson, 476 U.S. at 96-98.  Nevertheless, even assuming, arguendo, the state court erroneously applied federal

---

[32]The other prospective juror questioned about children, Ms. Betty Nelson, was African-American; she was also struck by the prosecution via a peremptory challenge and was included as part of defense counsel's initial Batson challenge, but Yarbrough has not included her removal in any of his claims in the instant petition. See Yarbrough's Federal Petition, at 80-81.  Yarbrough cites Miller-El v. Dretke, 545 U.S. 231, 125 S. Ct. 2317 (2005) for the proposition that the Court should rely on these additional questions targeted to two (2) African-American jurors to find a Batson violation.  See Yarbrough's Opposition Memorandum, at 8-9. Yarbrough's reliance on Miller-El appears misplaced; in that case, the court found that "[o]nly 6% of white venire panelists, but 53% of those who were black" heard a "script" about the death penalty designed to convince them to have reservations about death penalty sentencing.  Miller-El, 125 S. Ct. at 2334.  In the instant case, by comparison, Yarbrough has asserted that a single extra question about children was asked of only two (2) of the African-American jurors. Yarbrough's Federal Petition, at 80-81.  Yarbrough has failed to show a similar pattern for this questioning, and, in any event, the questioning about children does not appear relevant to the prosecutor's proffered reason to strike Bugg for her mental handicap.

law, this Court can only issue the writ if the result of that application was also objectively unreasonable. <u>Williams v. Taylor</u>, 529 U.S. 362, 411 (2000). This Court finds that even if the state court erroneously applied <u>Batson</u>, this error does not rise to the level of an objectively unreasonable result.

In completing its ineffective assistance of counsel analysis, the Supreme Court of Virginia held that Yarbrough failed to make out the initial <u>prima facie</u> showing for a <u>Batson</u> challenge, citing one of its previous decisions, for the proposition that the "fact that the prosecution has excluded African-Americans by using peremptory challenges does not itself establish such a prima facie case under <u>Batson</u>." <u>Id.</u> (quoting <u>Johnson v. Commonwealth</u>, 259 Va. 654, 674 (2000)). In making this statement about the <u>prima facie</u> case, it appears that the state court failed to give the trial court's determination that the <u>prima facie</u> case had been established the "great deference" as required by <u>Batson</u>. <u>See</u> <u>Batson</u>, 476 U.S. at 98 n.21. After making its determination regarding the <u>prima facie</u> case, the Supreme Court of Virginia's opinion then addressed whether the defense had established that the Commonwealth's proffered reasons for the strike were a pretext for discrimination, <u>see</u> <u>Yarbrough III</u>, at *5, finding that there was no pretext for discrimination based on the fact that two (2) African-American jurors remained on the panel after the Commonwealth removed three (3) other African-Americans using peremptories. <u>Id.</u>

_Batson_ does not require, however, that the Commonwealth remove _all_ of the jurors of the defendant's race in order for the defendant to make the _prima facie_ showing, _see_ _Batson_, 476 U.S. at 96; consequently, the trial court's determination that the _prima facie_ case had been established by the defendant's pointing to the "pattern" of the three (3) African-American jurors removed through peremptory challenges was entitled to the Supreme Court of Virginia's deference. _See_ _id._ at 96-97; Yarbrough's Petition, at 82.

As stated _supra_, the Commonwealth proffered as its race-neutral reason for striking Bugg a concern about her having a mental handicap, and the trial court found that because this ground was sufficient to support a challenge for cause (had one been lodged), there was no pretext for discrimination. Yarbrough's Federal Petition, at 83. The Supreme Court of Virginia agreed with the trial court's ultimate ruling on this challenge. _Yarbrough_ _III_, at *5. However, Yarbrough does not claim that his defense counsel was ineffective for failing to continue to object to the removal of Bugg; rather, Yarbrough claims that the prosecutor followed a complex scheme of delaying the removal of Bugg so as to prevent Blakeney from being seated in the panel.[33] This, Yarbrough

---

[33]Yarbrough states in his petition that the prosecutor did not have "a non-discriminatory cause" to be able to remove Blakeney if she had been seated in the panel. Yarbrough's Federal Petition, at 99. The Court finds nothing in the record to dispute this assertion, but notes that Blakeney admitted to knowing the victim

asserts, would have the effect of removing Blakeney without having to respond to a <u>Batson</u> challenge, thereby allowing the prosecutor to do indirectly what he could not do directly.   Yarbrough's Federal Petition, at 91.   <u>Batson</u> deals with peremptory challenges directed to specific jurors selected for the panel, <u>Batson</u>, 476 U.S. at 96, and Yarbrough's claim regarding the use of peremptory challenges to <u>indirectly</u> discriminate against <u>potential</u> jurors not seated on the panel is therefore not within the scope of federal law established in <u>Batson</u>.   This Court finds that it was not unreasonable for the Supreme Court of Virginia to restrict its <u>Batson</u> analysis to whether the prosecutor's strike of Bugg was a pretext for discriminating directly against Bugg and not whether it was a pretext for discriminating against another potential juror. See <u>Yarbrough III</u>, at *4-5.  This Court also finds that the Supreme Court of Virginia's conclusions that Yarbrough did not satisfy <u>Strickland</u>'s prongs for either part of this claim (defense counsel's performance at trial for failing to preserve the issue, and on appeal for failing to raise the issue)[34] were not objectively

---

and that she had been in the victim's store "[a]bout a dozen times."  Transcript II, Day I, at 324.   Defense counsel asked Blakeney a number of questions about her contact with the victim, <u>id.</u> at 323-25, and likely could have reasonably attempted to remove her on this basis using either a strike for cause or peremptory challenge.

[34]The Court notes that Yarbrough asserts that the <u>Batson</u> claim involving Bugg was "clearly stronger" than the mistrial claim raised on the appeal because the <u>Batson</u> claim was "timely preserved below."  Yarbrough's Federal Petition, at 96.  This assertion is

unreasonable.

Based on the foregoing, this Court FINDS that Yarbrough has failed to establish ineffective assistance of counsel as to claim II(B)(2). As such, the Court recommends that claim II(B)(2) be DENIED.

### 4. Claim III(B): Whether Trial Counsel was Ineffective for Failing to Object to the Trial Court's Instruction and Prosecutor's Explanation of "Reasonable Doubt" (State Habeas Claim III(B))

In claim III(B), Yarbrough alleges that the trial court's instruction regarding reasonable doubt established too broad a standard for the jury to properly determine reasonable doubt.[35] Yarbrough's Federal Petition, at 101. Consequently, he claims defense counsel should have objected to the instruction, and was ineffective for not doing so. Id. Further, the Commonwealth's Attorney, during his closing argument, advised the jury that they

---

directly contradicted by Yarbrough's corresponding claim that counsel was ineffective at trial for failing to preserve this issue for appeal. See id. at 93. In any event, Yarbrough failed to show that there is a reasonable probability that the appellate court would not have found this claim procedurally barred.

[35]That instruction was:
> Now, proof beyond a reasonable doubt, does not require proof beyond all possible doubt; however, suspicion or probability of vileness is not enough for a sentence of death.
> . . . .
> A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all of the evidence in the case.

Transcript II, Day III, at 99-100.

would meet their burden of proof if they "'believe[d] the defendant was guilty' after applying [its] common sense.'" <u>Id.</u>   Yarbrough asserts that this statement was erroneous and that defense counsel was ineffective for failing to object to it and for failing to request a curative instruction.   <u>Id.</u>

Regarding the first allegation, that defense counsel was ineffective for failing to object to the trial court's instruction on reasonable doubt, the Supreme Court of Virginia found that Yarbrough failed to satisfy either prong of <u>Strickland</u>.   <u>Yarbrough III</u>, at *7.   The court relied on its own prior case law that approved essentially identical instructions.   <u>Id.</u> (citing <u>O'Dell v. Commonwealth</u>, 234 Va. 672, 698 (1988)).   Yarbrough challenges this result by pointing to several federal cases, <u>infra</u>, to support his claim that the trial court's definition "failed to define the lower end of the spectrum" for the burden of proof.   Yarbrough's Federal Petition, at 107.   The Court finds that <u>Baker v. Corcoran</u>, 220 F.3d 276 (4th Cir. 2000), a Fourth Circuit case cited by Yarbrough, provides sufficient guidance for resolving this issue.[36]

---

[36]The additional United States Supreme Court cases cited by Yarbrough provide general guidance on the reasonable-doubt standard, but are not dispositive of the claim raised in Yarbrough's petition.   <u>E.g.</u>, <u>In re Winship</u>, 397 U.S. 358, 363 (1970) (cited for the proposition that the reasonable-doubt standard "plays a vital role in . . . criminal procedure"); <u>Victor v. Nebraska</u>, 511 U.S. 1, 23, 26 (1994) (Ginsburg, J., concurring) (cited for the proposition that if a court chooses to define "reasonable doubt," it must "adequately convey" the concept); <u>Cage v. Louisiana</u>, 498 U.S. 39 (1990) (per curiam) (cited for the proposition that a definition that "suggest[s] a higher degree of

In <u>Baker</u>, the Fourth Circuit stated that, in evaluating the definition of reasonable doubt in jury instructions, "the question is whether the instruction, <u>taken as a whole</u>, correctly conveyed the concept of reasonable doubt to the jury."  <u>Baker</u>, 220 F.3d at 292 (emphasis added).  The trial court's instruction specifically defined "reasonable doubt" as "a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case."  Yarbrough's Federal Petition, at 105.  This definition is not unlike a portion of the instruction upheld in <u>Baker</u>:  "A reasonable doubt is a doubt founded upon reason . . . not a fanciful doubt, a whimsical doubt or a capricious doubt."  <u>Baker</u>, 220 F.3d at 292.  Taking the definition of "reasonable doubt" in the Yarbrough instruction, in conjunction with the rest of the instruction on the burden of proof, <u>supra</u>, this Court finds that the instruction correctly conveyed the concept of reasonable doubt.[37]  Consequently, the state court's determination that the instruction was proper was not contrary to established federal law.  Because the instruction was proper, there was no need for defense counsel to object, so this Court finds the state court's

---

doubt than is required for acquittal under the reasonable-doubt standard" violates the Due Process Clause of the Constitution).

[37]This Court has previously relied on <u>O'Dell</u>, <u>supra</u>, to find that an instruction containing the "sound judgment" language, to which Yarbrough objects, did not "dilute the state's burden of proof."  <u>Mu'Min v. Greene</u>, No. 3:94cv769, 1996 U.S. Dist. Lexis 18736, at 39-41 (E.D. Va.  1996).

determination that neither prong of <u>Strickland</u> was satisfied to be reasonable.

Regarding the second allegation, that trial counsel should have objected to the prosecutor's explanation of reasonable doubt during his closing argument, the Supreme Court of Virginia also determined that neither prong of <u>Strickland</u> was satisfied. <u>Yarbrough III</u>, at *7-8.  In his petition, Yarbrough questions the state court's reliance on its finding that the prosecutor's alleged misstatement regarding "reasonable doubt" during his closing argument was not intentional.  Yarbrough's Federal Petition, at 113.  Yarbrough further asserts that the instruction must be taken in context, <u>Boyde v. California</u>, 494 U.S. 370, 384-85 (1990), and that the context in this instance was that the Commonwealth's Attorney's argument "expressed the law of the case" that was "in tandem" with "the court's instruction."  Yarbrough's Federal Petition, at 110, 115.  Although the court did not give an explicit instruction "that only the court can and will instruct them on the law," Yarbrough's Federal Petition, at 102, this Court finds that the jury had the appropriate context to properly consider the alleged misstatement: at the start of the case, the jury was instructed that the lawyers could not testify or give evidence, but merely provided a guide to assist deliberations, Transcript II, Day II, at 16; the trial court specified at the start of the jury instructions that it was instructing on the law, <u>id.</u>, Day III, at

97; and the court distinguished between the court's "instructions" and "argument[s] of counsel," <u>id.</u> at 100.   Additionally, the Commonwealth's Attorney preceded his discussion of reasonable doubt by stating, "The Court's instructions are written statements of the law . . . ."   <u>Id.</u> at 102.   Considering this context, and disregarding the prosecutor's subjective intentions, Yarbrough has not demonstrated that the prosecutor's discussion of common sense caused the jury to disregard the instruction on reasonable doubt provided by the court.   As a result, the Supreme Court of Virginia's determination, that defense counsel was not ineffective for failing to object during this portion of the closing argument, was reasonable.   This Court further agrees that Yarbrough has not made the requisite showing of ineffective performance or prejudice under this claim.

Based on the foregoing, this Court FINDS that Yarbrough has failed to establish ineffective assistance of counsel as to claim III(B).   As such, the Court recommends that claim III(B) be DENIED.

**5. <u>Claim IV: Whether Trial Counsel was Ineffective for Failing to Request Appointment of a Forensic Expert to Challenge the Forensic Evidence (State Habeas Claim III(C)(1))</u>**

In claim IV, Yarbrough alleges that defense counsel was ineffective for failing to seek appointment of a forensic expert to independently evaluate and to help challenge the DNA evidence presented at trial.   Yarbrough's Federal Petition, at 115.   As discussed, <u>supra</u>, the additional operative facts and controlling

legal principles not properly presented to the Supreme Court of Virginia for this claim are procedurally defaulted and will not be considered by this Court.[38]  In applying <u>Strickland</u> for this claim, the Supreme Court of Virginia held:

> Petitioner has failed to allege any facts that would suggest that counsel's performance was inadequate.  Petitioner has failed to show a particularized need for the assistance of an independent expert or that he was prejudiced by the lack of expert assistance.  <u>Husske v. Commonwealth</u>, 252 Va. 203, 213, 476 S.E.2d 920, 926 (1996).  Furthermore, petitioner has failed to identify the items that were tested by the Commonwealth or how testing of those items would disprove petitioner's guilt. Thus, petitioner has failed to demonstrate how counsel was ineffective for failing to obtain an independent expert and failing to request that the unspecified items undergo testing. Furthermore, he has failed to demonstrate that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

<u>Yarbrough III</u>, at *8-9.  Yarbrough provided the state court no

---

[38]The controlling legal principles that the Court finds procedurally defaulted consisted of Yarbrough's reliance on ABA Guidelines for the Appointment of Counsel in Death Penalty Cases, and the case law endorsing their use for evaluating counsel's effectiveness.  The additional operative facts that the Court finds procedurally defaulted were the following assertions:  the Commonwealth's forensic expert only tested ten (10) of twenty-three (23) loci in identifying DNA samples; the forensic expert used statistics that were flawed because they were based on a comparison with DNA collected solely from felons in Virginia; and the governor ordered a review of all DNA testing related to capital cases because of concerns about protocols.  Additionally, the report that was completed in response to the governor's order is barred from review because it was completed after Yarbrough's trial.  <u>See</u> <u>supra</u>, section III.A.  Under the principles of comity, this Court can only review the claim as it was presented to the state court.

standard for evaluating counsel's choice not to request appointment of a forensic expert.  <u>See</u> Yarbrough's 50-Page State Petition, at 22-25.[39]

The Supreme Court of Virginia's finding that counsel's performance was not inadequate rested on its finding that Yarbrough did not satisfy either of the prongs of <u>Husske</u>, one of which is a showing of prejudice.  For its similar finding of lack of prejudice under <u>Strickland</u>, the court then relied on its prior statement that "petitioner has failed to identify the items . . . or how testing of those items would disprove petitioner's guilt."  <u>Id.</u>  This statement is incorrect.  In all three (3) versions of his state habeas petition, Yarbrough identified several items whose testing he questioned, as well as hair found on Hamby that was not tested. See Yarbrough's Initial State Petition, at 10-11; Yarbrough's Amended State Petition, at 10-11; Yarbrough's 50-Page State Petition, at 6-7.  As a result, this Court concludes that claim IV was not squarely addressed by the Supreme Court of Virginia. Therefore, this Court must conduct its own de novo review of the controlling facts and applicable law on this issue.  See Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999) (where a claim properly presented to a state court was not adjudicated on the merits, the standard of review is de novo review of questions of law and mixed

---

[39]The <u>Husske</u> decision relied on by the state supreme court was not cited in Yarbrough's state habeas petition.

questions of law and fact, instead of the deferential review prescribed in § 2254(d)); Coleman v. Johnson, No. 2:04cv724, 2005 U.S. Dist. LEXIS 33709, at *30 (E.D. Va. Sept. 6, 2005).  As a result, this Court must evaluate each proffered item of evidence as part of its review.  In particular, the Court notes that much of the DNA testing focused on comparisons of genetic material with that of Hamby, Yarbrough, and Rainey.

### a.  Factual background and theory of the case

The Commonwealth's theory of the case was that, on May 8, 1997, Yarbrough and Rainey went to Hamby's store, with the intent to commit a robbery.  Yarbrough brought a shotgun with him, stolen from his mother's boyfriend, that he concealed beneath a coat. While in the store, Yarbrough tied Hamby's hands and legs, with Rainey's help, and then sliced Hamby's neck a number of times. After Yarbrough and Rainey left the store, Hamby continued to remain conscious and to lose blood for about fifteen (15) minutes before he died.  Yarbrough and Rainey returned to Rainey's residence where they changed clothes; they then went to Conrad Dortch's home to buy marijuana. Afterward they returned to Rainey's home, where Yarbrough changed back into his own clothes.  Before returning to his own home, Yarbrough threw his sneakers into a "burn barrel" behind Rainey's residence.

The defense's theory of the case included the arguments that

either Rainey[40] or an unknown third person had actually made the cuts on Hamby's neck that caused Hamby's death, that Yarbrough did not take a shotgun with him to Hamby's store, and that the sneakers found behind Rainey's residence did not belong to Yarbrough.

### b.  Evidence presented at trial that Yarbrough claims should have been independently tested

At trial, the Commonwealth offered a size 10-1/2 pair of FILA-brand sneakers alleged to belong to Yarbrough.  Yarbrough's 50-Page State Petition at 22.  In his state petition, Yarbrough argued that these shoes were not his because they were a size larger than another pair of his shoes.[41]  Id.  He also listed the various results of DNA swabs inside the shoes, which were presented to the jury at trial.  Id.; see also Transcript I, Day III, at 39-40.  The only evidence Yarbrough appeared to question was the shoe-size discrepancy.  Yarbrough's 50-Page State Petition, at 22.  Even if the shoes did not belong to Yarbrough, or they were larger than his

---

[40]Rainey was tried separately and convicted of first-degree murder and is serving twenty (25) years of a 50-year sentence. Yarbrough's Federal Petition, at 6.

[41]These shoes (item LW1) were submitted for analysis on July 17, 1997, from a Mr. Leroy Winn, who claimed that Yarbrough had left them at his home the previous Friday.  Handwritten lab notes (June 30, 1997).  Yarbrough has not asserted that counsel was ineffective for failing to test DNA or make size comparisons with an additional pair of black FILA-brand sneakers (RSY#11), size not documented, recovered from Yarbrough's home at the same time as the knife and clothing entered into evidence.  See Commonwealth Exhibit 56A, Division of Forensic Science, Certificate of Analysis (Nov. 12, 1997).

normal shoe size,[42] this would not necessarily contradict the expert testimony used to place him in those shoes at the crime scene, and an expert qualified in DNA analysis would not necessarily be qualified to address the shoe-size issue.  Id.; see also Respondent's Memorandum, at 43 n.9.  The police only found two (2) patterns of shoe prints in the store, Transcript I, Day II, at 87; Transcript I, Day III, at 129, and these were determined to match the FILA-brand sneakers and a pair of size-9 boots acknowledged by Rainey as his.  Transcript I, Day II at 178, 229; Transcript I, Day III, at 126, 129.

The Commonwealth also offered a shirt and jeans, taken from Yarbrough's home, which contained spots of Hamby's blood. Yarbrough's 50-Page State Petition, at 22.  This shirt also contained Yarbrough's DNA.  Id. at 22-23.  When the police found these items in Yarbrough's bedroom, they took photographs to show where they were found and that they contained red stains that were later confirmed to be blood.  Transcript I, Day II, at 213-15 (referencing Commonwealth Exhibit's 32-36).  Yarbrough asserts in the instant petition that his mother had washed the clothes before they were taken by the police[43] and they contained no blood before

---

[42]It may have been a different matter, however, if, for example, the shoes recovered had been smaller than Yarbrough's normal shoe size.

[43]According to the trial testimony, the jeans were taken from Yarbrough's home on May 14, 1997, which was six (6) days after the murder occurred.  Transcript I, Day II, at 208-09.

or after washing.   Yarbrough's 50-Page State Petition, at 23.
Yarbrough did not allege that counsel was ineffective for not
allowing his mother to testify to this at trial, see id., however,
and in response to counsel's questions at trial, the Commonwealth's
DNA expert confirmed the jeans did not appear to have been washed
because that would have changed the appearance of the stains from
what he observed at the time of his examination.   Transcript I, Day
III, at 51. Further, Yarbrough did not assert that the clothing had
been tampered with.   See Yarbrough's 50-Page State Petition, at 23.
Nor, did Yarbrough explain how there appeared to be blood on the
clothes at the time the police found and photographed them.   See
id.  He did claim that the blood stains were too minimal for him to
have been close enough to the decedent's throat to kill him in the
manner asserted by the prosecutor, and, as support for this claim,
he pointed to the amount of blood on Rainey's boots for comparison.
Id.  Yarbrough's claim regarding the quantity of blood on Rainey's
boots is directly contradicted by the DNA expert's testimony that
no blood was found on Rainey's boots.   Transcript I, Day III, at
55-56.

     In addition to the clothing, the Commonwealth offered a knife
found in Yarbrough's home, that contained Yarbrough's genetic
material and Hamby's blood.   Id. at 22-23.   Yarbrough asserts that
the forensic report for the knife was flawed because it did not
indicate the odds of the genetic material matching other randomly

selected individuals. Id. at 23.

Finally, the Commonwealth offered an orange stocking cap that was found on the scene and contained a mixture of genetic material from Hamby and another unknown person.  Id. at 24.  Yarbrough asserts that Rainey acknowledged that this cap was his, id., but Rainey was not questioned about the cap, and thus, did not testify to this.  Transcript I, Day II, at 155-97.  Because the additional genetic material found on the cap did not match either Rainey or Yarbrough, Yarbrough asserts this finding was material to his defense, both to suggest a third person on the scene and to impeach Rainey's claim that the cap was his.  Yarbrough's 50-Page State Petition, at 24.  At trial, defense counsel questioned the DNA expert about this evidence.  Transcript I, Day III, at 56.

Yarbrough asserted there were tests the Commonwealth chose not to do that could have been done by an appointed expert. Yarbrough's 50-Page State Petition, at 24.  These tests were PCR DNA testing of the white shirt and orange stocking cap,[44] and comparisons of Yarbrough's and Rainey's hair samples with hair found in Hamby's neck.  Id.  Yarbrough also asserted that insufficient fingerprint testing was done at the crime scene.  Id. Fingerprinting was done on the cash register, all of the counters,

---

[44]The Commonwealth's expert originally did testing of six (6) loci on all items, and then tested four (4) additional loci on all of the evidence except these two (2) items.  Yarbrough's 50-Page State Petition, at 24.  See supra note 19.

on the back door, and several items from the store, but only one
(1) usable print was found, which did not match Yarbrough or
Rainey.  Transcript I, Day II, at 246, 271; Transcript I, Day III,
at 114.

### c.  **Strickland** analysis

As with Yarbrough's other claims of ineffective assistance of
counsel, this claim is governed by the two-prong test provided for
in Strickland.  See supra, section III.C.1.  The Supreme Court of
Virginia's holding that, in light of all the issues Yarbrough
raised in his petition, counsel was not ineffective, was
reasonable.  During opening argument, defense counsel discussed DNA
testing in detail and pointed out that such testing can exclude
people as potential sources of DNA evidence, but it cannot be used
to positively assert that a particular person is unquestionably the
source of that particular evidence.  Transcript I, Day II, at 36-
43.  During this argument, defense counsel specifically highlighted
the minimal blood spot on the jeans found in Yarbrough's home.
Id., at 43.  When defense counsel questioned the Commonwealth's DNA
expert, defense counsel reviewed the entire DNA testing process and
specifically emphasized that statistics used were based on a
comparison with a database of DNA samples solely collected from
felons in Virginia.  Transcript I, Day III, at 43-55, 58-59.  Then,
during closing argument, defense counsel again emphasized that DNA
testing is only useful for "eliminating people . . . as the source

of th[e] [tested] DNA material"; he then went on to address one of Rainey's boot prints and asserted its location at the crime scene supported the defense's case that Rainey was the actual killer. Transcript I, Day IV, p. 39-41.  The record shows that defense counsel followed a consistent strategy with regard to the DNA evidence; it would have been consistent with this strategy for defense counsel to not have a forensic expert that could possibly confirm the Commonwealth's case.  Defense counsel could have considered, for example, that DNA testing of additional loci and testing of hairs found on Hamby would also have confirmed, rather than raised doubts in, the Commonwealth's case.  Defense counsel could also have determined that seeking additional fingerprinting could have a similar negative outcome.  Because the orange stocking cap neither tied Yarbrough to the murder nor had the potential to exonerate him, defense counsel could have reasonably concluded that additional forensic testing of it would not be helpful for the defense's case.  The Supreme Court of Virginia correctly held that Yarbrough failed to show that defense counsel's performance in regard to the failure to seek appointment of a forensic expert fell below the competence standard expected in criminal cases.

Because a reviewing court does not need to address both Strickland prongs, if the petitioner fails to make a sufficient showing on one, Strickland, 466 U.S. at 467, it is not necessary for this Court to evaluate the prejudice prong.

Based on the foregoing, this Court FINDS that Yarbrough has failed to establish ineffective assistance of counsel as to the remaining portion of claim IV.  As such, the Court recommends that claim IV be DENIED.

## 6. <u>Claim V: Whether Trial Counsel was Ineffective for Failing to Impeach Rainey (State Habeas Claim III(C)(2))</u>

In claim V, Yarbrough alleges that defense counsel was ineffective because he only impeached Rainey on some points, and did not "cross-examine [him] . . . in other available areas and by other available means."  Yarbrough's Federal Petition, at 125, 127. Yarbrough asserts that defense counsel failed to: demonstrate Rainey's testimony was inconsistent with Rainey's initial statement to police; point out inconsistencies between Rainey's testimony and that of another witness; point out inconsistencies between Rainey's testimony about turning off the store's lights and forensic evidence; and object to the prosecutor's "correction" of Rainey's statement that Yarbrough changed into pants while at Rainey's residence.[45]  <u>Id.</u> at 125-27.  The Supreme Court of Virginia held

_____

[45]One of the facts at issue in the case was whether Yarbrough took a shotgun with him to Hamby's store.  Rainey testified that Yarbrough wore a coat to conceal the shotgun on the way to the store.  Transcript I, Day II, at 166.  Rainey also testified that after the murder, he and Yarbrough returned to Rainey's residence where Yarbrough changed into Rainey's clothes.  Id. at 176-77. During this testimony, Rainey stated that Yarbrough put on a jacket, to which the prosecutor responded, "You mean pants -- what pants did he put on?"  Id. at 177.  Yarbrough points to this testimony to assert that he could not have put on a jacket if he was already wearing a coat.  Yarbrough's Federal Petition, at 126. The Court notes that nothing in the testimony contradicts the

that this claim did not satisfy either prong of <u>Strickland</u> because defense counsel had attacked the credibility of Rainey by challenging other inconsistencies in his testimony and identifying discrepancies between his testimony and physical evidence, and Yarbrough had failed to show how these additional challenges to Rainey's credibility would have affected the outcome of the trial. <u>Yarbrough III</u>, at *9-10.   Yarbrough asserts the state court erroneously applied <u>Strickland</u> by not "measur[ing counsel's performance] against objective norms of the profession," but has provided no support for his implication that counsel must seize on every opportunity to impeach an adverse witness.   Yarbrough's Federal Petition, at 127-28.   Further, as stated by Respondent, an effective trial strategy could involve avoiding impeachment opportunities that require the witness to repeat testimony that is damaging to the defendant.   Respondent's Memorandum, at 49. Yarbrough's assertion that defense counsel should have challenged the prosecutor's "correction" of Rainey's testimony that Yarbrough put on pants instead of a jacket, <u>see infra</u>, note 45, can be addressed with similar reasoning. Yarbrough's Federal Petition, at 126.   It is possible that further questioning on this point by defense counsel could have shown that Rainey's prior testimony that

---

equally plausible alternative interpretation that Yarbrough removed his coat to change, and could have therefore easily put on another jacket.   Therefore, Rainey's testimony was not necessarily inconsistent.

Yarbrough was wearing a coat to conceal a gun was inconsistent with him later putting on a jacket.  Yet, it is equally likely that Rainey made a simple misstatement and further questioning would have required him to emphasize Yarbrough's wearing of the coat earlier, strengthening that testimony against another witness's, albeit more favorable, testimony that Yarbrough was not wearing a coat.  As a result, Yarbrough's assertions amount to the "Monday-morning quarterbacking" courts are prohibited from engaging in while evaluating counsel's performance under <u>Strickland</u>.  <u>See Stamper</u>, 944 F.2d at 178.

Because this Court finds that the Supreme Court of Virginia's <u>Strickland</u> analysis was reasonable and Yarbrough has not provided any evidence to dispute that finding, this Court FINDS that Yarbrough has failed to establish ineffective assistance of counsel as to claim V.  As such, the Court recommends that claim V be DENIED.

### 7. <u>Claim II(A): Yarbrough Was Denied His Rights Under Batson by the Exclusion of Juror Woodson From His Sentencing Jury (Second Direct Appeal Claim I)</u>

In claim II(A), Yarbough alleges that Woodson, an African-American juror, was improperly removed via the Commonwealth's peremptory challenge on the basis of race.  Yarbrough's Federal Petition, at 85.  As stated <u>supra</u>, <u>Batson</u> claims are evaluated using a three-step burden-shifting process.  Yarbrough's defense counsel presented the <u>prima facie</u> case of discrimination by

pointing out that Woodson and two (2) other African-American jurors were removed by the prosecutor using peremptory challenges. _Id._ at 82.   The prosecutor then proffered his reasons for removing Woodson, which were that the prosecutor did not hear Woodson's response to a _voir dire_ question and the prosecutor was concerned by the way Woodson had "his eyes . . . on the defendant," when Woodson first entered the room.   _Id._ at 84.   In response to the prosecutor's claim about not hearing Woodson's response, the trial court had that portion of the transcript read back and allowed the prosecutor the opportunity to change his mind.   _Id._ at 84.   The prosecutor decided to retain the challenge, and added as his reason that Woodson was a teacher.   _Id._ at 84.   Yarbrough claims that because this additional reason, that Woodson would be sympathetic to Yarbrough because he was a teacher, was suggested by the trial court, and the trial court removed the prosecutor's confusion over Woodson's _voir dire_ response by reading back the transcript, the prosecutor's reasons for removing Woodson must have been merely a pretext for removing him based on race.   _Id._ at 86-87.

Yarbrough presented this issue on direct appeal, and the Supreme Court of Virginia held that the trial court's ruling was not clearly erroneous.   _Yarbrough II_, at 395.   Yarbrough asserts that the Supreme Court of Virginia's review was an unreasonable application of _Batson_ because it relied on the "teacher" justification that was offered at the prompting of the trial court,

rather than in direct response to defense counsel's <u>Batson</u> challenge.  Yarbrough's Federal Petition, at 89-90.  While this Court agrees that the Supreme Court of Virginia's focus on the after-the-fact "teacher" justification was misplaced, this Court is charged with evaluating whether the state court's "disposition of th[e] claim was either contrary to federal law" or "not 'minimally consistent with the facts and circumstances of the case,'" <u>Weeks</u>, 176 F.3d at 260 (quoting <u>Wright</u>, 151 F.3d at 157), and that the state court's decision was not "legally or factually unreasonable." <u>See</u> <u>Bell</u>, 236 F.3d at 163 (quoting <u>Aycox</u>, 196 F.3d at 1178). Accordingly, this Court finds, <u>infra</u>, that the Supreme Court of Virginia's ultimate holding, that the prosecutor's proffered reasons for striking Woodson were not a pretext for racial discrimination, was factually and legally reasonable.

First, defense counsel made the <u>Batson</u> challenge.  Next, the prosecution responded with two (2) race-neutral reasons.  Finally, the trial court determined that the prosecutor's reasons were not a pretext for racial discrimination.  In particular, the trial court agreed that it also did not hear Woodson's response.  At this point, the <u>Batson</u> requirements were met. However, because the prosecutor's reason enunciated for the challenge could be remedied by the court, the court elected to have the transcript read back and allowed the prosecutor the opportunity to change his mind. This second chance is not required by <u>Batson</u>, and consequently, the

prosecution did not have to provide an additional reason to maintain his peremptory challenge.  Further, Yarbrough has not asserted that the prosecutor's additional reason regarding the manner in which Woodson looked at the defendant was pretextual.  Thus, even if the prosecutor's reason, that he struck Woodson because the prosecutor did not hear Woodson's <u>voir dire</u> response, is disregarded, the prosecutor's other reason is sufficient to survive the <u>Batson</u> challenge.

Based on the foregoing, this Court FINDS that Yarbrough has failed to establish a <u>Batson</u> violation to support claim II(A).  As such, the Court recommends that claim II(A) be DENIED.

### 8. <u>Claim VI: The Death Penalty in Virginia is Unconstitutional (State Habeas Claim VI)</u>

In claim VI, Yarbrough asserts that the death penalty scheme in Virginia violates the Eighth and Fourteenth Amendments.[46] Yarbrough's Federal Petition, at 128.  In dismissing this claim, the Supreme Court of Virginia relied on its prior case law in stating "the constitutionality of the death penalty has been upheld repeatedly in this Court." <u>Yarbrough III</u>, at *16 (citing <u>Lovitt v. Commonwealth</u>, 260 Va. 497, 508 (2000)).  Yarbrough asserts that the <u>Lovitt</u> court did not enumerate the grounds on which Lovitt claimed

---

[46]Yarbrough also alleges that the death penalty violates the Virginia Constitution.  <u>See</u> Yarbrough's Federal Petition, at 128. Because this Court can only grant the writ based on unreasonable applications of established federal law, violations of the Virginia Constitution alone would be an insufficient basis for granting the writ on this claim.

the death penalty was unconstitutional, and did not consider the
Joint Legislative Audit and Review Commission ("JLARC") study[47]
cited by Yarbrough in his petition.  Yarbrough's Federal Petition,
at 133.  This Court notes that <u>Lovitt</u> did enumerate eight (8)
separate challenges to the constitutionality of the Virginia death
penalty, with references to the prior case law that addressed each
issue.  <u>Lovitt</u>, 260 Va. at 508-09.  Consequently, Yarbrough's
assertion that this court must review the claim <u>de novo</u> is
unfounded.  <u>See</u> Yarbrough's Federal Petition, at 133; Yarbrough's
Opposition Memorandum, at 22.

In further support of his challenge to the Supreme Court of
Virginia's dismissal, Yarbrough cites two United States Supreme
Court cases (one which summarily held that the Georgia death
penalty was unconstitutional, <u>Furman v. Georgia</u>, 408 U.S. 238
(1972) (per curiam), and one which later upheld Georgia's revised
death penalty law, <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976) (plurality
opinion)), plus three statistical studies.  In <u>Gregg</u>, the plurality
first addressed the constitutionality of the death penalty
generally, and provided guidance for how the death penalty could be
administered in a manner that was not "cruel or unusual." <u>Gregg</u>,
428 U.S. at 168-95.  In addressing that case, in which the death
penalty for a murder conviction was challenged, the plurality

---

[47]Yarbrough concedes that Lovitt's direct appeal reply brief
did reference the ACLU and Leibman studies that Yarbrough relies on
in the instant petition.  Yarbrough's Federal Petition, at 133.

stated that, in general, the death penalty is a constitutional punishment for murder because a sentence of death for a person who has taken another's life cannot be considered disproportionate punishment. Id. at 187.  The plurality determined that the death penalty would not be arbitrarily imposed if the sentencing authority were given limited discretion, and recommended further that the sentencing take place in a bifurcated proceeding during which additional evidence not relevant to the guilt phase could be presented.  Id. at 189-91.  The plurality stated that deliberations on sentencing should involve weighing aggravating evidence against mitigation evidence.  Id. at 193-95.  The plurality also recommended that the sentencing authority specify the factors considered in rendering the death sentence.  Id. at 195.  The plurality also noted that because of the complex nature of statistics, it is proper to leave them for evaluation by the legislature in enacting the relevant statutes.  Id. at 186. Further, the fact that a defendant could be removed from death penalty consideration through plea bargaining or conviction for a lesser included offense does not render the death penalty unconstitutional.  Id. at 199.

Yarbrough was sentenced using a bifurcated process.  See Yarbrough's Federal Petition, at 8.  The jury was provided evidence

in aggravation and mitigation.[48]  _Id._ at 9.  The jury specified that
it found the state's "vileness" factor to be satisfied "because the
defendant's conduct in committing the offense . . . involved
torture and depravity of mind . . . beyond the minimum necessary
the [sic] accomplish the act of murder."  Transcript II, Day III,
at 128.  As pointed out by Respondent, this claim was raised and
dismissed as meritless by a federal court in _Lenz v. True_, 370 F.
Supp. 2d 446, 493-95 (W.D. Va. 2005).  Because this Court finds
that Yarbrough's sentencing was conducted in accordance with the
United States Supreme Court case law cited by Yarbrough himself,
and because Yarbrough has not shown that the Supreme Court of
Virginia's case law upholding its death penalty unreasonably
applies _Gregg_ or other federal law, this Court FINDS that Yarbrough
has failed to provide support for claim VI.  As such, the Court
recommends that claim VI be DENIED.

### IV. __RECOMMENDATION__

For the foregoing reasons, the Court having denied Yarbrough's
motions for an evidentiary hearing and for funds for forensic
testing and expert assistance, and having determined that claims
II(B)(1) and III(A) in their entirety, as well as the "controlling
legal principles" and "operative facts" of claim IV that were not

---

[48]The Court notes that Yarbrough has challenged his defense
counsel's effectiveness in presenting mitigation, _see supra_,
Section III.C.2, but this does not bear on Yarbrough's _opportunity_
under the state law to present such evidence.

presented to the state court, are procedurally defaulted, and having recommended that all of the other claims be denied on the merits, the Court recommends that Yarbrough's petition for a writ of habeas corpus be DENIED, that Respondent's motion to dismiss be GRANTED on the merits, and that all of Yarbrough's claims be DISMISSED WITH PREJUDICE.

Yarbrough has failed to demonstrate "a substantial showing of the denial of a constitutional right," therefore, it is recommended that the Court decline to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. Miller-El v. Cockrell, 537 U.S. 322 (2003).

## V. <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve upon the other party and file with the Clerk specific written objections to the foregoing findings and recommendations within ten (10) days from the date of mailing of this report to the objecting party, <u>see</u> 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's specific objections within ten (10) days after being served with a copy thereof. <u>See</u> Fed. R. Civ. P. 72(b).

2. A district judge shall make a <u>de novo</u> determination of

those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984). Entered on September 6, 2006

F. Bradford Stillman
United States Magistrate Judge

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to the following:

F. Nash Bilisoly, Esq.
Vandeventer Black L.L.P.
500 World Trade Center
Norfolk, Virginia 23510-1699
COUNSEL FOR PETITIONER

Jennifer L. Givens, Esq.
Virginia Capital Representation Center
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
COUNSEL FOR PETITIONER

Robert Q. Harris, Esq.
Senior Assistant Attorney General
Office of the Attorney General
900 E. Main Street
Richmond, Virginia 23219
COUNSEL FOR RESPONDENT


Fernando Galindo,
Acting Clerk of Court

By: _____
Deputy Clerk

September    , 2006