**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**ROBERT STACY YARBROUGH,**

**Petitioner,**

v.                                                          **Civil Action No. 2:05cv368**

**GENE JOHNSON, Director,
Virginia Department of Corrections,**

**Respondent.**

**ORDER AND OPINION**

This matter was initiated on September 15, 2005, by a petition for a writ of habeas corpus

pursuant to Title 28, United States Code, Section 2254, filed by Robert Stacy Yarbrough

("Yarbrough" or "petitioner").  On June 26, 1998, petitioner was convicted of robbery and capital

murder and was sentenced to life imprisonment for robbery and death for capital murder.

Thereafter, due to a trial error unrelated to the instant petition, Yarbrough's case was remanded

for a second sentencing proceeding, at which an independent jury similarly concluded that

Yarbrough should be sentenced to death on the capital murder conviction.  Subsequently,

petitioner sought habeas relief at the state level, which was denied, and petitioner then filed his

§ 2254 petition in this court alleging violations of his federal rights pertaining to both his trial

and second sentencing proceeding in the Circuit Court of Mecklenburg County, Virginia.

Respondent moved to dismiss petitioner's § 2254 petition and pursuant to Title 28, United States

Code, Section 636(b)(1)(B) and (C), this court referred the instant matter to United States

Magistrate Judge F. Bradford Stillman for proposed findings of fact and conclusions of law.

Judge Stillman's Report and Recommendation ("R&R") concluded that Yarbrough's petition should be dismissed in its entirety.  Yarbrough v. Johnson, No. 2:05cv368, 2006 WL 2583418 (E.D. Va. Sept. 5, 2006).  After affording petitioner the opportunity to object to the R&R's findings, this court concurs with the ultimate conclusion of the R&R and largely adopts its reasoning; as set forth in great detail below, Yarbrough's federal petition for habeas corpus is therefore **DENIED** and **DISMISSED.**

## I. Factual Background

The relevant facts have previously been set forth by the Supreme Court of Virginia in Yarbrough v. Com., 258 Va. 347, 519 S.E.2d 602 (1999) ("Yarbrough I"), cert. denied, 535 U.S. 1060 (2002), as well as in various other opinions throughout the lengthy appellate process and various habeas corpus proceedings.  However, to aid in resolving petitioner's numerous federal habeas claims, the facts are repeated below.

> Yarbrough and Dominic Jackson Rainey had attended high school together in Mecklenburg County prior to Rainey's moving to Richmond with his mother. While on a subsequent visit to see his grandfather in Mecklenburg County, Rainey renewed his acquaintance with Yarbrough. On May 7, 1997, Yarbrough told Rainey of his plan to rob Cyril Hugh Hamby, the 77-year-old owner of Hamby's Store on U.S. Route 1 in Mecklenburg County. The following evening, Yarbrough went to Rainey's grandfather's house and told Rainey that "he was ready to go rob Mr. Hamby."

> Yarbrough and Rainey were seen walking along U.S. Route 1 toward Hamby's Store between 9:30 and 10:30 p.m. on May 8, 1997. Yarbrough was armed with a shotgun. The two men waited at a picnic table across the road until there were no customers in the store. Yarbrough hid the shotgun under his coat and the two men entered the store. At Yarbrough's direction, Rainey locked the front door.

> Yarbrough pointed the shotgun at Hamby and ordered him to come out from behind the store's counter. Yarbrough and Rainey took Hamby to the living quarters at the rear of the store where they found an electrical extension cord and string. Yarbrough brought Hamby back into the public area of the store, forced him to lie on the floor in an aisle, and tied Hamby's hands behind his back with

the extension cord and string.

Yarbrough went to the store's electrical circuit box and turned off the outside lights. He then demanded that Hamby reveal where guns were hidden in the store. When Hamby denied having any guns, Yarbrough kicked Hamby in the head and upper left arm. Yarbrough then forced the store's cash register open by dropping it on the floor and took the money that was in the register.

Yarbrough returned to where Hamby was lying and, pointing the shotgun at him, again demanded to be told where guns were hidden in the store. When Hamby again denied having any guns, Yarbrough put down the shotgun, took a knife from his pocket, and began to cut Hamby's neck with a "sawing motion" as Hamby pleaded with Yarbrough to stop. After cutting Hamby's neck at least ten times, Yarbrough rifled through Hamby's clothing and took his wallet. Yarbrough and Rainey took beer, wine, and cigarettes from the store and left by the back door. Yarbrough gave Rainey one hundred dollars in small bills and kept a larger sum for himself.

Yarbrough and Rainey returned to Rainey's grandfather's house to change clothes and then went to the home of Conrad Dortch to buy marijuana. Dortch was not at home, so Yarbrough and Rainey waited on the porch and drank the wine taken during the robbery. Dortch arrived home at approximately 12:45 a.m. and sold Yarbrough a marijuana cigarette for $10. According to Rainey, Yarbrough was "flashing" his money. When Yarbrough and Rainey left Dortch's home, Rainey threw an empty wine bottle into the yard.

Yarbrough and Rainey returned to Rainey's grandfather's house where they spent the remainder of the night. Before leaving in the morning, Yarbrough threw his tennis shoes, which were stained with Hamby's blood, into a trash barrel behind the house.

Hamby's body was discovered at approximately 8:20 a.m. on May 9, 1997 by Betsy Russell, a former employee of Hamby's who had been informed by a neighbor that "there was something wrong at the store." A subsequent autopsy revealed that Hamby had bled to death as a result of deep, penetrating wounds to his neck. According to a state medical examiner, Hamby's wounds were "entirely consistent" with an attempted beheading, however, because no major arteries were cut, it would have taken at least several minutes for Hamby to have bled to death. Hamby also had several blunt force injuries to his head and upper left arm consistent with his having been kicked with moderate force.

On May 10, 1997, Dortch contacted the Virginia State Police and told them of his encounter with Yarbrough and Rainey. Police later recovered a wine bottle and label from Dortch's yard. The wine bottle was of a brand that was sold at Hamby's store.

On May 14, 1997, police executed a search warrant at Yarbrough's home and recovered bloodstained clothing and a three-bladed "Uncle Henry" pocketknife. Police also recovered Yarbrough's tennis shoes from the trash barrel behind Rainey's grandfather's house. DNA testing of the bloodstains found on Yarbrough's shoes and clothing established a positive match with Hamby's blood. DNA tests of blood traces found on the "Uncle Henry" knife established that a mixture of Hamby's and Yarbrough's DNA was present on the blade of the knife.

Forensic analysis of the bloodstain patterns on Yarbrough's clothing supported the conclusion that they were consistent with a spray of blood resulting from trauma. An expert testified that the bloodstains on the lower front of Yarbrough's shirt were made "in close proximity to the trauma that released the blood." Several shoeprints found in the store were identified as having been made by Yarbrough's shoes, including those near the circuit box, behind the counter, and in the bloodstains near Hamby's head. Police also recovered Rainey's boots and identified prints found near Hamby's feet and in the living quarters as having been made by these boots.

Yarbrough I, 258 Va. at 353-55, 519 S.E.2d at 603-05.

## II. Procedural Background

Subsequent to petitioner's June 26, 1998 conviction and initial sentence of death on the capital murder charge, petitioner noted his appeal. On Yarbrough's first direct appeal his convictions on both capital murder and robbery were affirmed as was his life sentence on the robbery conviction, whereas petitioner's death sentence was vacated and the matter was remanded for a new penalty determination hearing on the capital murder conviction. Yarbrough I, 258 Va. at 374, 519 S.E.2d at 616.[1] Following the second penalty phase proceeding, on June 1, 2000, the jury again recommended a sentence of death and the court imposed such sentence. On petitioner's second direct appeal, the sentence of death was affirmed. Yarbrough v. Com., 262 Va. 388, 399, 551 S.E.2d 306, 312 (2001) ("Yarbrough II"). After a subsequent request for a rehearing was denied, Yarbrough petitioned the United States Supreme Court for certiorari; on

---

[1] The remand was due to the trial court's failure to instruct the jury that petitioner would not be eligible for parole if he was sentenced to life imprisonment.

May 13, 2002, such petition was likewise denied.  Yarbrough v. Virginia, 535 U.S. 1060 (2002).

On July 12, 2002, petitioner filed his first state habeas which was dismissed by the Supreme Court of Virginia on May 29, 2003.  Yarbrough v. Warden, No. 021660, at 5 (Va. May 29, 2003) ("Yarbrough III"); (FAP 000117).[2]  On June 30, 2003, Yarbrough filed a petition for a rehearing which was granted on January 7, 2004, by the Supreme Court of Virginia in light of Wiggins v. Smith, 539 U.S. 510 (2003), an intervening United States Supreme Court decision recognizing that defense counsel's failure to present mitigation evidence during a capital sentencing proceeding may amount to ineffective assistance of counsel.  Following remand, on March 16, 2004, the Mecklenburg County Circuit Court held an evidentiary hearing and thereafter submitted its findings to the Supreme Court of Virginia, indicating that although Yarbrough established that his trial counsel had rendered constitutionally deficient performance, Yarbrough was unable to establish resulting prejudice.  Yarbrough v. Warden, No. 021660, at 20 (Va. Cir. Ct. May 6, 2004) ("Yarbrough IV"); (FAP 000449).  On March 3, 2005, the Supreme Court of Virginia affirmed the lower court's finding that petitioner was not prejudiced by counsel's penalty phase representation and dismissed Yarbrough's state habeas petition. Yarbrough v. Warden of Sussex I State Prison, 269 Va. 184, 197, 609 S.E.2d 30, 38 (2005) ("Yarbrough V").  Subsequent to the denial of a rehearing, Yarbrough's execution was scheduled for June 24, 2005.

On June 17, 2005, following Yarbrough's notice of intent to file a federal habeas petition, this court entered an order staying petitioner's execution and granting him ninety days to file his federal habeas petition.  On September 15, 2005, the petitioner filed his federal habeas petition

---

[2] The citation "FAP 000117" is the bates stamp number on the appendix to Yarbrough's federal habeas petition.  Hereinafter, citations to this opinion and others not readily available will include a pinpoint cite to petitioner's federal appendix for ease of reference.

and the respondent thereafter filed a Rule 5 answer and motion to dismiss.  On December 6, 2005, petitioner filed his response in opposition to respondent's motion to dismiss as well as a "Motion for Funds for Forensic Testing and Expert Assistance"; respondent timely filed a response in opposition to petitioner's motion.

After examining the record, Yarbrough's habeas petition, and all associated filings, on September 5, 2006, Judge Stillman entered his comprehensive R&R, concluding that all of Yarbrough's federal habeas claims should be dismissed with prejudice and that a certificate of appealability should be denied; likewise, the R&R recommends denial of the motion for funds for expert assistance.  After affording petitioner adequate time to review the Magistrate Judge's detailed findings and file objections thereto, as well as permitting respondent to file a reply, the R&R is now ripe for review by this court.  The court, having reviewed all pertinent portions of the bulky record, makes de novo determinations with respect to the portions of the R&R to which objections were filed, and here, petitioner objects to nearly every finding made by the Magistrate Judge.  After conducting the appropriate review, this court adopts the R&R, with comments and slight modifications, reaching the same ultimate conclusions that petitioner's federal habeas petition be dismissed with prejudice and that his request for expert funds be denied.[3]  This court does, however, grant petitioner a certificate of appealability on his ineffective assistance claim regarding DNA evidence, discussed thoroughly below in Part IV(D).

### III. Standard of Review

#### A.  Procedural Default

As explained in the R&R, a federal court may not entertain a claim advanced in a federal

---

[3] Pursuant to 28 U.S.C. § 636(b)(1), the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge.

habeas petition unless the petitioner complied with the applicable state procedures and exhausted state remedies with respect to such claim.  28 U.S.C. § 2254(b); Clagett v. Angelone, 209 F.3d 370, 378 (4th Cir. 2000).  To qualify as "exhausted," claims must be "fairly presented" to the state court, meaning that petitioner must have presented "both the operative facts and the controlling legal principles."  Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (citations omitted).  Although all of Yarbrough's claims were exhausted in state court, claims fairly presented to the state court may nevertheless be deemed "procedurally defaulted" and barred from federal habeas review if the state court denied such claims pursuant to an "adequate and independent state ground."  Burket v. Angelone, 208 F.3d 172, 184 (4th Cir. 2000); see Harris v. Reed, 489 U.S. 255, 260 (1989) ("This Court long has held that it will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision.").  Without such rule, federal habeas proceedings would offer state prisoners the opportunity to undermine the state's enforcement of its own laws.  Coleman v. Thompson, 501 U.S. 722, 731 (1991).  Under Virginia's state procedural rules, "claims that are not presented at trial generally cannot be presented on direct appeal"; likewise, claims not raised on direct appeal "generally cannot be raised in state habeas proceedings unless petitioner also raises an ineffective assistance of counsel claim in the habeas proceedings"; finally, "claims not raised in an initial state habeas petition cannot generally be raised in subsequent state habeas petitions." Clagett, 209 F.3d at 378-79.

A petitioner on federal habeas review may overcome the bar prohibiting consideration of claims deemed procedurally defaulted by establishing: (1) "cause" for the default; and (2) "resulting prejudice"; or, in the alternative, by establishing that a "fundamental miscarriage of

justice" will result.  Clagett, 209 F.3d at 379; see Coleman, 501 U.S. at 750 ("We now make it

explicit: In all cases in which a state prisoner has defaulted his federal claims in state court . . .

federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

failure to consider the claims will result in a fundamental miscarriage of justice.").  One manner

in which a prisoner can justify failing to previously raise a claim is "by proving that he was

deprived of constitutionally effective assistance of counsel."  Clagett, 209 F.3d at 379.

### B.  Ineffective Assistance of Counsel

The Sixth Amendment dictates that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.

Such right to counsel has been construed to require the effective assistance of counsel.

Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to establish a valid claim that

counsel's performance failed to meet such constitutional standard, a defendant must prove both:

(1) that defense counsel's conduct fell below an objective standard of reasonableness; and (2)

that defendant suffered prejudice as a result of his attorney's deficient performance.  Strickland,

466 U.S. at 687-91; Clagett, 209 F.3d at 380.

Turning to the first prong of Strickland, "there exists a strong presumption that counsel's

conduct was within a wide range of reasonably professional conduct, and courts must be highly

deferential in scrutinizing counsel's performance."  Kratsas v. United States, 102 F. Supp. 2d

320, 322 (D. Md. 2000).  Furthermore, evaluating counsel's conduct in retrospect requires that

"every effort be made to eliminate the distorting effects of hindsight . . . and to evaluate the

conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  Such deferential

standard "appreciate[s] that counsel may choose a trial strategy from within a wide range of

acceptable strategies." <u>Clagett</u>, 209 F.3d at 380.

The second prong of <u>Strickland</u>, requiring "prejudice," turns on whether a defendant establishes a "reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different." <u>Strickland</u>, 466 U.S. at 694.  A reasonable probability that the result would be different exists if the alleged error "undermine[s] confidence in the outcome." <u>Id.</u>  In applying the two part <u>Strickland</u> standard, a reviewing court need not make a determination concerning the attorney's performance under the first prong where it is clear that no prejudice would result even if the attorney's representation had been deficient. <u>Id.</u> at 697.

### C.  The AEDPA Standard on Federal Habeas Review

If a claim has not been defaulted, or if a petitioner overcomes a prior default, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides the governing standard for determining whether a federal habeas claim should be granted.  28 U.S.C. § 2254(d). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Applying such standard, the United States Supreme Court has clarified: "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000).  Likewise, the Fourth Circuit has

explained:

> [A] state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.". . . [A] state court decision unreasonably applies clearly established federal law if, despite correctly identifying the governing legal principle, it "unreasonably applies that principle to the facts of the prisoner's case."

Burch v. Corcoran, 273 F.3d 577, 583 (4th Cir. 2001) (quoting Williams, 529 U.S. at 413).

Accordingly, when considering the merits of petitioner's habeas claims, this court must afford the state court's decisions the "benefit of the doubt," including "both the state court's legal conclusions and its factual findings."  Lenz v. Washington, 444 F.3d 295, 299 (4th Cir. 2006); see also Bell v. Cone, 543 U.S. 447, 455 (2005).

## IV.  Petitioner's Objections to the R&R

### A.  Claim One: Ineffective assistance based upon trial counsel's failure to investigate and present mitigating evidence

Petitioner's first claim is that his trial counsel provided ineffective assistance by failing to adequately investigate petitioner's personal background.  Petitioner's federal habeas petition and objections to the R&R indicate that such claim has two parts.  First, petitioner argues that the Supreme Court of Virginia unreasonably applied the United States Supreme Court precedent set forth in Rompilla v. Beard, 545 U.S. 374 (2005), Wiggins v. Smith, 539 U.S. 510 (2003), and Williams v. Taylor, 529 U.S. 632 (2000) and that the R&R failed to fully address the merits of such claim.  Second, petitioner argues that the state court made unreasonable determinations of the facts in light of the testimony presented at the evidentiary hearing conducted on March 16, 2004.  As set forth below, petitioner's objections to the R&R are overruled.

### (1) Unreasonable Application of Rompilla, Wiggins, and Williams

The court summarily rejects petitioner's allegation that the state court incorrectly applied Strickland, Rompilla, Wiggins, and Williams by comparing the facts of such cases with the facts of Yarbrough's case in a checklist fashion.  Although, it is clear that the Supreme Court of Virginia compared the instant record to the facts of Wiggins and Williams, a complete reading of the opinion reveals that such comparison was merely for illustrative purposes and petitioner's attempt to establish error by highlighting the court's comparison ignores the opinion's express justification for its ruling.  Yarbrough V, 269 Va. at 200-01, 609 S.E.2d at 39-40.  Tellingly, the opinion not only properly sets forth the applicable rule that "[i]n determining prejudice, we 'reweigh the evidence in aggravation against the totality of available mitigating evidence,'" id. at 200, 609 S.E.2d at 39 (quoting Wiggins, 539 U.S. at 534), but the court properly applied such rule by comparing the newly advanced "mitigation evidence concerning Yarbrough's childhood home life," such as his mother's crack addiction, with the "evidence in aggravation at Yarbrough's second penalty phase proceeding," such as the fact that the victim's wounds suggested an attempted decapitation and the victim was left to slowly bleed to death which may have taken as long as 15 minutes.  Id. at 200-01, 609 S.E.2d at 39-40.  It is therefore readily apparent that Yarbrough has failed to set forth an unreasonable application of United States Supreme Court precedent.

### (2) Unreasonable Determination of the Facts

Petitioner's objections to the R&R categorize numerous factual determinations made by the Virginia courts as "unreasonable determinations of fact" in light of the record.  The court reviews de novo each of Yarbrough's objections to the R&R's findings.

### (a) Testimony of Dorian Jenkins and Anthony Riley was not credible

After independently reviewing the transcript of the evidentiary hearing conducted on

11

March 16, 2004, and the Supreme Court of Virginia's opinion affirming the Circuit Court's findings, this court concurs with the Magistrate Judge's conclusion that it was not unreasonable for the state courts to deem the testimony provided by Dorian Jenkins ("Jenkins") and Anthony Riley ("Riley") not to be credible.[4]  Although petitioner's objections to the R&R highlight some confusion regarding whether Jenkins and Riley's testimony was corroborated by other evidence, the record reveals that some portions of such testimony were plainly corroborated, while other portions were not only uncorroborated, but were directly contradicted by other testimony. Furthermore, when testimony from witnesses who were adults during Yarbrough's youth is compared to that of Jenkins and Riley, who were between four and nine years old when the pertinent events occurred, the discrepancies are generally a matter of degree.  For example, while all witnesses acknowledge that Yarbrough's mother and other adults used drugs in the petitioner's home, the adult witnesses all characterized their drug use as hidden as best as possible from the children, occurring while the children were at school, napping, or required to remain upstairs, whereas Riley's testimony indicates that petitioner and Riley "would often be sent to go retrieve [marijuana]" from a dresser or were told "[g]o get my joint out of the ashtray" and that Riley remembers seeking cocaine around the house when he was only six or seven and that the young children could relate to razor blades and mirrors with powder on top at such a young age based on "seeing things depicted on television" (March 2004 Evidentiary Hearing Tr. 231-33) ("Evid. Hearing Tr."); (FAP 000363-65).  Similarly, while Yarbrough's mother testified that the children, including petitioner, were required to stay upstairs in their room while the adults used drugs in the basement, Jenkins and Riley characterized such episodes more akin to

---

[4] Jenkins, petitioner's half-sister, and Riley, petitioner's cousin, were both children when the events that were the subject of their testimony occurred.

jailhouse lockdowns where the children had to urinate in a soda bottle or urinate on themselves

for fear of leaving their room and if they did try to enter the basement they would "have got [sic]

popped, smacked, punched you know, for –that was like trespassing" (Evid. Hearing Tr. 237,

253-56); (FAP 000369, 000385-88).  Although drug use and keeping the children upstairs and

away from such drug use is plainly a consistent strand across all the witnesses' testimony,

thereby in a sense "corroborating" the testimony of Jenkins and Riley, the degree of mistreatment

and neglect presented by Jenkins and Riley, who were young children at the time of the relevant

events, was not corroborated and in many instances contradicted by adults, including petitioner's

mother, who if anything had a motive to exaggerate the negative character of past living

conditions in order to improve her son's chances of avoiding a death sentence.

This court does not have the benefit of hearing the live testimony presented at the

evidentiary hearing; however, as a trial court it recognizes the importance of weighing the

credibility of not only witnesses' words, but also the manner in which they conduct themselves

on the witness stand.  That being said, merely reading the cold transcript of Riley's testimony

supports the state court's finding that his testimony appeared exaggerated.  Likewise, although

the majority of Jenkins' testimony appears genuine,[5] even if Jenkins was testifying to what she

believed was the truth, such testimony related to events occurring when she was only four or five

years old and it was plainly reasonable for the state court to question the accuracy of such

testimony, especially in the face of conflicting testimony from adult family members who

themselves may have the motivation to exaggerate neglect.  Furthermore, although this court may

have interpreted the testimony differently if presiding over the evidentiary hearing, it is not

---

[5] Jenkins testimony was genuine enough such that Yarbrough's trial counsel stated under oath that he wished he had called her to testify at Yarbrough's sentencing hearings (Evid. Hearing Tr. 299); (FAP 000431).

within the province of this court to substitute its opinion for that of the Virginia courts.  Frye v. Lee, 235 F.3d 897, 903 (4th Cir. 2000) (finding that a federal court may not grant habeas relief merely because a state court decision was erroneous or incorrect).  Rather, this court must only consider whether the state courts' decisions giving little weight to the testimony of Jenkins and Riley are reasonable in light of the evidence.  Based on an independent review of the transcript of petitioner's evidentiary hearing, nothing suggests that the Virginia courts' factual determinations are unreasonable.

### (b) Supreme Court of Virginia mischaracterized the findings of the trial court

Petitioner next finds fault with the Supreme Court of Virginia's finding that the trial court rejected the testimony of Jenkins and Riley as incredible and "made its findings of fact based on the remaining evidence received at the habeas hearing."  Yarbrough V, 269 Va. at 200, 609 S.E.2d at 39.  Although petitioner is correct that at one point in the trial court's recommendation, the court explained that Yarbrough failed to establish Strickland prejudice even if the testimony of Jenkins and Riley was construed as true, such alternative finding does not alter the fact that the trial court appears to have generally rejected such testimony as unreliable.  A complete reading of the recommendation reveals that a reasonable construction of the court's "findings of fact" was that both Jenkins and Riley's testimony was "troublesome," and should be dismissed as unreliable.  As a result, the Supreme Court of Virginia's acceptance of the trial court's "findings of fact" and decision to give no weight to Jenkins and Riley's testimony is both consistent with the trial court's findings and this court's independent review of the transcript.  Therefore, petitioner is unable to establish that the Supreme Court of Virginia's opinion was premised upon an unreasonable determination of the facts in light of the record.

### (c) Yarbrough's mother did not provide adequately for him after she admitted

14

_____ **her addiction to crack and she did not curtail her crack use**

Petitioner's next two claims contend that the evidence does not support the Supreme Court of Virginia's findings that Lorraine Mitchell ("Mitchell"), Yarbrough's mother, at times provided adequately for Yarbrough and that Mitchell did not use drugs regularly after she admitted her drug addiction.  After independently reviewing the transcript of the evidentiary hearing, the court adopts the Magistrate Judge's finding that the state court was not unreasonable for making such determinations.  Turning to the record, although there was ample evidence before the trial court indicating that petitioner's mother was a serious drug addict for a period of years and that she repeatedly relapsed after admitting her drug problem, there was also testimony indicating that after her addiction was at its worst and she for a time lost both her daughter and her son, she worked hard to fight her addiction and was thereafter relapsing rather than consistently using crack on a daily basis as she had in the past (Evid. Hearing Tr. 114-18); (FAP 000247-51).  Specifically, Mitchell testified that when she started using crack she was a "functional" addict and still taking care of her daily responsibilities as a housewife and mother that was meeting the needs of her children (Evid. Hearing Tr. 113); (FAP 000246).  As Mitchell's drug use worsened, her appearance deteriorated as did her housekeeping, bill paying, and frequency of cooking dinners for the children (Evid. Hearing Tr. 150-51); (FAP 000283-84).[6]

However, Willis Jenkins, Dorian Jenkins' father who lived with Mitchell and Yarbrough from approximately 1980-1987, indicated under oath that he helped care for petitioner, had a good

---

[6] Mitchell admits that her "dysfunctional" stage lasted for years and that she was abusing crack almost daily; however, both Mitchell and others testified that even during her dysfunctional period her children had shelter, food, and clothing (Evid. Hearing Tr. 107-08, 111, 203-04); (FAP 000240-41, 000244, 000336-37).  Likewise, although Mitchell's failure to pay her electricity bill at times left her home without power, Mitchell and her children often stayed at her mother's house during such times (Evid. Hearing Tr. 110-11); (FAP 000243-44).

relationship with him, and that both Dorian Jenkins and the petitioner had food to eat and a place to live (Evid. Hearing Tr. 155-57); (FAP 000288-90).  Similarly, Yarbrough's grandmother testified that the children always had food and that she checked up on the children to make sure they were doing alright (Evid. Hearing Tr. 203-04); (FAP 000336-37).  Willis Jenkins further noted that even after Mitchell's crack abuse worsened she took care of the children "on and off" (Evid. Hearing Tr. 159); (FAP 000292).

Mitchell admitted to the court that when she "hit rock bottom," struggling with severe addition, Willis Jenkins removed Dorian Jenkins from Mitchell's home (Evid. Hearing Tr. 79-80); (FAP 000212-13).  Likewise, Mitchell and Yarbrough's father agreed to send petitioner, age 10 or 11, to Illinois to live with his brother (Evid. Hearing Tr. 78-79); (FAP 000211-12).  Petitioner was only in Chicago for about a  year as losing Dorian permanently, and losing Yarbrough for a year, was a "wake up call" that made Mitchell work toward getting her life back together (Evid. Hearing Tr. 84-85); (FAP 000217-18).  Although petitioner admits that she did not beat her addiction at such time, she once again became "functional" and Yarbrough's father was willing to let him return from Illinois after only a year because Mitchell was looking like herself again and it at least appeared that she had stopped using drugs (Evid. Hearing Tr. 113-115, 180-81); (FAP 000246-48, 000313-14).  Further testimony from Mitchell indicated that on several occasions she sought help from both her family and counselors and that after moving to the Eastern Shore, she was working outside the home and even saving some of the money that she earned (Evid. Hearing Tr. 84-85, 122); (FAP 000217-18, 000255).  Although Mitchell admits that during Yarbrough's teenage years she was still battling her addiction which was "a struggle every day," she indicated that her son moved back in with her when she was living on the Eastern Shore because they both wanted to be together (Evid. Hearing Tr. 121-24); (FAP 000254-57).

Considering the testimony set forth above, the court finds that the Virginia Supreme Court was not unreasonable for concluding that petitioner's mother adequately provided for him at times and that after Mitchell admitted her addiction and started trying to beat it, she took better care of petitioner and abused crack less regularly.  Petitioner's mother freely admitted her crack use over the years and the severity of such use, and the state court was not unreasonable in reaching the challenged conclusions.

### (d) Prison counselor's testimony was not "personal background" information

Yarbrough next claims that the state court was unreasonable for classifying the testimony of petitioner's prison counselor as "personal background" information.  As stated in the R&R, such claim does not allege that the trial court made an unreasonable finding of fact, but instead is better characterized as arguing that the state court placed an unreasonable label on an undisputed factual finding.  First, the label placed on such evidence is both reasonable and accurate as the prison counselor's testimony suggested that Yarbrough would not misbehave in prison were the jury to sentence him to life imprisonment.[7]  Second, even if inaccurate, here, the label is largely irrelevant as the Circuit Court, the Supreme Court of Virginia, the federal Magistrate Judge, and this court's findings all turn not on whether petitioner's counsel was ineffective for failing to present any "personal background" information, but rather, whether such failure prejudiced petitioner.  Thus, even if this court disagrees with the state court's characterization of such evidence and concludes that, similar to Wiggins, defense counsel presented absolutely no personal background information and that such failure amounts to constitutionally deficient

---

[7] Petitioner argues that his prior conduct involving caring for his younger sister is mitigating personal background information, yet he argues that prior good conduct in jail is not mitigating information about his personal background; the court sees little distinction between the two.

performance, Yarbrough's claim nevertheless fails as he is unable to establish the prejudice prong of <u>Strickland</u>.

### (e) State court failed to address or consider significant evidence presented by Yarbrough at the evidentiary hearing

Petitioner's final factual argument contends that the state courts failed to consider certain evidence presented at the evidentiary hearing and that the Circuit Court merely recounted portions of witnesses' testimony rather than making factual findings.  Although petitioner is correct that the Circuit Court could have more effectively stated its "findings of fact" and avoided both conclusory statements and simply repeating excerpts from the record, such unartful statements nevertheless reflect the Circuit Court's factual findings and summarize the testimony that it found compelling.  The Supreme Court of Virginia adopted such findings, indicating that although "Yarbrough faced periods of privation and neglect . . . [and] often cared for himself and his sister," he was "not physically or sexually abused as a child . . . [and] no mitigation evidence . . . show[ed] that Yarbrough has a diminished mental capacity."  <u>Yarbrough V</u>, 269 Va. at 200-01, 609 S.E.2d at 39-40.  After reviewing the record de novo, the court finds, first, that the state court's findings of fact were reasonable in light of the record because although it is clear that petitioner had a rough childhood, the evidence also established that Yarbrough always had a roof over his head, food to eat, and a mother and grandmother that cared for him.  Second, Yarbrough is unable to advance anything beyond conclusory statements to suggest that the state court's unartful summary of the facts equates to ignoring evidence.  Although the transcript from the evidentiary hearing plainly reveals that Yarbrough was neglected at times, the state court adequately addressed such claim, and its findings of fact and conclusion that petitioner failed to establish <u>Strickland</u> prejudice are not "unreasonable" in light of controlling Supreme Court

precedent.  As a result, petitioner's objections to the R&R relating to the state courts' factual findings are overruled.

### B.  Claim Two: Jurors Woodson and Bugg were stricken in violation of Batson

As set forth in detail in the R&R, at Yarbrough's second sentencing hearing, the Circuit Court appears to have concluded that defense counsel established a prima facie showing that the Commonwealth exercised its peremptory strikes in violation of Batson v. Kentucky, 476 U.S. 79 (1986), as 60% of the venire members who were the same race as petitioner were struck from the panel.[8]  As a result of such finding, the state prosecutor proffered a race-neutral justification for each of the three peremptory strikes exercised to remove African-American jurors from the qualified jury pool.  Petitioner now challenges the removal of two of the three jurors originally challenged, Melvin Woodson and Virginia Bugg.  Although petitioner acknowledges that his claim with respect to juror Bugg is defaulted, he argues that such default occurred as a result of ineffective assistance of counsel.[9]

---

[8] In Matthews v. Evatt, 105 F.3d 907 (4th Cir. 1997), the Fourth Circuit explained the Batson framework as follows:

> First, the opponent of the challenge has to make out a prima facie case of discrimination.  Second, if a prima facie case of discrimination is made, the burden then shifts to the proponent of the challenge to come forward with a neutral explanation for the challenge. . . .  Third, if parts one and two are satisfied, the trial court must then decide whether the opponent of the strike has proved 'purposeful discrimination.'  The ultimate burden always rests with the opponent of the challenge to demonstrate purposeful discrimination.

Id. at 917.  Here, the Circuit Court did not expressly state that a prima facie case was made; however, the court asked the prosecutor to respond to the defendant's Batson challenge and the Commonwealth then proffered race-neutral justifications for its strikes; thus, this court presumes that the Circuit Court concluded that defendant had in fact established a prima facie case.

[9] The court adopts the R&R's conclusion that petitioner's Batson claim with respect to juror Bugg and petitioner's challenges to the reasonable doubt instruction and prosecutor's closing argument are procedurally defaulted; however, the court addresses such claims as petitioner contends that the claims were defaulted due to ineffective assistance of counsel.

### (1) Juror Woodson

Petitioner contends that Melvin Woodson ("Woodson"), an African-American juror, was improperly removed based upon his race.  Briefly recounting the facts, upon motion by the defense, the court required the prosecution to present a race-neutral justification for utilizing a peremptory strike on juror Woodson.  The prosecution initially offered two explanations: first, that it was troubled by the way Woodson was looking at the defendant in court; and second, that it was unable to hear Woodson's response to defense counsel's final question but was aware that the topic involved race and based on the Commonwealth's perception of defense counsel's reaction, the prosecution concluded that Woodson's sympathies lied with the defendant (May 30, 2000 Sentencing Tr. 331-32).[10]  After hearing such justifications, the court cleared up the confusion regarding Woodson's response to the final voir dire question and the Commonwealth conceded that such response did not suggest that Woodson's sympathies lied with the defendant (Sentencing Tr. 333-34).  However, after being permitted to reconsider its strike, the prosecution chose not to withdraw it, then indicating to the court that Woodson's occupation as a teacher suggested that his sympathies may lie with the defendant.[11]

After conducting a de novo review of the transcript, the court concludes that the Virginia courts did not unreasonably apply United States Supreme Court precedent nor make an

---

[10] Yarbrough's second sentencing hearing spanned three days, from May 30, 2000, until June 1, 2000.  The transcript of such hearing is not included in the bound Joint Appendix and will be referred to hereinafter as "Sentencing Tr."

[11] The Magistrate Judge's R&R declined to even consider the second stage of petitioner's Batson challenge, indicating that the prosecution successfully met its burden by explaining its initial reasons for striking Woodson.  Although such conclusion may be correct, this court considers both the first stage and the second stage of the Batson challenge as the Commonwealth was granted a brief recess to reconsider its strike in light of new information regarding Woodson's response to the final voir dire question and if at that point the Commonwealth did in fact violate Batson, it appears to the court that Yarbrough would be entitled to relief.

unreasonable factual determination in finding that the strike of juror Woodson did not violate

Batson.  First, as dictated by the United States Supreme Court, the Supreme Court of Virginia

properly afforded significant deference to the trial judge's findings as "findings in the context [of

a Batson challenge]. . . largely will turn on evaluation of credibility, [therefore] a reviewing court

ordinarily should give those findings great deference."  Batson, 476 U.S. at 98.  Second, because

the instant facts involved a two stage Batson challenge, the state courts properly considered all of

the prosecution's justifications for striking Woodson.  In the first stage of the Batson challenge,

the prosecution explained that its concern was first aroused by the manner in which Woodson

was looking at the defendant and that such concern was multiplied when the prosecution

misheard and misinterpreted a response given by juror Woodson; the fact that the court also had

difficultly hearing Woodson's response to the final question lends credence to the

Commonwealth's proffered race-neutral justification.  Although this court would have handled

matters differently if unable to hear a potential juror's responses to voir dire questions, it cannot

deem the state court's factual and credibility determinations as "unreasonable" merely because

such court failed to ask Woodson to repeat himself.

In the second stage of the Batson challenge, the prosecution was again permitted the

opportunity to either seat or strike Woodson and the Commonwealth persisted in its decision to

strike him, relying on Woodson's occupation as a teacher.  Although petitioner attempts to

characterize the "teacher" justification as being suggested by the court, such claim

mischaracterizes the record as the court did not suggest that Woodson's occupation was a

permissible reason to strike him, but rather, the court merely referred to Woodson as "the

teacher" as a means to differentiate him from the other jurors.  Furthermore, the prosecution's

increased concern about the potential for undue sympathy because petitioner was a teenager and

Woodson a teacher appears natural in light of the preceding conversation where the court,

defense counsel, and even the court reporter referenced Woodson as a teacher.[12]  In addition to

Woodson's occupation, the way that Woodson looked at the defendant during the voir dire

remained a viable "race-neutral" justification accepted by the court that was in the best position

to judge the credibility of the attorneys.  As a result, neither the Circuit Court in so ruling, or the

Supreme Court of Virginia in affirming such ruling, unreasonably applied United States Supreme

Court precedent or reached a factual determination that was unreasonable based upon the record.

Petitioner is therefore unable to establish a <u>Batson</u> violation with respect to juror Woodson.

### (2) Juror Bugg

Petitioner's <u>Batson</u> challenge involving the Commonwealth's strike of Virginia Bugg

("Bugg"), an African-American juror, does not allege that Bugg was stricken based upon her

race, but rather, contends that the prosecution hatched a scheme where it intentionally avoided

utilizing a well justified strike for cause, retaining Bugg on the qualified jury panel knowing that

she would be removed with a peremptory strike; such scheme was not targeted at Bugg but was

allegedly intended to avoid seating Emma Blakeney ("Blakeney"), an African-American juror

that the prosecution lacked an adequate basis for striking.[13]  To clarify, petitioner acknowledges

---

[12] Furthermore, although the prosecution did not <u>rely</u> on Woodson's occupation during the initial stage of the <u>Batson</u> challenge, the transcript suggests that Woodson's occupation was always a concern to the prosecution as the first time the court mentioned Woodson's occupation, prior to clarifying the response to the final voir dire question, the Commonwealth immediately attempted to explain its concern about such fact but was cut off by the court (Sentencing Tr. 332).

[13] As explained in greater detail in the R&R, potential jurors were interviewed in panels of three and each individual not stricken for cause was seated on the qualified pool.  Once the qualified pool reached twenty-four jurors, the attorneys stopped interviewing potential jurors and exercised their peremptory challenges to whittle down the pool to twelve jurors and two alternates.

that the Commonwealth had a race-neutral reason to strike Bugg, but claims that it utilized such valid reason in a deceitful manner in order to accomplish the equivalent of striking Blakeney, a potential juror that the prosecution did not have a race-neutral reason for striking. Petitioner's novel claim with respect to the alleged scheme faces an additional hurdle as such claim has been defaulted and petitioner must therefore establish both cause and prejudice to succeed on such claim; Yarbrough attempts to do so by establishing ineffective assistance of counsel.

Petitioner's Batson claim involving jurors Bugg and Blakeney fails for three reasons. First, as discussed in the R&R, the protections offered by Batson have not been extended by the Supreme Court to those individuals that are not stricken from the jury pool. Here, the prosecution never struck Blakeney; rather, the qualified pool of twenty-four jurors was simply filled before Blakeney's opportunity to join the pool arose. Because petitioner offers no legal support for his creative argument that a Batson violation may be established in such a manner, petitioner is unquestionably unable to establish that defense counsel was deficient for failing to preserve such a novel legal theory. Second, even if seating one juror to avoid qualifying another is legally sufficient to establish a Batson violation in narrowly defined circumstances, here, the prosecution offers a race-neutral and reasonable justification for its actions; namely, that the prosecution was not aware of Bugg's mental deficiencies until after she was seated on the qualified pool. The petitioner offers no evidence suggesting that the prosecution had such information when it failed to move to strike Bugg for cause; thus, petitioner has no evidence other than conjecture that a "scheme" existed and therefore cannot establish a Batson violation and certainly cannot establish ineffective assistance for failing to preserve such argument. Third, on these facts, the scheme alleged by petitioner is plainly fantastic as even if the prosecution was aware of juror Bugg's mental capacity issues from the outset, to succeed in the alleged scheme

the prosecution would need to prophesy that by retaining Bugg, a member of jury panel nine, it would be able to avoid seating Blakeney, a member of jury panel thirteen who missed being seated on the qualified pool by only one position.  In order to predict such outcome, the prosecution would have had to foresee all the individuals in panels ten, eleven, twelve, and thirteen that would be stricken based on challenges for cause advanced by both the defense and the Commonwealth.  Based on the forgoing, it is readily apparent that petitioner is unable to establish an unreasonable application of the facts or United States Supreme Court precedent; it is even more evident that petitioner fails to establish ineffective assistance for failure to preserve a meritless and fantastic allegation in support of which petitioner only offers conjecture.

### (3) Objection to the R&R's legal analysis

In addition to petitioner's <u>Batson</u> claims discussed above, Yarbrough challenges the legal analysis set forth in the R&R because the Magistrate Judge recommends dismissal of petitioner's <u>Batson</u> claims even though the R&R concludes that the Supreme Court of Virginia incorrectly relied on the "teacher" justification and "appeared to conflate the requirements for making the prima facie case (step 1 of <u>Batson</u>) with the requirements for determining if a proffered race-neutral justification is a pretext for discrimination (step 3 of <u>Batson</u>)."  <u>Yarbrough v. Johnson</u>, No. 2:05cv368, 2006 WL 2583418, at *16 (E.D. Va. Sept. 5, 2006).[14]  After conducting a de novo examination of the record, this court concurs with the resolution recommended in the R&R; however, this court's conclusion is predicated on alternative analysis as a careful examination of both the Supreme Court of Virginia's September 2001 and May 2003 opinions reveals that the

---

[14] The R&R recognized that the state court misapplied federal law but then concluded that such misapplication is irrelevant because the ultimate result was not unreasonable.  This court takes no position on such analysis as it recognizes alternative grounds for dismissing Yarbrough's <u>Batson</u> claim.

state court reasonably applied the pertinent United States Supreme Court precedent.

First, the portion of the September 2001 opinion addressing the removal of juror Woodson was properly deferential to the trial court as is required by Supreme Court precedent when a Batson challenge turns on a credibility determination.  See Hernandez v. New York, 500 U.S. 352, 365 (1991) (discussing the deference owed to the trial judge when re-evaluating alleged discriminatory intent because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province") (citations omitted). Likewise, the Supreme Court of Virginia properly presumed a prima facie showing of purposeful discrimination and then required the Commonwealth to proffer a race-neutral justification for striking juror Woodson; nothing about such application of Batson was unreasonable.  Yarbrough II, 262 Va. at 395, 551 S.E.2d at 310.  Additionally, as discussed above, this court concludes that it was reasonable for the Supreme Court of Virginia to consider Woodson's occupation in reviewing the trial court's Batson analysis as such justification was plainly relevant to the second stage of the Batson challenge.

Second, the portion of the May 2003 opinion addressing juror Bugg properly applies the only Supreme Court precedent that it need reach, that is, whether petitioner established both deficient performance and prejudice under the Strickland standard.  Yarbrough III, at 5; (FAP 000121).  Because petitioner's claim with respect to juror Bugg was procedurally defaulted, any Batson analysis performed by the Supreme Court of Virginia, whether correct or incorrect, reasonable or unreasonable, is irrelevant as the court properly concluded that petitioner failed to establish either cause or prejudice as "[n]othing in the record supports the conclusion that the prosecutor's use of a peremptory strike to remove juror Bugg was a pretext for racial discrimination."  Id.  To clarify, as there is nothing in the record to suggest that the prosecution's

actions were racially motivated, defense counsel's prior decision to abandon such claim cannot possibly be deemed outside the "wide range of reasonably professional conduct." Kratsas, 102 F. Supp. 2d at 322.  Additionally, any claim of prejudice stemming from counsel's failure to pursue such argument is undermined by both the fact that Bugg's mental capacity was grounds for a strike for cause and the fact that Batson's protections do not likely extend to juror Blakeney because she was never struck from the jury pool.  As a result, because the Supreme Court of Virginia reasonably applied Strickland, the controlling United States Supreme Court precedent that eliminated the need to reach the merits of petitioner's Batson claim, any analysis regarding the merits of such claim is inconsequential, even if flaws exist.  Accordingly, after a de novo review, this court rejects petitioner's claim that the Supreme Court of Virginia's decision was contrary to, or involved an unreasonable application of, clearly established federal law as such court properly applied Strickland, concluding that petitioner "satisfies neither the 'performance' nor the 'prejudice' prong of the two-part test enunciated in Strickland." Yarbrough III, at 5; (FAP 000121).

### C.  Claim Three: Misrepresentations at trial regarding the burden of conviction

Petitioner's next claim argues that Yarbrough's constitutional rights were violated because the jury was mislead about the applicable burden of proof.  Specifically, Yarbrough challenges both the trial court's reasonable doubt instruction and the prosecution's comments during closing arguments regarding the definition of "beyond a reasonable doubt."  Although Yarbrough concedes that such arguments are procedurally defaulted, he purports to overcome such default by establishing ineffective assistance based upon counsel's failure to object.

### (1) Ineffective Assistance: Failing to object to the reasonable doubt instruction

The Magistrate Judge, after examining the jury instruction at issue and several cases discussing reasonable doubt instructions, determined that because the instruction offered by the court was proper, defense counsel need not have objected and certainly could not be considered ineffective for failing to object, even if such instruction was not ideal.  Although petitioner obviously doesn't agree with such conclusion, petitioner offers little in the way of an objection to such finding.  As a result, this court adopts the finding of the Magistrate Judge, noting that the trial court's instruction was not a self-composed instruction confounding the standard of proof, but rather, was Virginia Model Jury Instruction No. 2.100 which concluded with the explanation: "A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case" (Joint Appendix 1146-47);[15] see O'Dell v. Com., 234 Va. 672, 698-99, 364 S.E.2d 491, 506 (1988) (rejecting the defendant's claim that the reasonable doubt instruction identical to the instant instruction was improper, stating: "We find this language properly balanced the instruction as to what constitutes proof beyond a reasonable doubt . . . [and] the trial court did not err in granting this instruction").  Although Yarbrough's trial counsel certainly had the ability to lodge an objection to such model instruction and argue that portions of it were imprecise, counsel's failure to object to such approved model instruction in no way suggests deficient performance; likewise, Yarbrough does not establish prejudice.

### (2) Ineffective Assistance: Failing to object to prosecutor's burden of proof remarks

In addition to Yarbrough's challenge to the court's jury instruction, petitioner alleges that trial counsel was ineffective for failing to object to the prosecutor's explanation of reasonable

---

[15] The four volume bound "Joint Appendix" including pleadings and orders, transcripts, and trial exhibits, will be cited hereinafter as "Joint App."

doubt during closing arguments.[16]  After reviewing the R&R and the trial transcripts, it is

apparent that the R&R mistakenly relied upon the transcript from petitioner's second sentencing

hearing, whereas petitioner's habeas claim alleges misstatements occurring at petitioner's trial.[17]

The analysis below is based on a de novo review of the transcript of petitioner's <u>trial</u>.

Notably absent from petitioner's habeas petition or objections to the R&R is a detailed

discussion aimed at establishing that petitioner's counsel was ineffective for failing to object to

the prosecutor's burden of proof remarks.  Rather, although Yarbrough concedes that the merits

of his claim are procedurally defaulted, he purports to overcome such default by merely stating,

in conclusory fashion, that prior counsel was ineffective; after making such unsupported claim,

petitioner jumps right into the merits of his admittedly defaulted claim.  After spending

significant time reviewing the transcript of both the Commonwealth's and defense counsel's

closing arguments, it is apparent that defense counsel's conduct was "within [the] wide range of

reasonably professional conduct."  <u>Kratsas</u>, 102 F. Supp. 2d at 322 (D. Md. 2000).

The transcript from Yarbrough's trial plainly reveals that, in light of the prosecutor's

---

[16] During closing, the prosecutor appears to have attempted to demystify the term "beyond
a reasonable doubt" by explaining that such term has "everyday usage" and that "[b]eyond a
reasonable doubt asks for nothing more and nothing less than simply an application of your
common sense to what you heard from the evidence" (Joint App. 1156-57).  The prosecutor goes
on to state: "If after applying your common sense to what you heard from the testimony of the
witnesses you believe the defendant is guilty of the offense, then the Commonwealth has proven
that to you beyond a reasonable doubt" (Joint App. 1157).

[17] Subsequent to both petitioner's and respondent's filings in response to the R&R,
petitioner's habeas counsel sent a letter to this court highlighting the R&R's mistaken reliance on
the incorrect transcript.  The respondent thereafter objected to such letter, contending it was an
impermissible attempt to advance additional objections.  The court, however, directly addresses
the miscites not because they were highlighted in a letter, but because the court's thorough
review of R&R and record reveals the miscites, and it is this court's obligation to review the
proper transcript in order to determine whether petitioner's trial counsel was ineffective for
failing to object to the prosecution's comments.

questionable statements, mounting an objection was permissible, and maybe even preferable; however, defense counsel instead chose to clarify and correct such questionable statements during his closing argument and such tactic was also permissible.  See Clagett, 209 F.3d at 380 (recognizing that courts "must not permit hindsight to distort [the] assessment of counsel's performance, and . . . must appreciate that counsel may choose a trial strategy from within a wide range of acceptable strategies").  First, to counter the Commonwealth's statements, defense counsel explained to the jury that "if you conclude that somebody is probably guilty of a crime, you have not found him guilty beyond a reasonable doubt" (Joint App. 1175).  Second, defense counsel explained the reality that "[w]e don't have [a] very good instruction on this.  Proof beyond a reasonable doubt is a pretty hard concept to grasp" (Joint App. 1188-89).  Defense counsel then set forth several examples attempting to illustrate what a high standard the jury was called on to apply, suggesting that to convict beyond a reasonable doubt the jurors needed as much evidence as they would require "to make a very important decision in [their] own life," such as the decision to buy a home, or have a baby or adopt a child knowing that they would "have this youngster's life in [their] hand" (Joint App. 1189-90).  Defense counsel also indicated that, as he had explained during voir dire, the defendant is presumed innocent and the prosecution must prove the defendant's guilt to such a degree that the jurors are confident with their decision and can "go home and get a good night's sleep and look at [themselves] in the mirror tomorrow morning" (Joint App. 1191-92).  Third, defense counsel indicated that the juror's decision would extend beyond Yarbrough's trial and that it was up to the jury to "keep the standard high" because anyone, the jurors or their friends or family, could be falsely accused and "[i]f anybody stands trial in the country, we want the standard to be high as the law demands it. Proof beyond a reasonable doubt is a high standard, and the prosecution has to have brought you

29

up there. . . .  We want the standard to stay high for ourselves, for all of us" (Joint App. 1192).

Fourth, at the conclusion of defense counsel's closing, he states: "You will not hear from me

anymore.  [The prosecutor] gets to make closing arguments, and that is fair. . . . [because] [t]he

burden upon him is so heavy, so great, that the law allows him a second closing argument" (Joint

App. 1196).

Following defense counsel's extensive closing remarks regarding reasonable doubt, the

jury did hear from the prosecutor again; however, although the prosecutor countered numerous

points raised by the defense, and although the prosecutor again asked the jury to use its common

sense when weighing the evidence, the rebuttal made no attempt to redefine reasonable doubt nor

state that the standard set forth by defense counsel was too high.  Accordingly, after considering

the totality of the statements made by both the court and counsel during opening statements,[18]

jury instructions,[19] and closing arguments, petitioner is unable to establish that defense counsel

---

[18] Prior to opening statements, the court explained that the lawyers "are not witnesses,
they're not here to testify . . [s]o what they say to you is not to be considered by you as
evidence"; rather, the lawyers are there to "marshal the evidence" and the jurors should not  "take
what they say as being the gospel" (Joint App. 716-17).  Furthermore, the court stated that
"[a]fter all the evidence has been presented to you, then I will give you certain instructions of law
that apply to this case" and that after such instructions of law the lawyers would make closing
arguments (Joint App. 718) (emphasis added).  Similarly, near the beginning of the
Commonwealth's opening statement, the prosecutor stated:
> And then next are the instructions.  And these are instructions of typewritten
> pages that are given by the Court, by the judge, that you will have an opportunity
> to take with you into the room and study them.  And they tell you what the law
> says.  They will be critical to you because you'll want to follow them.  And they
> will instruct you on how to handle the evidence and how to look at it.
(Joint App. 724) (emphasis added).

[19] At the conclusion of the evidence the court explained:
> [W]e have reached the point in this trial now where all the evidence is in, and the
> Court will now give you the instructions of law that apply to this case.  I'm going
> to read them to you at this time, but then you will have them to take with you of
> course when you retire to the jury room for your deliberations in this case.
 (Joint App. 1146) (emphasis added).  The court concluded its instructions by explaining that

was ineffective for failing to object to the prosecution's closing argument.  Although the prosecution's reasonable doubt comments may have temporarily muddled the Commonwealth's burden of proof, taken in context with defense counsel's closing argument that focused extensively on the prosecution's onerous burden, defense counsel's performance was not deficient because he opted to counter the prosecution's remarks rather than lodge a formal objection.  Because defense counsel's strategic decision is not outside of the wide range of acceptable professional conduct, petitioner's claim is procedurally defaulted and therefore dismissed.

### D.  Claim Four:  Ineffective Assistance for failing to seek funds to hire a DNA expert and/or mount a more significant challenge to the prosecution's forensic evidence

Petitioner's next claim, and the strongest in his federal habeas petition, is that petitioner's trial counsel was ineffective for unreasonably failing to subject the Commonwealth's DNA evidence to virtually any scrutiny.  Specifically, petitioner contends that defense counsel failed to request public funds in order to subject the physical evidence to independent testing, hire a DNA expert to testify on Yarbrough's behalf, or hire a consulting expert to help defense counsel mount a more educated attack on the Commonwealth's expert (Federal Petition 115, 118).  Although, on these facts, defense counsel's failure to request funds to hire a DNA expert was plainly below average, constitutionally deficient performance "is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance."  Griffin v. Warden, Maryland Correctional Adjustment Center, 970 F.2d 1355, 1357 (4th Cir. 1992).  As discussed at great length below, the court is unable to declare

---

"these are the instructions that the Court gives you, and you will now listen to the arguments of counsel" (Joint App. 1152).

petitioner's trial counsel's performance to be constitutionally deficient because petitioner is unable to establish that he had a particularized need for expert assistance; likewise, petitioner has failed to establish prejudice resulting from trial counsel's mistakes.

### (1) Standard of Review

Before reaching the merits of petitioner's claim, the court must first address the proper standard of review for this claim, and after reviewing the R&R, this court adopts the Magistrate Judge's conclusion that the proper standard is de novo.  Tellingly, neither petitioner nor respondent objected to the Magistrate Judge's conclusion that the Supreme Court of Virginia's denial of Yarbrough's state habeas evidenced a failure to squarely address Yarbrough's ineffective assistance claim on the merits; therefore, this court declines to disturb such finding.

In addition to the R&R's conclusion, an alternative justification for conducting a de novo review is that the Supreme Court of Virginia's adjudication of Yarbrough's ineffective assistance claim "resulted in a decision that was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(2).  Notably, Yarbrough's state habeas petition sets forth specific challenges to the Commonwealth's DNA evidence by highlighting testing that yielded partial or inconclusive results and by identifying specific items that should have been tested, such as "material from the wound on the victim's neck" which according to lab notes may be a hair (50-page State Petition 22-25).  The Supreme Court of Virginia rejected such claims with minimal analysis, stating in conclusory fashion that Yarbrough "failed to allege any facts that would suggest that counsel's performance was inadequate . . . [and] failed to show a particularized need for the assistance of an independent expert or that he was prejudiced by the lack of expert assistance."  Yarbrough III, at 8-9; (FAP 000124-25).  Because little rationale was articulated, this court "must independently review the record and the applicable law" to determine if the state's result "contravenes or

unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented."  Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000) (emphasis added).[20]  After conducting such examination, it is plain that Yarbrough's state habeas petition expressly identifies alleged deficiencies in DNA results and additional items to be tested and that both allegations are supported by the record; however, the Supreme Court of Virginia concluded that petitioner "failed to allege any facts that would suggest that counsel's performance was inadequate . . . [and] failed to identify the items that were not tested by the Commonwealth or how testing of those items would disprove petitioner's guilty [sic]."  Yarbrough III, at 8-9 (emphasis added); (FAP 000124-25).  De novo review is therefore proper for this individual claim as the state court's findings were based upon an unreasonable determination of the facts in light of the evidence presented.

In performing a de novo review of Yarbrough's DNA claim, the legal standard this court must apply is the familiar standard for effective assistance articulated in Strickland v. Washington, 466 U.S. 668, 686 (1984).  Applying such standard to a federal habeas petition in a capital case, the Fourth Circuit recently explained:

> To demonstrate inadequate performance, [the petitioner] "must show that counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms."  To demonstrate prejudice, [the petitioner] "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Emmett v. Kelly, 474 F.3d 154, 160 (4th Cir. 2007) (quoting Strickland, 466 U.S. at 688, 694).

### (2) Applicability of the ABA Guidelines

Although the court adopts the R&R's conclusion with respect to the de novo standard of

---

[20] This court's independent review must still apply the "deferential provisions of § 2254(d)" because a summary dismissal "is no less an 'adjudication' of the merits of the claim." Bell, 236 F.3d at 158.

review, the court disagrees with the R&R's finding that petitioner's references to the ABA Death

Penalty Guidelines are procedurally defaulted.[21]  Petitioner's failure to previously raise the ABA

Guidelines as the appropriate benchmark of defense counsel's performance is undisputed;

however, because such Guidelines are not a "controlling legal principle," petitioner's failure to

cite the Guidelines in his state habeas petition does not bar this court from considering them.

Furthermore, as discussed in more detail below, even if petitioner failed to reference the ABA

Guidelines in his federal habeas petition, this court would nevertheless consider them sua sponte

in evaluating counsel's performance.

It is well settled that in order for a claim to be properly advanced in a federal habeas

petition such claim must be "fairly presented" to the state court, meaning that petitioner must

have previously presented "both the operative facts and the controlling legal principles."

Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (citations omitted).  Here, Yarbrough

unquestionably presented all the operative facts in conjunction with his state habeas petition by

advancing a complete transcript of his trial and both sentencing hearings as well as the factual

assertion that his counsel failed to obtain a DNA expert to aid in investigating/challenging the

Commonwealth's forensic evidence (50-page State Petition 22-26).  As for the "controlling legal

principle," Yarbrough's state habeas petition alleged that under Strickland, the controlling United

States Supreme Court precedent, his counsel provided ineffective assistance.  The state court

plainly had a full and fair opportunity to apply the operative facts to the controlling legal

principle as it was tasked with analyzing defense counsel's performance and determining whether

---

[21] The full title of the 1989 ABA Death Penalty Guidelines is: "American Bar Association Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases."  The revised edition, dated February of 2003, shares the same title except that "Defense" is inserted before the word "Counsel."  Hereinafter, such Guidelines will be referred to generally as the "ABA Death Penalty Guidelines," "ABA Guidelines," or "Guidelines."

such performance fell below the threshold that distinguishes effective assistance from

constitutionally ineffective assistance.  Without advancing additional facts or an alternative legal

justification, petitioner now asks this court to conduct the identical analysis tasked to the state

court; however, petitioner supplements his prior argument by pointing to the ABA Death Penalty

Guidelines as an aid in defining the effectiveness threshold.  Thus, petitioner's citations to the

Guidelines do not represent a new legal theory, but rather, merely highlight an additional source

in support of petitioner's consistent factual and legal position that by failing to request funds for

a DNA expert and failing to seek re-testing or additional DNA testing, petitioner's trial counsel

failed to perform within the wide range of professional conduct that constitutes effective

assistance.

In an attempt to illustrate the somewhat blurred distinction between advocating a new

"controlling legal principle" and advancing additional arguments or theories in support of a

previously raised controlling legal principle, the United States Supreme Court recently reached a

result consistent with Yarbrough's position, permitting a petitioner to advance additional theories

in his federal habeas petition supporting his claim of a Batson violation.  Miller-El v. Dretke, 545

U.S. 231, 241 n.2 (2005).  The Court permitted the petitioner to compare "the prosecution's

disparate questioning of black and nonblack panelists and its use of jury shuffles," because the

operative facts, the transcript of the voir dire, and the controlling legal principle, Batson v.

Kentucky, were properly advanced before the state court.  Id.  The majority further indicated that

the dissent's position "conflates the difference between evidence that must be presented to the

state courts to be considered by federal courts in habeas proceedings and theories about that

evidence."  Id.  Similarly, a treatise on federal habeas corpus practice explains:

> The legal bases for the claim urged upon the state courts must be "the substantial
> equivalent" of those relied upon in the federal petition.  The federal courts may

conclude that legal claims are not substantially equivalent if (1) they arise under
different federal constitutional provisions . . . (2) they arise under the same
constitutional provision but are logically distinct or are based on different and
unrelated lines of precedent, or (3) one claim relies on state law while the other
relies on possibly distinct federal law . . . .  <u>On the other hand, the language used
to raise a legal claim in the state courts "need not spell out each syllable" of the
federal claim. Nor does the exhaustion requirement forbid a prisoner in her federal
petition to strengthen and add additional legal support to the legal claim as
presented in the state courts.</u>

1 Randy Hertz & James S. Liebman, <u>Federal Habeas Corpus Practice and Procedure</u> § 23.3(c)(i)

(2006) (emphasis added).  As a result, here, petitioner's references to the ABA Death Penalty

Guidelines are not barred as procedurally defaulted as they do not represent a new "controlling

legal principle" or new operative facts; rather, they are an additional source that strengthens

petitioner's prior claim that his counsel failed to provide effective assistance in violation of

<u>Strickland</u>.[22]

In addition to the fact that petitioner is permitted to raise the ABA Death Penalty

Guidelines for the first time in his federal habeas petition, even if petitioner failed to make such

reference, nothing prevents this court from considering the Guidelines sua sponte as the court is

tasked with making a de novo determination of whether petitioner's counsel provided effective

assistance and such determination necessitates consideration of the prevailing norms of the

defense bar.  The appropriateness of the court's sua sponte consideration of the ABA Guidelines

is supported by the United States Supreme Court's repeated citation to ABA Guidelines as a

helpful tool for measuring counsel's performance.  <u>See</u> <u>Strickland</u>, 466 U.S. at 688 ("In <u>any case</u>

presenting an ineffectiveness claim, the performance inquiry must be whether counsel's

---

[22] Even if the ABA Guidelines represented a new "legal principle," the Supreme Court
has repeatedly indicated that the ABA Guidelines are not hard and fast rules, but are "only
guides" to determining what constitutes a reasonable defense.  <u>See</u>, <u>e.g.</u>, <u>Strickland</u>, 466 U.S. at
688.  Thus, the Guidelines cannot be deemed a new "<u>controlling</u> legal principle" as the Supreme
Court has expressly defined the Guidelines as not "controlling."

assistance was reasonable considering all the circumstances.  <u>Prevailing norms of practice as reflected in American Bar Association standards and the like,</u> e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ('The Defense Function'), <u>are guides to determining what is reasonable,</u> but they are only guides.") (emphasis added); <u>Williams v. Taylor,</u> 529 U.S. 362, 396 (2000) (citing the "ABA Standards for Criminal Justice" as support for the conclusion "that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); <u>Wiggins v. Smith,</u> 539 U.S. 510, 524 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)–<u>standards to which we long have referred as guides to determining what is reasonable.</u> ") (emphasis added) (citations omitted); <u>Rompilla v. Beard,</u> 545 U.S. 374, 387 (2005) (noting that the Supreme Court has long referred to the ABA standards as guides for measuring counsel's performance and quoting both the 1989 and 2003 ABA Death Penalty Guidelines).  Accordingly, even if Yarbrough's federal habeas petition failed to cite the ABA Guidelines, it remains appropriate for this court to rely on them as a tool to aid the court in "determining what is reasonable" and defining the "prevailing norms of practice"; questions this court must plainly reach to determine whether trial counsel provided effective assistance with respect to his handling of the DNA evidence.

### (3) Prong I of Strickland: Deficient Performance

The United States Supreme Court has construed the constitutional right to counsel to afford defendants the right to the <u>effective assistance</u> of counsel.  <u>Strickland,</u> 466 U.S. at 686.  In order to establish that counsel failed to provide effective assistance, a petitioner must first prove that his attorney's conduct fell below an objective standard of reasonableness.  <u>Id.</u> at 687-91; <u>Clagett,</u> 209 F.3d at 380.  When analyzing counsel's performance, a reviewing court must be

highly deferential as "it is all too easy for a court, examining counsel's defense after it has proved

unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."

Strickland, 466 U.S. at 689.  Therefore, in order to make a fair assessment of counsel's

performance, a reviewing court must make "every effort . . . to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time."  Id.  Because of the inherent difficulties in such

task, "a court must indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance" and recognize that there are "countless ways to

provide effective assistance in any given case."  Id.

### (a) An indigent defendant's right to public funds for a defense expert

It is well established that an indigent defendant's due process rights include the right to

the assistance of an expert to aid in his defense in defined circumstances.  Ake v. Oklahoma, 470

U.S. 68 (1985).  In Ake, the Supreme Court explained:

> This Court has long recognized that when a State brings its judicial power to bear
> on an indigent defendant in a criminal proceeding, it must take steps to assure that
> the defendant has a fair opportunity to present his defense.  This elementary
> principle, grounded in significant part on the Fourteenth Amendment's due
> process guarantee of fundamental fairness, derives from the belief that justice
> cannot be equal where, simply as a result of his poverty, a defendant is denied the
> opportunity to participate meaningfully in a judicial proceeding in which his
> liberty is at stake.

Id. at 76.  In concluding that an indigent defendant is constitutionally entitled to have a

psychiatrist appointed to aid in his defense when sanity at the time of offense is in issue, the

Supreme Court stated:

> We recognized long ago that mere access to the courthouse doors does not by
> itself assure a proper functioning of the adversary process, and that a criminal trial
> is fundamentally unfair if the State proceeds against an indigent defendant without
> making certain that he has access to the raw materials integral to the building of
> an effective defense.  Thus, while the Court has not held that a State must

> purchase for the indigent defendant all the assistance that his wealthier counterpart
> might buy, it has often reaffirmed that fundamental fairness entitles indigent
> defendants to an adequate opportunity to present their claims fairly within the
> adversary system.  To implement this principle, we have focused on identifying
> the basic tools of an adequate defense or appeal, and we have required that such
> tools be provided to those defendants who cannot afford to pay for them.

Id. at 77 (emphasis added) (citations omitted).

The constitutional analysis set forth in Ake logically extends beyond psychiatric experts, and in Husske v. Com., 252 Va. 203, 476 S.E.2d 920 (1996), the Supreme Court of Virginia established the Commonwealth's test for obtaining funds for non-psychiatric experts.[23]  The Husske opinion does not break new ground in extending the reasoning of Ake to non-psychiatric experts, but rather, borrowing from other jurisdictions, indicates that the appointment of non-psychiatric experts is only required if an indigent defendant has made a "particularized showing of the need for the assistance of such experts."  Id. at 211, 476 S.E.2d at 925.  The Virginia Supreme Court expounded upon such "particularized need" standard, stating:

> [A]n indigent defendant's constitutional right to the appointment of an expert, at
> the Commonwealth's expense, is not absolute. We hold that an indigent defendant
> who seeks the appointment of an expert witness, at the Commonwealth's expense,
> must demonstrate that the subject which necessitates the assistance of the expert is
> likely to be a significant factor in his defense, and that he will be prejudiced by the
> lack of expert assistance. An indigent defendant may satisfy this burden by
> demonstrating that the services of an expert would materially assist him in the
> preparation of his defense and that the denial of such services would result in a
> fundamentally unfair trial. The indigent defendant who seeks the appointment of
> an expert must show a particularized need: Mere hope or suspicion that favorable
> evidence is available is not enough to require that such help be provided. This
> particularized showing demanded is a flexible one and must be determined on a
> case-by-case basis. The determination whether a defendant has made an adequate

---

[23] Although this opinion repeatedly refers to the Husske standard as the "Virginia standard," the Husske opinion is not grounded in Virginia's statutes or constitution, but rather, is Virginia's construction of the federal Constitution.  See Husske, 252 Va. at 205, 476 S.E.2d at 921 (defining the question before the court as whether an indigent defendant is entitled to the appointment of a DNA expert at the Commonwealth's expense "under the Due Process and Equal Protection clauses of the Fourteenth Amendment of the federal Constitution").

showing of particularized necessity lies within the discretion of the trial judge.

Id. at 211-12, 476 S.E.2d at 925-26 (citations omitted).

Although if applied properly, the Husske standard is plainly within the rule set forth in

Ake, in some circumstances such standard appears to skate dangerously close to conflicting with

the federal constitutional requirement that indigent defendants be provided with the "basic tools

for an adequate defense"; namely, that such individuals receive the tools necessary to subject the

prosecution's evidence to "meaningful adversarial testing."  See United States v. Cronic, 466

U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is thus the right of the

accused to require the prosecution's case to survive the crucible of meaningful adversarial

testing.").  A review of Husske, and cases applying Husske, suggests that in certain scenarios an

indigent defendant can find himself in the precarious position of: (1) having no funds to hire a

defense expert necessary to subject the prosecution's evidence to meaningful adversarial testing;

and (2) being unable to obtain public funds for a defense expert as the only manner of

overcoming the onerous "particularized need" standard is for defendant to produce the expert

analysis that he is unable to afford.[24]  Although this court recognizes the very real possibility of

such scenario occurring, the particularized need standard set forth in Husske has repeatedly been

held to be within the federal constitutional standard articulated in Ake.  See Bramblett v. True,

59 Fed. Appx. 1, 9 (4th Cir. 2003) (unpublished) (recognizing that Virginia's Husske standard is

"congruent with the requirements of the federal Constitution"); Weeks v. Angelone, 176 F.3d

249, 266 (4th Cir. 1999) ("[T]he Husske rule recognizing a federal constitutional right to

non-psychiatric experts in Virginia state cases upon a particularized showing of such need adds

---

[24] See generally, Husske, 252 Va. 203, 476 S.E.2d 920; Barnabei v. Com., 252 Va. 161,
477 S.E.2d 270 (1996); Bramblett v. True, 59 Fed. Appx. 1, 9 n.9 (4th Cir. 2003) (unpublished).

to an existing guarantee of due process."); see also Page v. Lee, 337 F.3d 411, 415-16 (4th Cir. 2003) ("North Carolina's [particularized need] test, considered in the abstract, is surely a reasonable interpretation of Ake.").

Notwithstanding the sometimes onerous Husske showing that must be made in order to obtain public funds to retain a non-psychiatric expert, here, Yarbrough does not challenge the trial court's denial of public funds, but rather, challenges trial counsel's failure to even request public funds for a DNA expert.  A review of Virginia cases from both before and after Yarbrough's trial indicates that members of the Virginia defense bar representing indigent defendants frequently request, and are sometimes granted, public funds for expert assistance in both capital and non-capital cases.  See, e.g., Husske, 252 Va. at 205, 476 S.E.2d at 921 (requesting funds for DNA defense expert in non-capital trial occurring years before Yarbrough's trial); Barnabei v. Com., 252 Va. 161, 170, 477 S.E.2d 270, 275 (1996) (seeking the appointment of a forensic pathologist at the Commonwealth's expense years prior to Yarbrough's trial); Com. v. Sanchez, 268 Va. 161, 163, 597 S.E.2d 197, 198 (2004) (requesting and receiving $3,000 to obtain a DNA expert "in order to evaluate the Commonwealth's DNA evidence and the process by which it was developed" in a trial occurring a few years after Yarbrough's trial).  In order to effectively analyze Yarbrough's counsel's performance and avoid the distorting affects of hindsight, the court must consider Yarbrough's counsel's failure to request funds for expert assistance in light of the "prevailing norms" in existence at the time of Yarbrough's trial.

### (b) The ABA Death Penalty Guidelines's position on defense experts

The 1989 ABA Death Penalty Guidelines indicate that in order to qualify as lead counsel

for a capital defendant an attorney <u>should</u>[25] be "familiar with and experienced in the utilization of expert witnesses and evidence, including, but not limited to, psychiatric and forensic evidence." ABA Death Penalty Guidelines 5.1 (1989).[26]  Likewise, the "Supporting Services" section states: "The legal representation plan for each jurisdiction should provide counsel appointed pursuant to these Guidelines with investigative, expert, and other services necessary to prepare and present an adequate defense."  ABA Death Penalty Guidelines 8.1 (1989).  The most pertinent section of the 1989 Guidelines, titled "Investigation," states:

> Counsel <u>should</u> conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. . . .  The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.
> . . .
> <u>Physical Evidence</u>: Where appropriate, counsel should make a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.
> . . .
> <u>Expert Assistance</u>: Counsel <u>should secure the assistance of experts</u> where it is necessary or appropriate for:
>     A. <u>preparation of the defense</u>;
>     B. <u>adequate understanding of the prosecution's case</u>;
>     C. <u>rebuttal of any portion of the prosecution's case</u> at the guilt/ innocence phase or the sentencing phase of the trial . . . .

---

[25] The Introduction to the 1989 Guidelines states that: "'<u>Should</u>' is used throughout as a mandatory term and refers to activities which are minimum requirements."  ABA Death Penalty Guidelines, Introduction (1989) (emphasis added).

[26] Yarbrough was tried for capital murder in 1998 and at that time both <u>Ake</u> and <u>Husske</u> were decided and the ABA Death Penalty Guidelines had been in existence for nearly a decade. Although the Guideline revisions did not occur until five years after Yarbrough's trial, the 2003 Guidelines are still informative as it is likely that by 1998, closer in time to 2003 than 1989, the "prevailing norms" were somewhere in between what is expressed in the 1989 and 2003 versions of the ABA Death Penalty Guidelines.  Furthermore, although the Supreme Court of Virginia's <u>Husske</u> opinion was not issued until 1996, it appears the trial occurred sometime around 1993, indicating that several years prior to Yarbrough's trial the Commonwealth's defense bar was already requesting public funds for DNA experts.

ABA Death Penalty Guidelines 11.4.1 (1989) (emphasis added).  A subsequent section sets forth a list of issues that defense counsel should consider raising in a pretrial motion, including "access to resources which may be denied to the client because of indigency and which may be necessary in the case, including independent and confidential investigative resources . . . and expert witnesses . . . ."  ABA Death Penalty Guidelines 11.5.1 (1989).

In addition to the text of the ABA Guidelines quoted above, the commentary to the very first Guideline section, titled "Objective," explains the significant difference between defending a criminal defendant, and defending a capital defendant, stating:

> [D]eath penalty cases have become so specialized that defense counsel has duties and functions definably different from those of counsel in ordinary criminal cases. The quality of counsel's "guiding hand" in modern capital cases is crucial.  At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles and rules, and be able to develop strategies applying them in the pressure-filled environment of high-stakes, complex litigation. . . . Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, Guidelines 11.4.1(d)(7), 11.8.6(b)(8), and must be able to zealously challenge the prosecution's evidence and experts through effective cross-examination.  Utilization of experts has become the rule, rather than the exception, in proper preparation of capital cases.

ABA Death Penalty Guidelines, Commentary to 1.1 (1989) (emphasis added).  Likewise, the commentary to the "Supporting Services" section states that "quality representation cannot be rendered by assigned counsel unless the lawyers have available for their use adequate supporting services [including] expert witnesses capable of testifying at trial. . . .  [E]xperts and other supporting services are frequently vital in capital cases."  ABA Death Penalty Guidelines, Commentary to 8.1 (1989) (emphasis added).  Finally, the Commentary to the section titled "Investigation" states: "The type and amount of assistance that can or will be made available varies from jurisdiction to jurisdiction; counsel should demand on behalf of the client all necessary experts for preparation of both phases of trial."  ABA Death Penalty Guidelines,

Commentary to 11.4.1 (1989) (emphasis added).

The 2003 ABA Guidelines warrant less attention for two primary reasons.  First, as discussed supra, such Guidelines were not yet in existence when Yarbrough was tried in 1998.[27]  Second, citation to numerous sections is unnecessary because the commentary to the 2003 Guidelines expressly states that Yarbrough's trial counsel would be deemed per se ineffective under the 2003 ABA standards, which "are not aspirational [but] [i]nstead they embody the current consensus about what is required to provide effective defense representation in capital cases."  ABA Death Penalty Guidelines, History of Guideline 1.1 (rev. ed. 2003).  Most notably, the commentary to the opening section of the 2003 ABA Death Penalty Guidelines states:

> Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make extraordinary efforts on behalf of the accused. . . . With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence– whether testimonial, forensic, or otherwise—purporting to inculpate the client.  To assume the accuracy of whatever information the client may initially offer or the prosecutor may choose or be compelled to disclose is to render ineffective assistance of counsel.

ABA Death Penalty Guidelines, Commentary to 1.1 (rev. ed. 2003) (emphasis added).  Likewise, the commentary to the section titled "The Defense Team and Supporting Services," states:

> This need [for supporting services] is particularly acute in death penalty cases.  The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own.  Yet investigating a homicide is uniquely complex and often involves evidence of many different types.  Analyzing and interpreting such evidence is impossible without consulting experts –whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others.

---

[27] Although not in existence at the time of Yarbrough's trial, the revised Guidelines are still pertinent as they indicate areas that evolved over time or warranted clarification.  Notably, in Rompilla, 545 U.S. at 387, the United States Supreme Court cited as instructive both the 1989 and 2003 Death Penalty Guidelines even though the underlying trial occurred prior to 1989.

ABA Death Penalty Guidelines, Commentary to 4.1 (rev. ed. 2003) (emphasis added).

After consideration of both the 1989 and 2003 ABA Death Penalty Guidelines, it appears that the primary goal behind the Guidelines is to highlight the stark difference between death penalty cases and other criminal cases and the need for increased vigilance when representing a defendant in a capital case.  As explained by the Supreme Court: "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense . . . [as the pre-1989 ABA Guidelines] describes the obligation in terms no one could misunderstand."  Rompilla, 545 U.S. at 387.  Similarly, the 1989 ABA Death Penalty Guidelines, in existence for almost a decade at the time of Yarbrough's trial, state in terms no one can misunderstand: "Counsel should secure the assistance of experts where it is necessary or appropriate for preparation of the defense [or] adequate understanding of the prosecution's case."  ABA Death Penalty Guidelines 11.4.1 (1989) (emphasis added).

Although the Guideline provisions discussed above plainly suggest that Yarbrough's trial counsel was ineffective for failing to hire a DNA expert, the court's analysis of the Guidelines and their impact on the court's determination of the effectiveness threshold would be incomplete without stressing the fact that although the 2003 Guidelines claim that they are "not aspirational" and embody the "current consensus" about what is required to effectively defend a capital defendant, controlling caselaw, as well as the commentary to the Guidelines themselves, belies such assertion, at least with respect to obtaining public funds for independent defense experts. For example, the Commentary to section 8.1 of the 1989 Guidelines indicates that an adequate defense "requires the services of expert witnesses to testify on behalf of the client and to prepare defense counsel to effectively cross examine the state's experts" and that defense experts "are frequently vital in capital cases."  ABA Death Penalty Guidelines, Commentary to 8.1 (1989)

(emphasis added).   However, the commentary goes on to state:

> It is critical, therefore, for each jurisdiction to authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation for trial, sentencing, appeal and postconviction and to procure the necessary expert witnesses and documentary evidence.  Assigned attorneys involved in capital cases are typically provided with few, if any, resources to fund this aspect of case preparation. According to one source, the funds which states and counties provide for defense counsel are far below the amounts that would be needed even if capital trials had only one phase.  Furthermore, funds available to appointed defense counsel are <u>substantially</u> below those available to the prosecution.  This inequity is unconscionable.

<u>Id.</u>  Such language definitively establishes the aspirational nature of this aspect of the Guidelines;

tellingly, whether or not the ABA considers states' decisions to provide defense attorneys "few,

if any, resources" to hire experts to be "unconscionable," such practice has plainly been held to

be constitutional and has continued for decades.  Thus, it is clear that as much as the court may

agree with the ABA's attempt to secure more resources for the defense of indigent defendants

facing capital punishment, such aspirational goal has not yet become the constitutional standard.

Because this court is required to apply the standards dictated by the United States Supreme Court

and the federal Constitution, and not the ABA, if a trial attorney is unable to establish a

"particularized need" for a non-psychiatric expert, failure to file a motion seeking public funds

does not constitute ineffective assistance of counsel even if certain members of the bar label a

state's application of such onerous standard as "unconscionable."

### (c) Yarbrough's trial counsel's argument with respect to the DNA evidence

Turning to the facts of the instant matter, there is no question that the DNA evidence

advanced against Yarbrough was a substantial portion of the prosecution's case; notably,

Yarbrough's counsel conceded at trial that DNA was one of "two main thrusts," of the

Commonwealth's case (Joint App. 731).  Notwithstanding such fact, defense counsel did not file

46

a motion requesting funds to retain a DNA expert; rather, through his opening statement, cross-examination of the prosecution's DNA expert, and closing argument, defense counsel attempted to challenge the forensic evidence implicating Yarbrough and establish limitations with DNA testing in general, suggesting that it can only exclude people rather than definitively prove that they were the contributor of genetic material.[28]   Counsel's cross-examination of the prosecution's expert reveals defense counsel's familiarity with DNA testing, and respondent argues that such questioning proves that "trial counsel was fully prepared to deal with the testimony concerning DNA testing in the case" (Memo. in Support Mo. to Dismiss 41).   A careful review of the transcript, however, indicates the flaws with such claim as although defense counsel used scientific terms and was extremely familiar with the genetic makeup of DNA, counsel failed to understand the difference between two different methods of DNA analysis, the benefits and drawbacks of each, nor fully comprehend which testing method was utilized in this case (Joint App. 1018-22, 1033-34).   Specifically, Yarbrough's counsel's cross-examination reveals that he was primarily familiar with RFLP testing whereas the Commonwealth's forensic lab utilized PCR testing to analyze the physical evidence.[29]   The following exchange occurred as part of

---

[28] Defense counsel's argument that DNA testing could only exclude individuals rather than establish a confirmed "match" was rather unpersuasive in light of the prosecution's statistics indicating a 1 in 33 million chance that the blood found on Yarbrough's jeans was from anyone other than the victim.  However, the court must not lose sight of the fact that, in light of the Commonwealth's evidence, defense counsel was fighting an uphill battle.

[29] PCR testing and RFLP testing are two different procedures utilized in order to test physical evidence for DNA.  As compared to RFLP, PCR analysis can be utilized on a smaller sample of genetic material as well as samples that may be degraded as it involves making billions of copies of a small portion of DNA in order to type that portion of the DNA.  See Spencer v. Com., 240 Va. 78, 96, 393 S.E.2d 609, 620 (1990) (explaining that a "small quantity of isolated DNA" is processed and the "gene of interest" is "replicated or amplified" billions of times in order to permit the analyst to determine the "type" of the amplified gene).  After a DNA type has been established through the PCR or RFLP process, the results are then compared to genetic frequencies of a known population, here the Virginia felon population, and through statistical

defense counsel's cross-examination of the prosecution's DNA expert:

> Q.   Now, when you test these fragments, you wash them with a gel.  You–Wait a minute.  I'm sorry, what do you call it? The PRC process; is that right?
> A.   PCR.
> Q.   I'm sorry, that is what I had written down.  What do those letters stand for?
> A.   Actually it stands for preliminary chain reaction.  This is the process of making copies of just one area.
> Q.   But does that type of analysis provide you with these numbers that you gave us, one in thirty-three million, or do you have to do the–
> A.   Well, that provides me with the DNA type.  The information about how often you would see each of the different types or the profile as a whole is a separate part of the analysis, and that's based on other information.
> Q.   And what's that called?
> A.   I'm sorry?
> Q.   That type of analysis, is that the RFLP?
> A.   No sir. When I talk about– It's an additional step for my analysis.  First I test the sample.  I get my results, then I want to know what do these results mean.  How often would you expect to see the stain type of all of those DNA types on the pant leg of the Route 66 jeans? How often would I see that particular DNA profile if I was to go out and select somebody off the street at random?  What would be the chance that I'd find somebody else with that same type?
> Q.   Mr. Scalon, I'm sorry to interrupt, but that's not what I asked you.
> Govt: Judge I think it is because what he is asking about are the numbers which are the frequency but don't have anything to do with RFLP, which is a completely different type of testing . . .
> Q.   I deeply appreciate counsel testifying here.  My only question was is that the RFLP process. If its not, say no?
> A.   No.

(Joint App. 1018-20).  After the prosecutor's clarification, defense counsel appeared to

understand that PCR testing was utilized by the Commonwealth; however, a few pages later in

the transcript, defense counsel again indicates his minimal familiarity with PCR testing, as he

asks:

> Q.   Okay. Now when you cut these fragments, does that leave a flanking region off each end of the segment?

---

analysis, an estimate of how often such DNA profile exists in the general public is calculated.
Here, defense counsel not only confuses PCR and RFLP testing, but at one point asks whether
the second step, the statistical analysis utilizing math and not forensics, is called RFLP testing.

> A.   I think you are confusing what I did with another type of analysis called RFLP, because I don't cut DNA into fragments for PCR.

(Joint App. 1022).  Notwithstanding defense counsel's misunderstandings, later in the cross-examination, counsel makes what appears to be an important point for the defense, highlighting the limitations in the instant DNA results, asking:

> Q.   You said at one point you couldn't do all of the locations, the loci, because in some cases something interferes with making a copy of the particular locus.  What kind of things interfere, inadequate volumes or what?
>
> A.   Well, first of all if there is not enough DNA there that's present, then it could prevent people from being able to get a result or make those copies and subsequently get a result.  That's one thing.
>
> Q.   So you are talking about–This isn't if its too small of a sample?
>
> A.   That would be one way that would prevent you from getting a result.  Do you want to know of any others?
>
> Q.   Sure, if you could keep it relatively brief for my sake.
>
> A.   There can be materials that are with the stain that might prevent the PCR process from working . . . [a]nd soil actually is one thing that can cause difficulties.
>
> Q.   Okay.  Thank you.

(Joint App. 1033-34).  Although defense counsel did not further explore the topic of potential contamination and/or inadequate volumes and additional inquiry may have further undermined the Commonwealth's forensic evidence, as discussed more extensively infra in Part IV.E, virtually every cross-examination can be reviewed in hindsight and criticized for failure to ask additional questions.[30]

---

[30] The transcript excerpts indicating defense counsel's mistakes, although relevant to the court's analysis, are insufficient to establish ineffective assistance because the court must ensure that "every effort be made to eliminate the distorting effects of hindsight," Strickland, 466 U.S. at 689, and must endeavor not to scrutinize each question with the aim of highlighting a manner to improve it.  Considering the totality of defense counsel's cross-examination of the prosecution's DNA expert, the questioning, albeit flawed, constituted adversarial testing and interjected at least some doubt into the adequacy of Commonwealth's case; therefore, it does not fall outside the wide range of reasonably professional conduct.  See Cronic, 466 U.S. at 656 ("When a true adversarial criminal trial has been conducted–even if defense counsel may have made demonstrable errors–the kind of testing envisioned by the Sixth Amendment has occurred.").  The court's citation to the above "demonstrable errors" endeavors only to display the reality that

Yarbrough's trial counsel's apparent unfamiliarity with the DNA testing procedures utilized by the Commonwealth, the fact that Yarbrough was charged with capital murder, the ABA Death Penalty Guidelines, the importance of DNA evidence to the Commonwealth's case, the lack of interpretable results at certain genetic loci,[31] as well as review of capital and non-capital cases from the 1990s, all lead to the inescapable conclusion that defense counsel should have requested funds for a DNA expert.[32]  Such deficiency, however glaring, is insufficient for petitioner to establish the first prong of <u>Strickland</u>, as petitioner must establish that appointed counsel's performance was "constitutionally deficient," meaning that counsel's failure to seek expert funds must have had an impact on the trial proceedings.  To clarify, although defense counsel's performance was plainly "below-average," as discussed in great detail below, because

---

defense counsel was not fully prepared to "go it alone," and considering counsel's limitations and the numerous cases indicating the appropriateness of a motion seeking public funds, the court cannot fathom why, on these facts, defense counsel failed to request funds for a DNA expert. That being said, the question before this court, is not whether <u>high quality</u> representation would include filing such motion, but rather, whether failure to file it equates to ineffective assistance.

[31] Although the Commonwealth's forensic testing yielded interpretable results on at least nine out of ten loci tested on the blood found on Yarbrough's jeans, the blood found on the sneakers recovered behind Rainey's grandfather's house, and the genetic material found on Yarbrough's knife, the DNA results from the inside of the sneakers used to establish that Yarbrough wore the sneakers only returned interpretable results on seven of ten, two of ten, and zero of ten loci tested (FAP 000055, 000077).

[32] Although the decision whether to request funds for a defense expert is a fact specific consideration, it is always counsel's responsibility to zealously represent his client and such responsibility is even more pronounced in capital cases where the defendant's life is by definition hanging in the balance of the trial outcome.  After considering the facts and law, as well as applying common sense, this court struggles to conceptualize a situation where it would be a wise decision for a defense attorney representing an indigent defendant in a capital case relying heavily on DNA evidence to not file a motion requesting funds for a DNA expert to at least perform a preliminary investigation into testing procedures and results or to help counsel prepare for cross-examination.  <u>See</u>, <u>e.g.</u>, <u>Sanchez</u>, 268 Va. at 163, 597 S.E.2d at 198 (granting the defendant limited funds for pre-trial expert assistance).  Although a trial judge may deny such motion for failure to establish a particularized need, there is no harm in filing the motion.

Yarbrough is unable to meet the onerous "particularized need" standard set forth in Husske and its progeny, trial counsel's failure to seek public funds is legally irrelevant.  See Bramblett, 59 Fed. Appx. at 9 ("Because trial counsel could not have demonstrated an entitlement to the appointment of an expert, Bramblett cannot establish that counsel were constitutionally deficient for failing to make a request.").  Yarbrough's inability to establish a "particularized need" within Husske is, unfortunately for petitioner, not impacted by the fact that the trial transcript reveals that in every other sense of the word, defense counsel "needed" the assistance of a DNA expert.

Although the above discussion indicating a distinction between counsel's deficiencies and a "constitutional deficiency" could be misinterpreted as improperly blurring the lines between Strickland's performance prong and prejudice prong, in actuality, such analysis is best characterized as only involving the performance prong of Strickland.  Tellingly, even if a petitioner could show both that trial counsel was deficient for failing to request an expert and that petitioner had a "particularized need" for expert assistance, if upon such showing, an evidentiary hearing was scheduled and a DNA expert was appointed to aid the defendant, yet such expert's analysis thereafter bolstered the prosecution's case thereby confirming the petitioner's guilt, the habeas petition would ultimately be denied for failure to establish Strickland prejudice.  Thus, a finding that petitioner had a "particularized need" does not establish the prejudice prong, but rather, merely indicates that counsel's error was relevant as it had a potential impact on the proceedings; the question as to whether or not such potential impact was a negative impact amounting to Strickland prejudice is an entirely separate inquiry.  Accordingly, in order to establish that Yarbrough's counsel's performance was "constitutionally deficient" this court must conclude both that, on these facts, professional norms required counsel to file a motion for expert funds and that failure to file such motion had an impact on the proceedings because petitioner is

entitled to public funds.  If it is clear that petitioner has no legal entitlement to public funds, then counsel's failure to file such motion cannot have impacted petitioner's substantial rights nor amounted to constitutionally deficient representation.[33]

### (d) Petitioner's failure to establish a "particularized need" for a defense expert

The Husske standard, Virginia's construction of the rights afforded an indigent defendant by the United States Constitution, requires an indigent defendant to establish a "particularized need" for expert assistance, meaning that a defendant must show "that he will be prejudiced by the lack of expert assistance" before the Commonwealth will provide funds for such assistance. Husske, 252 Va. at 211-12, 476 S.E.2d at 925-26.  Another way to phrase the Husske standard is that a defendant must demonstrate that expert services will "materially assist" the defense and that "the denial of such services would result in a fundamentally unfair trial." Id.  In contrast, "[m]ere hope or suspicion that favorable evidence is available" is insufficient to demonstrate the requisite particularized need.  Id.; see also State v. Mills, 332 N.C. 392, 420 S.E.2d 114 (1992) (explaining the defendant's failure to make a "particularized showing" as the defendant only established that a defense expert "might help him in general at trial").

Turning to the facts of Husske, the primary issue as articulated by the Supreme Court of Virginia, was whether the indigent defendant "made the particularized showing necessary to

---

[33] Approaching the same analysis from another angle, it can be argued that counsel should not be faulted for failing to file a motion that would have ultimately been denied.  Although this court recognizes such alternative reasoning, the court disapproves of such analysis as it ignores capital defense counsel's responsibility to aggressively defend his client.  As the ABA Death Penalty Guidelines suggest, counsel should not pursue only those motions that must be granted or else run afoul the United States Constitution, but rather, counsel should seek out funds for expert assistance when the prosecution's case relies heavily on forensic evidence, especially when counsel has a limited understanding of the underlying science.  Although failure to pursue such funds will not always constitute a deficiency so great as to render counsel's performance ineffective within the dictates of Strickland, in this court's opinion, such failure on facts similar to the instant matter should not be referred to as anything other than a deficiency.

require the Commonwealth, under the Due Process and Equal Protection clauses of the

Fourteenth Amendment of the federal Constitution, to supply at its expense a DNA expert to

assist the defendant." Husske, 252 Va. at 205, 476 S.E.2d at 921.  Subsequent to a bench trial,

the defendant in Husske was convicted of, among other things, breaking and entering and rape.

Several months prior to trial, the court denied the defendant's initial motion requesting funds for

a defense expert to help challenge the DNA evidence inculpating the defendant.  Id. at 208, 476

S.E.2d at 923.  Subsequently, the defendant renewed his motion, attaching an affidavit from an

attorney who represented himself as "familiar with issues surrounding the forensic applications

of DNA technology"; the trial court again denied defendant's motion, although it did appoint the

attorney who submitted the affidavit as co-counsel for the defense.  Id.  On the day of trial, the

defendant again moved for the appointment of a bonafide DNA expert; however, such motion

was also denied.  On appeal, the defendant argued that the trial court's denial of his multiple

requests for an expert violated the federal constitutional standard articulated in Ake.  In rejecting

such argument, the Supreme Court of Virginia explained:

> [W]e are of opinion that the trial court did not err by refusing to appoint a DNA
> expert witness to assist Husske with the preparation of his defense.  As we
> previously stated, an indigent defendant who seeks the appointment of an expert,
> at the Commonwealth's expense, must show a particularized need for such
> services and that he will be prejudiced by the lack of expert assistance.  The
> defendant failed to meet these requirements.  At best, the defendant asserted, inter
> alia, that: DNA evidence is "of a highly technical nature;" he thought it was
> difficult for a lawyer to challenge DNA evidence without expert assistance; and he
> had concerns about the use of DNA evidence because "the Division of Forensic
> Science [was] no longer [conducting] paternity testing in [c]riminal cases."  The
> defendant's generalized statements in his motions simply fail to show a
> particularized need.

Id. at 213, 476 S.E.2d at 926 (alterations in original) (footnote omitted).

Similar to the argument advanced in Husske, in Barnabei v. Com., a capital case, the

defendant argued on appeal that the trial court violated <u>Ake</u> by "refusing to appoint a forensic

pathologist to assist in his defense and to rebut the medical examiner's testimony about [the

victim's] bruises and other injuries because the only evidence of rape adduced at trial was the

medical examiner's testimony." <u>Barnabei</u>, 252 Va. at 170, 477 S.E.2d at 275.  The Supreme

Court of Virginia's opinion, issued two years prior to Yarbrough's trial, rejected such claim, and

citing <u>Husske</u> explained:

> Barnabei failed to make the particularized showing that would have entitled him
> to the appointment of an expert forensic pathologist at the Commonwealth's
> expense.  At most, Barnabei hoped or suspected that an expert might testify that
> the [victim's] injuries . . . did not necessarily result from force.  A hope or
> suspicion that favorable evidence may be procured from an expert, however, is
> not sufficient to require the appointment of an expert.

<u>Id.</u> at 171, 477 S.E.2d at 276.

Likewise, in <u>State v. Mills</u>, a North Carolina capital case applying a standard similar to

the <u>Husske</u> "particularized need" standard,[34] the state Supreme Court affirmed the trial court's

denial of funds for a DNA expert.  <u>Mills</u>, 332 N.C. at 400, 420 S.E.2d at 117.  Although Mills

was sentenced to life in prison, prior to his trial, at which he was subject to the penalty of death,

defense counsel filed a motion seeking funds for a DNA expert; the motion stated:

> Defendant is informed and believes, and therefore alleges, after timely discovery
> by the State of North Carolina, that the State intends to submit the sock mentioned
> supra for special examination, to wit for DNA identification.  This is a process of
> which Defendant has as yet been unable to discuss because of, at least, the novelty
> of the process.  Defendant is in need of an expert in Deoxyribonucleic Acid
> Identification Testing so that he may adequately prepare for introduction of such
> evidence, if any, at trial.

<u>Id.</u> at 401, 420 S.E.2d at 118.  On appeal, the defendant claimed that "given the new field of

---

[34] The <u>Husske</u> opinion defines Virginia's particularized need standard in part by quoting
the standard articulated in <u>Mills</u>.

study, the fact that [the North Carolina Supreme Court] had not even ruled on the admissibility of

DNA evidence at the time of trial, and the importance of the expert testimony to the State's case"

he made a "particularized showing" requiring the appointment of an expert and that he was

denied a fair trial because his motion for expert funds was denied.[35]  Id. at 402, 420 S.E.2d at 118

(footnotes omitted).  The reviewing court rejected such argument, noting that although the

defendant's DNA claim was his strongest, the need for a DNA expert was not set forth "with the

degree of particularity required under other cases deciding this issue" because although the

defendant showed that such expert "might help him in general at trial," he demonstrated "no

more than a general desire to have an expert assist him in some vague manner in the event that

DNA evidence might be introduced at trial."  Id. at 402, 420 S.E.2d at 118-19.

＿＿＿＿＿Turning to a Virginia case decided after Yarbrough's trial, in Com. v. Sanchez, the trial

court granted the indigent defendant $3,000 for preliminary DNA testing; however, when the

defendant thereafter filed a motion seeking additional funds to enable the defense's expert to

testify at trial, the court denied such motion, citing the defendant's failure to establish a

particularized need.  Sanchez, 268 Va. at 163-64, 597 S.E.2d at 198-99.  The Supreme Court of

Virginia explained:

> A review of Sanchez' proffer reflects that it rests only on conclusory assertions;
> nothing in his proffer is particularized.  He represented to the trial court "that
> there were errors in the way that the DNA procedures were followed . . . which
> could have had a significant impact in the results of the DNA."  Sanchez' counsel
> then stated, again in conclusory fashion, " therefore the DNA results that the
> Commonwealth is going to put forth as being scientifically valid could be
> questioned, will be questioned, to an extent."  These statements are not
> "particularized" because they indicate nothing more than Sanchez' "hope or

---

[35] Mills is an example of a state Supreme Court decision finding that defense counsel's
failure to understand the science behind DNA evidence, even when such science was still in its
infancy, is an insufficient justification for the appointment of a DNA expert.

suspicion" regarding the availability of evidence favorable to him with respect to the DNA test results and procedures.

As a result, the trial court was left only to guess whether the unknown, unexplained potential testimony of Sanchez' expert would be a significant or material factor in his defense and, consequently, whether the lack of that testimony would prejudice Sanchez.  His proffer makes no attempt to explain what particular procedural defects Sanchez' expert's review uncovered or in what particular respect the Commonwealth's expert was in error.  The trial court could not have known, nor can we discern from the record, whether the alleged errors pertained to the use of PCR analysis or simply whether the calculation of the probability of finding a DNA match should have been one in 2.7 billion instead of 2.8 billion.  When viewed in this light it is clear the proffer was unspecific and speculative and therefore not a showing of particularized need.  The conclusory statements of trial counsel, although made by an officer of the court, are insufficient to meet the Husske standard.

Id. at 166, 597 S.E.2d at 200 (alterations and emphasis in original).

Even more analogous to the facts of the instant matter, in Bramblett v. True, an unpublished opinion, the Fourth Circuit affirmed the district court's dismissal of the petitioner's federal habeas petition advancing a claim almost identical to Yarbrough's, namely, that trial counsel was constitutionally ineffective for failing to even request funds for a defense expert. Bramblett, 59 Fed. Appx. at 9.  Explaining why such argument failed, the Fourth Circuit explained:

Because trial counsel could not have demonstrated an entitlement to the appointment of an expert, Bramblett cannot establish that counsel were constitutionally deficient for failing to make a request.  Under Virginia law, which is congruent with the requirements of the federal Constitution, an indigent defendant is entitled to "the basic tools of an adequate defense," which may sometimes include appointed experts.  Virginia does not appoint experts whenever requested, however.  Rather, an indigent defendant bears the burden of demonstrating that the appointment of an expert "would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial."  Importantly, "[m]ere hope or suspicion that favorable evidence is available" is not sufficient.  Because Bramblett offers only bare allegations and speculation to support his claim, he has failed to make the showing necessary to establish entitlement to the appointment of an expert.

Id. (quoting Husske, 252 Va. at 211-12, 476 S.E.2d at 925) (emphasis added).  In a footnote

following the passage cited above, the Fourth Circuit rejected the defendant's claim that he was

unable to demonstrate the need for an expert without the assistance of an expert as "to accept this

argument would be to relieve Bramblett of the burden of making any showing that expert

assistance was necessary to assist in the preparation of his defense."  Id. at 9 n.9.

Considering a capital case from outside the Fourth Circuit with facts similar to the instant

matter, in Hinojosa v. Dretke, an unpublished federal habeas opinion from the Western District

of Texas, the district court came to the "inexorable conclusion that the state habeas court's

rejection on the merits of [the DNA] aspect of petitioner's ineffective assistance complaints was

both eminently reasonable from a factual standpoint and wholly consistent with federal law."

Hinojosa v. Dretke, No. SA-01-CA-136-RF, 2004 WL 2434353, at *10 (W.D. Tex. Sept. 30,

2004) (unpublished).  In Hinojosa, the petitioner argued on federal habeas review that his trial

counsel violated Strickland by failing to: "(1) adequately prepare for the prosecution's DNA

evidence, (2) adequately cross-examine the prosecution's DNA expert witness, (3) object to the

admission of the DNA evidence, (4) obtain a ruling on the defense's pretrial motion to exclude

the DNA evidence, (5) request a hearing outside the jury's presence on the admissibility of the

DNA evidence, (6) voir dire the prosecution's DNA expert outside the jury's presence, and (7)

present favorable DNA evidence."  Id. at *9.  Both the state and federal court rejected such

habeas claims even though the defendant presented a DNA expert at his state habeas proceeding

who was "critical" of the testing laboratory's failure to report a result for a certain DNA allele,

suggested that the evidence indicated that "a gel had shifted" during DNA testing, suggested that

"over-amplification could produce inaccurate test results," and was critical of the lab's failure to

have at least two individuals "actually sign off on test results."  Id.  The state habeas court's

rejection was based upon the conclusion that "at best, the testimony of petitioner's DNA expert at the state habeas hearing furnished a basis for impeaching the prosecution's DNA expert at trial." Id. at *10.  Likewise, the federal district court concluded:

> At best, petitioner presented the state habeas court with evidence suggesting that there was evidence available at the time of petitioner's trial which could have been used to criticize the record-keeping undertaken by Lab Corp in connection with its DNA testing in petitioner's case.  However, at no time did petitioner present the state court with any fact-specific allegations, much less any evidence, showing that the test results obtained by Lab Corp . . . were inaccurate.

Id. at *12 (emphasis added).

Turning to the facts of the instant matter, although Yarbrough's trial counsel never requested funds for a DNA expert, even at this stage in the proceedings with the aid of habeas counsel, Yarbrough has failed to set forth facts demonstrating a particularized need for expert assistance.  Yarbrough's state habeas petition contends that much of the forensic evidence "was equivocal at best" and that "alternative explanations were available to explain such evidence," but offers little to support such conclusory statements (50-page State Petition 22).[36]  After summarizing the physical evidence purportedly linking petitioner to the crime, Yarbrough's state petition highlights the fact that Yarbrough's shoe size was different from the shoes he allegedly wore during the murder and that there were different statistics linking Yarbrough to such shoes

---

[36] Yarbrough's argument that the results were "equivocal" appears to argue that there were shortcomings because DNA evidence could not establish a confirmed "match."  Such claim is unpersuasive both because the Commonwealth's evidence indicated that there was only a 1 in 33 million chance that the blood found on Yarbrough's jeans was from an individual other than the victim and because both defense counsel and the prosecution's expert indicated at trial that the DNA testing used in this matter was not capable of conclusively proving that someone was a contributor.  Furthermore, the DNA evidence was not the only evidence against Yarbrough, but rather, it was utilized to corroborate the testimony of Dominic Rainey.

depending on the site tested.[37]  Petitioner next highlights the fact that although the DNA tests on

the alleged murder weapon reveal a result consistent with a mixture of Yarbrough's DNA and the

victim's DNA, no statistics were provided indicating the likelihood of such results as compared

to the general public.[38]  The bulk of Yarbrough's remaining DNA arguments are set forth below:

> Other questions remain.  For instance, genetic testing was conducted on the
> orange stocking cap found at the murder scene.  The genetic profile obtained from
> the front of the cap was consistent with a mixture of [DNA] material from the
> victim and an individual other than Yarbrough or Rainey.  Another individual at
> the scene is critical information in and of itself; also, the fact that the orange
> stocking cap was likely worn or used by someone else casts more doubt on
> Rainey's truthfulness, as he told the police that the orange cap belonged to him.
>
> While the Commonwealth's forensic scientist, Robert Scalon, indicated that
> further PCR DNA testing could be conducted on the white shirt seized from
> Yarbrough's home and the orange stocking cap found at the scene, Scalon was
> instructed by Special Prosecutor Von Schuch to refrain from conducting any
> further testing on these items.[39]  Additionally, no hair or fiber examination was
> conducted on the evidence.  Further, the medical examiner collected material from
> the wound on the victim's neck.  This material was never analyzed or compared
> with the hair fiber evidence gathered.  According to lab notes, the material may be
> hair.  While hair was collected from both Rainey and Yarbrough, no analysis was
> ever conducted to compare their hair to the material found near the victim's neck
> wound.

---

[37] The Commonwealth's expert testified that based on a swab at the tongue of the
sneakers, where seven out of ten DNA loci returned interpretable results, there was a 1 in 53,000
chance that the DNA belonged to anyone other than Yarbrough, based on a swab of the heel
where only two of ten loci returned interpretable results there was a 1 in 640 chance, and there
was no finding based on a swab of the toe where zero of ten loci returned interpretable results
(Joint App. 1011-12); (FAP 000055, 000077).

[38] Yarbrough also offers the somewhat fantastic claim that Yarbrough's mother had just
washed the jeans and shirt that were seized by the police and that there was no blood present on
either article of clothing prior to the police seizing them from Yarbrough's room.

[39] Such characterization does not appear entirely accurate as subsequent to six loci being
tested on numerous items, the prosecutor requested that four additional loci be tested on several,
but not all of the items.  After identifying the items that would undergo further testing, the
forensic report states that "no further DNA analysis will be conducted on the remaining
evidence" (FAP 000057).  Although such distinction may be subtle, it appears incorrect to state
that the prosecution told the analyst to refrain from testing any of the other items.

(50-page State Petition 24).  At no point does Yarbrough's state habeas petition offer the assertion that he had a "particularized need" for a DNA expert.

Unlike Yarbrough's state habeas petition, Yarbrough's federal petition expressly states that Yarbrough had "a particularized need for an independent expert in this matter"; however, the text following such claim fails to meet the rigorous standard set forth in Husske (Federal Petition 118).  Initially, Yarbrough's federal petition mirrors the arguments advanced in his state petition; subsequently, his federal petition sets forth several "glaring inadequacies" in the prosecution's evidence, such alleged inadequacies are: (1) the fact that only ten genetic loci were tested instead of twenty-three; (2) that the testing of several items returned interpretable results from less than all ten loci; and (3) that the "failure of all targeted loci to show up demonstrates a serious deficiency in the sample, is indicative of testing outside of well-characterized and recommended limits and denotes possible degradation or contamination of the sample" (Federal Petition 120).[40] Additionally, Yarbrough's federal petition adds the claim that the Commonwealth's expert failed to produce support for his statistical analysis regarding DNA frequencies (Federal Petition 120).

After a painstakingly thorough consideration of petitioner's state and federal habeas

---

[40] Although the R&R classifies such arguments as procedurally defaulted as they were raised for the first time in petitioner's federal habeas petition, in an abundance of caution, this court considers such claims based on the analysis set forth by the majority opinion in Miller-El, where the Court distinguished between "evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence."  Miller-El, 545 U.S. at 241 n.2.  Here, the testing of ten, rather than twenty-three loci, and the lack of interpretable results at several loci, is abundantly clear from the transcript as the Commonwealth's DNA expert discussed such facts while on the stand.  Likewise, with the exception of the unsupported claim that the lack of interpretable results are "indicative of testing outside of well-characterized and recommended limits," petitioner's claims relating to deficiencies in the samples, such as contamination, was also part of the record.  Although this court considers such claims, it reaches the same ultimate result as the R&R.

petitions, as well as uncountable hours spent scouring the record, the court comes to the "inexorable conclusion" that under the <u>Husske</u> standard, which applies the federal constitutional standard elucidated in <u>Ake</u> and is admittedly an uphill battle for an indigent defendant, Yarbrough fails to establish a particularized need for a DNA expert.  As a result, this court has no choice but to dismiss Yarbrough's claim that counsel was ineffective for failing to hire a DNA expert nor mount a more effective attack on the prosecution's evidence.[41]  Although the court acknowledges the Supreme Court of Virginia's unreasonable determination of the facts in light of the record, a de novo analysis results in the same ultimate conclusion.  Furthermore, notwithstanding the legitimacy behind Yarbrough's frustration with defense counsel's failure to seek public funds to retain a DNA expert, petitioner's arguments amount to nothing more than "mere speculation" as all of Yarbrough's newly highlighted avenues for investigation may just as easily confirm petitioner's guilt as suggest his innocence.

For example, although the forensic lab's inability to obtain interpretable results on several DNA loci may raise questions as to the quantity and quality of the DNA samples, because ten of ten loci linked Yarbrough's jeans to the victim's blood, it is more likely than not that additional

---

[41] Although defense counsel's cross-examination of the prosecution's expert indicates that trial counsel misunderstood the DNA testing procedures utilized in this case, such questioning, albeit flawed, fails to establish that trial counsel was ineffective for his "complete lack of an investigation" into DNA evidence and failure to subject that evidence to any adversarial testing. Petitioner's counsel's questions reveal both that he had researched DNA evidence and that he attempted to undermine the Commonwealth's expert.  Although defense counsel could certainly have done more, counsel's lack of understanding of the PCR testing process is insufficient grounds for the appointment of a defense expert.  <u>Husske</u>, 252 Va. at 208, 476 S.E.2d at 923; <u>Mills</u>, 332 N.C. at 401-02, 420 S.E.2d at 118-19.  Without the benefit of such expert, counsel must conduct his own research and do his best to challenge the evidence; based on the transcript, petitioner's trial counsel appears to have done just that, and thus, his performance is not constitutionally deficient.  <u>See</u> <u>Griffin</u>, 970 F.2d at 1357 (explaining that constitutionally deficient performance "is not merely below-average performance").

testing would confirm the conclusions reached by the Commonwealth's expert.  Likewise, the

fact that DNA testing technology had advanced by the time of Yarbrough's trial such that twenty-

three loci could be tested reveals nothing more than a "hope" that favorable evidence may result

if more sophisticated tests were conducted.  Furthermore, the speculation surrounding the testing

sought on the substance found in the victim's neck is undeniable as the petitioner concedes that

he doesn't even know what such substance is and can only hope that "it may be hair."  Tellingly,

even if such substance is hair, it could be the victim's or Yarbrough's hair just as easily as it

could be Rainey's hair.[42]

Petitioner's failure to advance evidence establishing improper testing protocol or

incorrect results prevents Yarbrough from demonstrating a "particularized need" for a defense

expert.  Although this court would undoubtedly prefer to see defense experts appointed almost as

a matter of course in capital cases where DNA evidence is a substantial part of the prosecution's

case, this court's aspirations cannot impact its judgment, and here, petitioner has failed to meet

the standard necessary for the appointment of an expert.  Rather, "[a]t best, [Yarbrough] asserted,

inter alia, that DNA evidence is of a highly technical nature" and that it is "difficult for a lawyer

to challenge DNA evidence without expert assistance; . . . [petitioner's] generalized statements in

his motions simply fail to show a particularized need."  Husske, 252 Va. at 213, 476 S.E.2d at

926.  Yarbrough's state and federal habeas petitions likewise "fail[] to make the particularized

showing that would have entitled him to the appointment of [a DNA expert] at the

_____

[42] Even if additional testing was ordered and the substance found in the victim's wound
was proven to be Rainey's hair, such evidence, although beneficial to Yarbrough, would not
establish Yarbrough's innocence as Rainey admits to holding the victim's hands while
Yarbrough tied him up and one of Rainey's hairs could have found its way onto the victim's
body at such time (Joint App. 890).

Commonwealth's expense.  At most, [Yarbrough] hoped or suspected that an expert might testify that" the DNA testing or findings were unreliable; "[a] hope or suspicion that favorable evidence may be procured from an expert, however, is not sufficient to require the appointment of an expert."  Barnabei, 252 Va. at 171, 477 S.E.2d at 276.  Yarbrough's habeas petition must therefore be denied, as he has, in hindsight, only established "that there was evidence available at the time of petitioner's trial which could have been used" to further question the DNA results; however, such evidence merely indicates that a defense expert could have been utilized "for impeaching the prosecution's DNA expert at trial."  Hinojosa, 2004 WL 2434353, at *10, *12 (emphasis added).  Such showing is insufficient to establish ineffective assistance as "at no time did petitioner present the state court [or this court] with any fact-specific allegations, much less any evidence, showing that the test results obtained by [the Division of Forensic Science] . . . were inaccurate."  Id. at *12.

The court's conclusion that petitioner fails to establish constitutionally deficient performance does not equate with a lack of sympathy for petitioner's legal argument and frustration with the Husske standard.  Such standard is understandably frustrating to both Yarbrough and his habeas counsel as it can create a seemingly impossible hurdle for indigent defendants, that is, a defendant must mount a sufficient challenge to the prosecution's DNA testing protocol and findings to show a true need for a defense expert, yet such challenge must be mounted in the absence of assistance from an individual capable of understanding the complex testing protocol and findings.[43]  Notwithstanding such reality, the onerous Husske standard is

_____

[43] Although it is hard to imagine that the courts of Virginia would intentionally permit the Husske standard to be applied in a manner that would deny a defendant a fair trial, this court recognizes the reality that in some circumstances, no safeguard appears to prevent an unjust result.  Tellingly, a treatise on the subject recognizes that across numerous jurisdictions

well established in both Virginia and other states, and although certain trial judges may be

inclined to grant a defendant in Yarbrough's position funds for a defense expert, doing so in this

instance would be a violation of the standard articulated in <u>Husske</u> and its progeny.  Accordingly,

even though Yarbrough's defense would have undoubtedly benefitted from a DNA expert,

Yarbrough is unable to succeed on federal habeas review as he fails to establish that the United

States Constitution <u>entitled</u> him to a DNA expert.  <u>See</u> <u>Husske</u>, 252 Va. at 211-12, 476 S.E.2d at

925 (finding that <u>Ake</u> does not require the appointment of non-psychiatric experts unless "the

denial of such services would result in a fundamentally unfair trial"); <u>Smith v. Mitchell L</u>, No.

1:03cv153-1-MU, 2005 WL 1926565, at *3-4 (W.D.N.C. Aug. 8, 2005) (unpublished) ("It has

not been brought to this Court's attention, nor is this Court aware of, any clearly established

Supreme Court precedent establishing that an indigent defendant has a constitutional right to a

[non-psychiatric] expert.").  Although Yarbrough's arguments before this court effectively

highlight the "catch-22" faced by indigent defendants, such reality is insufficient to succeed on

federal habeas review.  <u>See</u> <u>Bramblett</u>, 59 Fed. Appx. at 9 n.9 ("Bramblett maintains that his

inability to demonstrate his need for expert assistance is the result of the refusal of the district

court to appoint an expert to assist him in developing such evidence.  However, to accept this

argument would be to relieve Bramblett of the burden of making any showing that expert

assistance was necessary to assist in the preparation of his defense."); <u>Cowans v. Bagley</u>, 236 F.

Supp. 2d 841, 864 (S.D. Ohio 2002) ("[P]etitioner argues, with colorful reference to Joseph

Heller's novel, <u>Catch-22</u>, that he was prohibited from submitting evidence dehors the record

---

defendants face a "Catch-22 analysis" where it appears the courts are saying "we'll allow you to
undermine the state's expert's testimony just as soon as you undermine the expert's testimony."
BNA Criminal Practice Manual § 10:18 (2007), <u>available at</u> Westlaw: CRPMAN § 10:18.

because the state courts denied his requests for expert funds and discovery; but that the state courts denied his requests for expert funds and discovery because he failed to submit evidence dehors the record.  Petitioner's argument, however colorful, is not persuasive."); see also Smith, 2005 WL 1926565, at *3-4 (citing Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985)) (rejecting the petitioner's claim that Ake "clearly establishes" an entitlement to non-psychiatric experts and highlighting that shortly after deciding Ake "the Supreme Court declined to rule on what, if any, showing would entitle, as a matter of federal constitutional law, the defendant to the assistance of a criminal investigator, a fingerprint expert, or a ballistics expert").

Accordingly, as the Husske standard and standards similar to Husske have repeatedly been held to be within Ake and the federal Constitution, Yarbrough's ineffective assistance claim must fail as, on these facts, Yarbrough is not constitutionally entitled to the appointment of a DNA expert.  Likewise, Yarbrough's request for federal funds to hire an expert, premised in part on the inequity of the circular logic he faced in state court, must be denied as "to accept this argument would be to relieve [Yarbrough] of the burden of making any showing that expert assistance was necessary to assist in the preparation of his defense."  Bramblett, 59 Fed. Appx. at 9 n.9; see Schriro v. Landrigan, ___ S. Ct. ___, No. 05-1575, 2007 WL 1387923, at *5-6 (May 14, 2007) (recognizing that both prior to and subsequent to the AEDPA the decision of whether to grant an evidentiary hearing is "generally left to the sound discretion of district courts . . . [however,] [b]ecause the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate").  As a result, petitioner has both failed to establish that his trial counsel provided constitutionally deficient performance, as defined by the performance prong of Strickland, and failed to establish the need for an evidentiary hearing and appointment

of an expert at this stage in the proceedings.[44]

### (4) Prong II of Strickland: Prejudice

Although the court need not even reach the prejudice prong of Strickland because

petitioner failed to establish that his trial counsel's performance was constitutionally deficient,

the court briefly addresses prejudice because the petitioner concedes in his federal habeas

petition that he is unable to establish Strickland prejudice without expert funds.  Petitioner argues

that his inability to establish prejudice stems from his inability to hire an expert and petitioner

requests funds from this court for such purpose; however, this court refuses to grant petitioner

funds in an attempt to stir up evidence of prejudice when petitioner is both unable to establish

that funds would have been granted by the trial court and unable to establish that the federal

Constitution mandates the appropriation of public finds.

A review of relevant caselaw indicates that in the federal habeas cases where a petitioner

succeeds in establishing Strickland prejudice, the petitioner found a means to advance evidence,

be it expert affidavits or testimony or caselaw and scientific studies, that tended to undermine the

reliability of the prosecution's expert's testimony.  For example, in Gersten v. Senkowski, 426

F.3d 588 (2d Cir. 2005), the Second Circuit affirmed the district court's grant of a federal habeas

petition premised upon ineffective assistance based on defense counsel's failure to "consult or

call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the

---

[44] Although granting petitioner federal funds to retain a DNA expert would permit such expert to examine the evidence and/or forensic reports to opine on whether Yarbrough has a particularized need for an expert, granting such motion would ignore the procedure mandated by Virginia precedent.  Husske establishes in no uncertain terms that an indigent defendant must prove a "particularized need" for an expert prior to obtaining public funds to hire such expert. This court will not permit Yarbrough to evade such requirement by granting federal funds where state funds would be denied.  To rule otherwise would render the Virginia standard meaningless.

scientific issues." Id. at 611.  In Gersten, unlike the instant matter, both cause and prejudice were

clear as petitioner provided the federal court with affidavits from two doctors who severely

undermined the prosecution's evidence.  Id. at 599-600.  The doctors' affidavits indicated: (1)

that "none of the medical evidence corroborated the allegations of abuse or the alleged victim's

testimony"; (2) that the syndrome relied upon by the prosecution's trial expert "is no longer

regularly accepted" in the research community; and (3) that the theory advanced by the

prosecution's expert "has no scientific validity in the field." Id. at 599-601.  Such affidavits

plainly reveal why the federal district and appellate courts' confidence in the outcome of trial was

undermined as defense counsel's failure to hire an expert resulted in his failure to pursue a

defense strategy "that would likely have yielded exculpatory evidence" and counsel's failures

"precluded counsel from offering a potentially persuasive affirmative argument." Id. at 610, 612

(emphasis added).  Furthermore, it appeared to the Second Circuit that "even a minimal amount

of investigation into [the syndrome relied upon by the prosecution's expert] would have revealed

that it lacked any scientific validity for the purpose for which the prosecution utilized it." Id. at

611 (emphasis added).

Likewise, in Little v. Armontrout, 835 F.2d 1240, 1245 (8th Cir. 1987), the Eighth Circuit

reversed the district court's dismissal of a federal habeas petition as the prosecution's case relied

heavily upon an identification provided subsequent to the witness undergoing hypnosis.  In

applying a standard similar to Husske, requiring that the defendant prove that the "denial of

expert assistance would result in an unfair trial," the Eighth Circuit concluded that although

hypnosis has been "accepted as a therapeutic tool since 1958, its role in criminal investigations

and trials has remained controversial." Id. at 1244.  The court then explained the "perils of

hypnotically enhanced testimony," including: confabulation, where the subject "fills in gaps in

her memory" with information that can be "purely imagined"; suggestibility, where the subject answers in a way to please the hypnotist; and memory hardening, where "[h]ypnosis gives the subject great confidence in the memories reviewed" even if they are inaccurate, making the witness "difficult to shake under cross-examination."  Id.; see Leonard v. Michigan, 287 F. Supp. 2d 765, 776 (W.D. Mich. 2003) (granting the petitioner's federal habeas petition because a previously retained DNA expert that had withdrawn from the case had raised significant areas of controversy with the prosecution's DNA analysis; however, appointed counsel failed to rehire such expert nor hire an alternative defense expert even though the trial court granted petitioner's motion for public funds for a DNA expert); see also Miller v. Anderson, 255 F.3d 455, 457-59 (7th Cir. 2001), vacated 268 F.3d 485 (7th Cir. 2001) (granting federal habeas petition due to trial counsel's numerous errors, some more glaring then the failure to seek out defense experts, concluding that it was "irresponsible" for trial counsel not to seek out expert assistance as evidenced by the fact that postconviction counsel found several experts to testify on the defendant's behalf including a "DNA expert and a treadmark and footprint expert" that would have testified that the physical evidence did not tie the defendant to the scene of the crime).

Unlike Gersten, Little, Leonard, and Miller, here, the court has not been presented with scientific studies or caselaw indicating the "controversial" nature of  DNA testing in general nor has the court received expert affidavits or reports that lead the court to question the Commonwealth's forensic testing in this matter; rather, Yarbrough has advanced purely speculative challenges to the prosecution's evidence.  As to DNA testing in general, unlike hypnotically induced testimony, the prevalence and acceptance of DNA testing in criminal investigations has increased exponentially since the time of Yarbrough's trial, and as conceded by Yarbrough's trial counsel, even in 1998 it was a "totally valid and vital science" (Joint App.

734-35).[45]  As to the DNA results in this matter, nothing about the Commonwealth's evidence undermines this court's confidence in the outcome, because although the forensic reports reveal that certain genetic loci did not yield interpretable DNA results, there is nothing to suggest that such samples were tampered with or improperly tested; rather, the Commonwealth's DNA expert freely admitted on direct and cross-examination that contamination with substances such as dirt or the fact that samples sizes were too small could have led to the lack of interpretable results. Likewise, the ten of ten loci match between the victim's blood and the blood found on Yarbrough's jeans and the associated statistical analysis, which has not been proven inaccurate, indicates that there is a 1 in 33 million chance that such blood came from anyone other than the victim; such evidence, which Yarbrough fails to mount any cognizable challenge to on federal habeas review, severely undermines any claim of prejudice or actual innocence.[46] Although the court does not doubt that with the benefit of federally appointed funds the defense could find an expert willing to testify on Yarbrough's behalf and "raise questions" about the lack of results at certain genetic loci, petitioner's failure to articulate identifiable deficiencies with the prosecution's forensic evidence or testing protocol prevents him from establishing a "<u>reasonable probability</u> that, but for counsel's unprofessional conduct, the result of the proceedings would have been different." <u>Strickland</u>, 466 U.S. at 694 (emphasis added).[47]  Although, in hindsight, it

_____

[45] In fairness to defense counsel, his next statement after acknowledging the validity of DNA testing was that such science "starts to get weak" when DNA is applied to forensics and used as evidence at trials (Joint App. 734-35 ).

[46] Additionally, the knife alleged to be the murder weapon was found in Yarbrough's room and results from nine of ten loci were interpretable and all nine were consistent with the victim's DNA or a mixture of the victims DNA and Yarbrough's DNA.

[47] It bears repeating that DNA evidence was not the only evidence implicating Yarbrough. The DNA evidence was used to corroborate Rainey's testimony which identified Yarbrough as the killer.  Likewise, the testimony of David Thompson and Conrad Dortch established that

is plain that trial counsel could have provided a more complete defense, petitioner has failed to

allege error that undermines this court's confidence in the trial outcome.  Id.  Accordingly,

Yarbrough fails to establish Strickland prejudice.

### E.  Claim Five: Ineffective assistance for failure to more extensively impeach Dominic Rainey

A review of the R&R, trial transcripts, and the record in general reveals that petitioner's

failure to impeach claim should be summarily dismissed as petitioner is unable to establish that

the state court unreasonably applied Supreme Court precedent nor unreasonably applied the facts

to the controlling law.  Notably, petitioner fails to overcome the "strong presumption that

counsel's conduct was within a wide range of reasonably professional conduct."  Kratsas, 102 F.

Supp. 2d at 322.  A hindsight review of any cross-examination will unquestionably reveal an

opportunity to ask one more question or highlight one more point; however, in the midst of a trial

with an adverse witness on the stand, a lawyer must always make split-second decisions as to

how to best shape his questioning in order to extract the most desirable responses.  See

Strickland, 466 U.S. at 689 (explaining that a court must endeavor "to eliminate the distorting

effects of hindsight . . . and to evaluate the conduct from counsel's perspective at the time");

Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991) (rejecting petitioner's post-trial attack on

defense counsel's decision to acquiesce to the court's response to a juror's question because

petitioner's "recasting of the pros and cons of trial counsel's decision amounts to Monday

morning quarterbacking").  Here, the trial transcript reveals that defense counsel asked multiple

---

Rainey and Yarbrough were seen together both before and after the time of the murder and that
Rainey and Yarbrough, both under 21, had alcohol and a money on them after the robbery
allegedly took place; likewise, shoe prints at the crime scene indicate there were two assailants.

probing questions on cross-examination regarding Rainey's version of events and that counsel

used Rainey's responses during his closing argument in an attempt to impeach Rainey and prove

that he was a liar.[48]   Furthermore, counsel's portrayal of Rainey as a liar began as the trial began,

as defense counsel "argued" such fact during his opening statement.[49]   Considering defense

counsel's opening statement, cross-examination of Rainey, and closing argument, it is clear that

petitioner's after-the-fact attempt to establish that trial counsel's questions highlighted some, but

not all, of the potential omissions or inconsistencies in Rainey's version of events represents

nothing more than "Monday morning quarterbacking" which warrants no additional analysis

because the Supreme Court of Virginia reasonably applied Strickland and concluded that defense

counsel's performance was not constitutionally deficient.[50]

### F.  Claim Six: the death penalty as applied in Virginia is unconstitutional

Petitioner's final objection to the R&R contends that even if the instant sentencing

---

[48] Although it may have been consistent with counsel's strategy to "seize on additional evidence that Rainey was not a reliable witness" (Objections to R&R 30 n.11), just because further questioning was appropriate does not mean failure to ask such questions constitutes constitutionally deficient performance.  Furthermore, this court is not tasked with addressing whether it would, in the first instance, deem counsel's performance as deficient, but rather, addresses only whether the state court's conclusion was reasonable; here, it is plain that it was.

[49] Part of defense counsel's opening, though plainly beneficial to Yarbrough, may even have been objectionable as inflammatory or impermissible argument as defense counsel did more than merely state: "Dominic Rainey is a liar," but counsel argued: "[H]e's a nasty, vicious, lying child" (Joint App. 732).  Defense counsel further argued: "[Rainey] is a liar.  He is a self-centered young punk is what he is" (Joint App. 734).

[50] Footnote 12 of petitioner's objections to the R&R suggests that the Magistrate Judge's R&R was incomplete for failing to individually address each line of questioning that petitioner proposes in hindsight.  Although this court has carefully examined the transcript and each and every question petitioner now argues should have been asked, the court need not spell out the potential impact of every line of questioning as petitioner has established nothing more than an alternative reasonable strategy for cross examination, composed years after the trial.

proceeding was constitutional, the application of the Virginia death penalty is unconstitutional as it is applied in a random and arbitrary manner; petitioner further contends that the R&R failed to reach such claim on the merits.  After reviewing the R&R, the record, and petitioner's objections, the court adopts the reasoning and conclusion set forth in the R&R's and further rejects Yarbrough's claim that the death penalty was applied in a random and arbitrary manner in this case.

Yarbrough attempts to establish that the death penalty is randomly and arbitrarily applied in Virginia by advancing statistical studies suggesting that there are identifiable racial and geographic disparities in the application of the death penalty, as well as significantly lower reversal rates of capital sentences in Virginia as compared to other states.  Specifically, petitioner relies upon statistics provided by an ACLU report and a similar report issued by the Joint Legislative Audit and Review Commission of the Virginia General Assembly ("JLARC").[51] Considering petitioner's random and arbitrary claim de novo, this court rejects petitioner's allegation that the death penalty is unconstitutionally applied, adopting the reasoning set forth in the R&R and in Lenz v. True, 370 F. Supp. 2d 446 (W.D. Va. 2005), where the district court explained:

> The Supreme Court and the Fourth Circuit both have held that statistical information alone is insufficient to prove the types of claims [petitioner] asserts. The JLARC statistics do not prove that geographic location, race, wealth, or some impermissible review factor enters into any capital sentencing decisions, or that such circumstances were a factor in [petitioner's] particular case. "Statistics at most may show only a likelihood that a particular factor entered into some

---

[51] ACLU of Virginia, Unequal, Unfair and Irreversible: The Death Penalty in Virginia (2000), available at http://www.acluva.org/publications/deathpenaltystudy.pdf (hereinafter "ACLU Report"); Joint Legislative Audit and Review Commission, Review of Virginia's System of Capital Punishment (2000), available at http://jlarc.state.va.us/reports/rpt274.pdf (hereinafter "JLARC Report").

decisions."

Id. at 494-95 (quoting McCleskey v. Kemp, 481 U.S. 279, 308 (1987)) (additional citations

omitted).[52]  Therefore, petitioner's challenge to the constitutionality of the death penalty as

random and arbitrary must be dismissed.

## V.  Conclusion

After an exhaustive review of the expansive record, and countless hours spent researching

and considering petitioner's claims, the court **OVERRULES** the majority of petitioner's

objections; furthermore, those objections which were meritorious nevertheless fail to establish an

unreasonable application of controlling Supreme Court precedent or constitutionally ineffective

assistance of counsel.  The court therefore **ORDERS** that the petitioner's federal habeas petition

be **DENIED** and **DISMISSED** in its entirety**.**

As is evident from the length of analysis devoted to each of petitioner's claims,

petitioner's strongest argument is that he was denied the effective assistance of counsel because

appointed counsel failed to request public funds to hire a DNA expert even though Yarbrough

---

[52] Although the JLARC and ACLU studies may suggest that there is some arbitrariness in the application of the death penalty in general, statistics alone are insufficient to establish that the death penalty was unconstitutionally applied in this case.  Additionally, the diversity of conclusions that can be drawn from the same data based upon which variables are relied upon greatly reduces the usefulness of such studies in the trial context.  For example, although the ACLU and JLARC studies both examine historical Virginia death penalty statistics, the ACLU report concludes that "both the race of the offender and the race of the victim continue to be significant factors in terms of who receives the death penalty in Virginia," ACLU Report at 41, whereas the JLARC report concludes that the study's findings "clearly indicate that race plays no role in the decisions made by local prosecutors to seek the death penalty in capital-eligible cases."  JLARC Report at III (emphasis added).  An updated ACLU report released in 2003 goes so far as to have a section titled "Why the JLARC Study is Wrong"; such inconsistent findings based on the same data confirms the minimal value of such studies when conducting legal analysis.  ACLU of Virginia, Broken Justice: The Death Penalty in Virginia (2003), available at http://www.aclu.org/ FilesPDFs/broken _justice.pdf.

was facing the death penalty and DNA evidence was one of the "two main thrusts" of the prosecution's case.  Although the court acknowledges the circular logic that in some scenarios appears to create an almost impossible hurdle for an indigent defendant to overcome, it is this court's responsibility to apply the record before it to the controlling law; here, such analysis results in the conclusion that Yarbrough's inability to establish a particularized need for an expert under the Husske standard undermines his ability to establish constitutionally deficient performance under Strickland.  Additionally, petitioner concedes that he is unable to establish Strickland prejudice without the benefit of funds to hire an expert and this court **DENIES** petitioner's motion for such funds as ruling otherwise would ignore the principles of comity as petitioner has failed to either satisfy the Husske standard or establish that the Husske standard runs afoul of Ake or the United States Constitution.

Notwithstanding the court's dismissal of Yarbrough's petition and denial of his motion for expert funds, petitioner has made a "substantial showing" that counsel's failure to mount a more significant challenge to the prosecution's forensic evidence, most notably his failure to request funds for an expert, amounted to the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  Petitioner has made such showing as he demonstrated that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)); Beck v. Angelone, 261 F.3d 377, 386 (4th Cir. 2001).  Accordingly, the court **GRANTS** petitioner a certificate of appealability solely with respect to the claim addressed above in Part IV.D, alleging that defense counsel was ineffective for failing to subject the prosecution's DNA evidence to meaningful adversarial testing, including counsel's failure to request funds for a DNA expert.

See Longworth v. Ozmint, 302 F. Supp. 2d 569, 571 (D.S.C. 2004) ("While the existence of the death penalty is not in itself grounds for the grant of a certificate of appealability, in such a serious context any doubt as to whether one should issue must be resolved in the petitioner's favor."); Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000) (same).

The Clerk is **REQUESTED** to mail a copy of this Order to counsel for the petitioner and counsel for the respondent.

**IT IS SO ORDERED**.

_____
/s/
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May  30 , 2007

75